## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA

VERSUS

CHRISTOPHER G. YOUNG

CRIMINAL ACTION

NO. 16-45-JWD-RLB

## RULING AND ORDER

This matter comes before the Court on the Motion to Dismiss for Selective and Vindictive Prosecution (Doc. 11) by Defendant Christopher G. Young.  The motion is opposed. (Doc. 12.)  Evidentiary hearings were held on September 15, 2016, and October 5, 2016. (Docs. 24 & 37.)  Both parties have provided extensive post-hearing briefing. (Docs. 39, 40, 45 & 47.) Oral argument was also heard on January 6, 2017. (Doc. 48.)  The Court has carefully considered the law, evidence in the record, and the arguments of the parties.  For the following reasons, the Defendant's motion is denied.

## TABLE OF CONTENTS

I.    **Introduction and Summary of Ruling** .......................................................................5

II.   **Procedural History**...............................................................................................11

III.  **Evidence in the Record**........................................................................................17

     A.  **Individuals Relevant to this Motion** ...................................................17

     B.  **July 31, 2015—Initial Complaint** ........................................................19

     C.  **August 3, 2015—Arranging the Meeting with Ms. Wempren** .........20

     D.  **August 4, 2015—The Government Meets With Ms. Wempren for the First Time**.............................................................................21

     E.  **August 5, 2015—Galatoire's and the FBI Office** ..............................23

       1. Defendant's Lunch with Wempren ......................................23

       2. Defendant's Initial Encounter and Interview with
       the FBI Agents........................................................................24

       3. Defendant's Trip to the FBI Office and Agent Hattier's
       Alleged Inappropriate Comments ......................................29

       4. Defendant's Trip Back to Galatoire's ..............................35

F.  August 6, 2015 .........................................................................36

       1. Downie's Work on Defendant's iPhone—Extracting
       the Files and Removing the Videos .....................................36

       2. Defendant Gets His Phone Back, and Agent Soli
       Tells the Defendant That Defendant Is Not a Child
       Pornographer ........................................................................44

G.  August 7, 2015—Limited Extraction of Shantel Wempren's
   Phone .......................................................................................48

H.  Between August 7, 2015 and October 28, 2015 ....................49

       1. Videos Still on the Phone ...................................................49

       2. The Case Agent in this Investigation................................52

I.   October 7, 2015—Agent Hattier's Review of the Cell Phone ........................53

J.   October 28, 2015—The Target Letter and Hattier's Second
   Alleged Set of Inappropriate Comments to the Defendant .............................56

K.  Beyond October 28, 2015...........................................................63

       1. Defendant's Interaction with the FBI since the Target
       Letter ....................................................................................63

       2.November 5, 2015—The Meeting Between the
       Government and the Defendant's Attorneys.......................64

       3. January 5, 2016—Plea Negotiations................................68

       4. January 26, 2016—Plea Negotiations..............................68

5. February 3, 2016 – The Government's Interview with
Jessica Starns ................................................................69

6. February 4–12, 2016—Plea Negotiations ...........................69

7. Meeting Between Defense Counsel, the U.S. Attorney,
the First Assistant U.S. Attorney, and the Prosecutor .........71

8. May 12, 2016—Indictment ...........................................71

L.  Other Aspects of the Investigation  ....................................71

1. Why Not Search Other Devices? ..................................71

2. Why Not Follow Up with Other Recipients?
(And Other Inaction) ..................................................74

3. The National Center for Missing and Exploited
Children Request ......................................................79

4. The Young Girl in Costa Rica and the Legat
Request ..................................................................80

5. Did the FBI Know That Zeid Ammari Sent
One of the Videos? And More on Why the
Videos Were Not Removed .............................................83

6. DOJ Guidelines and the Policy of the U.S. Attorney's
Office for the Middle District of Louisiana ......................87

7. The Agent's Role ......................................................91

8. Similarities (or Dissimilarities) To Other Cases ...............92

9. Location of the Copy of the Phone ...............................94

IV.  Discussion ............................................................94

A.  Selective Prosecution  ..................................................94

1. Parties' Arguments ..................................................94

a.  Defendant's Original Memorandum
in Support (Doc. 11-1) ..............................................94

b.  Government's Original Opposition  (Doc. 12) ...............96

      **c.**  **Defendant's Post-Hearing Memorandum (Doc. 40)** ..............................98

      **d.**  **Government's Post-Hearing Brief (Doc. 39)** .........................100

      **e.**  **Defendant's Response to the Government's Post-Hearing Memorandum (Doc. 45)** ....................102

      **f.**  **Government's Reply to the Defendant's Post-Hearing Memorandum (Doc. 47)** ....................104

**2. Analysis** ...................................................................107

    **a.**  **Discriminatory Effect** ...............................................110

    **b.**  **Discriminatory Purpose** ..........................................118

        **i.**  **Guidelines for the DOJ And This U.S. Attorney Office** ...................................120

        **ii.**  **The Government's Initial Investigation Into the Defendant** ....................................122

        **iii.**  **Explanations for the Irregularities in the Investigation** ...............................124

        **iv.**  **Imputing Hattier's Statements to the U.S. Attorneys** ..............................127

        **v.**  **AUSA Cam Le's Meeting with Defense Counsel** ...........................................128

        **vi.**  **Evidence of Plea Negotiations** ......................129

        **vii.**  **Plain Language of the Statute** ......................130

        **viii.**  **Failure to Cooperate Is Not a Protected Right** ...............................................132

        **ix.**  **Summary** ...............................................133

    **3. Legitimate Basis for Prosecuting** ...........................133

  **B.**  **Vindictive Prosecution** ................................................134

**1. Parties' Arguments** ..................................................................134

    **a. Defendant's Original Memorandum in Support (Doc. 11-1)** ............................134

    **b. Government's Original Opposition (Doc. 12)** ........................134

    **c. Defendant's Post-Hearing Memorandum (Doc. 40)** ....................................................135

    **d. Government's Post-Hearing Brief (Doc. 39)** .........................137

    **e. Defendant's Response to the Government's Post-Hearing Memorandum (Doc. 45)** ...................................138

    **f. Government's Reply to the Defendant's Post-Hearing Memorandum (Doc. 47)** ...................................139

**2. Analysis** ..................................................................141

    **a. Standard and Summary of Ruling on This Issue** .................................................141

    **b. Presumption of Vindictiveness** ................................................142

    **c. Actual Vindictiveness** ................................................144

        **i. Agent Hattier's Statements Do Not Prove Vindictiveness** ......................................145

        **ii. Insufficient Evidence of Misconduct by the United States Attorney's Office** .............................147

        **iii. Overwhelming Case Law Demonstrates that the Defendant's Motion Should Be Denied.** ......................................148

**V.**     <u>**Conclusion**</u> ..................................................................158

**RULING**

## I.    <u>Introduction and Summary of Ruling</u>

Defendant Christopher G. Young is a local attorney and former lobbyist. Once in 2013 and again in 2015, he received two separate videos, each showing a prepubescent male engaged

in a sexual act with a donkey.  He forwarded these videos in text messages to about thirty-eight people on thirty-three separate occasions over a two-year period.  Now, Young is charged with one count of distributing child pornography and one count of possessing child pornography.

In the instant motion, Defendant argues that he was unlawfully targeted for prosecution because he refused to cooperate in a public corruption investigation and because he is a lobbyist. The Defendant claims selective and vindictive prosecution.

Preliminarily, the Court is very sympathetic to the "common sense" argument made by defense counsel at oral argument.  Agent Stephen Soli, who was the lead child pornography investigator for the FBI in this district for several years and the agent who first investigated this case, candidly testified that he told the Defendant that Defendant was not a child pornographer. This statement is entirely understandable considering the sense in which the Court believes Soli intended it and the sense in which most lay persons understand the term. Defendant received and passed on to friends a video of a minor male child having sex with a donkey, a video he did not create, search for, solicit, pay for, or share with others for purposes of his or anyone else's sexual gratification. The Government does not argue otherwise. Rather he sent the video to friends, family, and clients as a crude joke.

The Defendant testified he never thought he was distributing child pornography, and this contention seems supported by the fact that he sent the videos openly to family, friends and clients. This conduct doesn't square with the conduct of others before me charged with the same offenses, defendants allegedly surreptitiously prowling the internet and receiving hundreds or thousands of child pornographic images which are viewed and shared with other child pornographers for sexual gratification.

Defendant admits sending these two videos was a mistake. It certainly was. What he did was, by his own account, the kind of gross, juvenile, and unthinking act the Court suspects has probably been engaged in by millions (if not more) high schoolers and college fraternity boys. But the language of the criminal statutes under which he is charged contains no exemptions from criminal culpability because his purpose was not sexual gratification but, rather, to engage in locker room humor. One of these statutes carries with it a mandatory minimum of five years imprisonment if convicted. Given the seriousness of these charges and the social stigma associated with them, merely being charged can carry a heavy burden. Indeed, in this case, the Defendant testified he terminated his lobbying business and registration because he was "concerned about [his] clients" and because he didn't want to put them in an "uncomfortable situation." If he pleads or is found guilty, he may well lose his license to practice law in addition to any prison sentence he is given.

Whether to charge one with a crime and choosing the specific crime with which to charge a given defendant are decisions belonging to the prosecutor. It is an awesome power and grave responsibility, but it is one in which the Government is given very broad discretion. No matter how emphatically this Court may disagree with how the Government exercised its discretion in this case, it is powerless to affect that decision unless the Defendant is able to prove that the Government's decision was unlawful. He has not.

Critically, in *United States v. Armstrong*, 517 U.S. 456, 116 S. Ct. 1480, 134 L. Ed. 2d 687 (1996), the Supreme Court identified the core principles relevant to this issue and resolving this motion:

> The Attorney General and United States Attorneys retain " 'broad discretion' " to enforce the Nation's criminal laws. *Wayte v. United States,* 470 U.S. 598, 607, 105 S. Ct. 1524, 1530–1531, 84 L. Ed. 2d 547 (1985) (quoting *United States v. Goodwin,* 457 U.S. 368, 380, n. 11, 102 S. Ct. 2485, 2492, n. 11, 73 L .Ed. 2d 74

7

(1982)). They have this latitude because they are designated by statute as the President's delegates to help him discharge his constitutional responsibility to "take Care that the Laws be faithfully executed." U.S. Const., Art. II, § 3; *see* 28 U.S.C. §§ 516, 547. As a result, "[t]he presumption of regularity supports" their prosecutorial decisions and, "in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." *United States v. Chemical Foundation, Inc.,* 272 U.S. 1, 14–15, 47 S. Ct. 1, 6, 71 L. Ed. 131 (1926). In the ordinary case, "so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Bordenkircher v. Hayes,* 434 U.S. 357, 364, 98 S. Ct. 663, 668, 54 L. Ed. 2d 604 (1978).

*Id.*, 517 U.S. at 464, 116 S. Ct. at 1486.  Although the Government's discretion is subject to

constitutional limitations (including the ones implicated by this motion), the Supreme Court has

recognized "why courts are properly hesitant to examine the decision whether to prosecute." *Id.*,

517 U.S. at 464–65, 16 S. Ct. at 1486 (citation and quotations omitted).  The high court has

specifically stated:

> Judicial deference to the decisions of these executive officers rests in part on an assessment of the relative competence of prosecutors and courts. Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake. It also stems from a concern not to unnecessarily impair the performance of a core executive constitutional function. Examining the basis of a prosecution delays the criminal proceeding, threatens to chill law enforcement by subjecting the prosecutor's motives and decisionmaking to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy.

*Id.*, 517 U.S. at 465, 116 S. Ct. at 1486 (citations and quotations omitted).

In short, "[t]he decision as to which crimes and criminals to prosecute is entrusted by the

Constitution not to the judiciary, but to the executive who is charged with seeing that laws are

enforced." *United States v. Smith*, 231 F.3d 800, 807 (11th Cir. 2000) (citing U.S. Const. Art. II,

§ 3). "The judiciary cannot interfere with a prosecutor's exercise of charging discretion, except in

narrow circumstances where it is necessary to do so in order to discharge the judicial function of interpreting and applying the Constitution." *Id.*

Having carefully reviewed the evidence, the arguments of the parties, and, most importantly, the law that this Court must follow, the Court finds that the Defendant has failed to satisfy his burden of proving that he was selectively and vindictively prosecuted.  The Court bases this decision on the following reasons.

First, the Court finds that the Defendant has not satisfied the very heavy burden required to demonstrate selective prosecution and to rebut the presumption of prosecutorial good faith. For this claim, the Defendant must prove discriminatory effect and discriminatory purpose of the prosecutor.

Even assuming that the Defendant had proven discriminatory effect (*i.e.*, that he was singled out for prosecution while others similarly situated and committing the same acts have not, a burden which strikes the Court as virtually insurmountable given the unique facts of this case), the Defendant has failed to prove a discriminatory purpose.  The key question here is whether the Defendant was prosecuted "because of" his First Amendment rights to lobby and associate.  In the Fifth Circuit, this requires that the government's discriminatory selection of him for prosecution be invidious or in bad faith in that it rests upon impermissible considerations such as the desire to prevent his exercise of constitutional rights.

The Court has thoroughly reviewed the record and finds that the Defendant has not proven that the U.S. Attorney's Office for the Middle District of Louisiana acted with a desire to prevent the Defendant from exercising his constitutional rights, be it his right to lobby or his right to associate.  Regardless of the irregularities in the investigation by Agent Hattier, the evidence shows that the U.S. Attorney's Office prosecuted the Defendant because its attorneys

believed they had probable cause to suspect that the Defendant committed the crimes charged in

the Indictment.  The Court bases this decision on the following:

(1) The Defendant's prosecution is consistent with DOJ Guidelines generally and with the policy of the U.S. Attorney's Office in this district specifically, as confirmed by the Middle District of Louisiana Prosecution Guidelines for the United States Attorney's Office (July 2014) and the declaration of  First Assistant United States Attorney and Criminal Division Chief Corey Amundson;

(2) The U.S. Attorney's Office's initial response and investigation of the complaint against the Defendant indicates an absence of bad faith by the Government;

(3) Several of the irregularities in the FBI's investigation have credible explanations;

(4) Even assuming that Agent Hattier made the improper statements attributed to him by the Defendant, the Court finds that there is insufficient evidence to impute these statements to the U.S. Attorneys who made the decision to prosecute;

(5) The record of the interview between the defense counsel and Assistant U.S. Attorney ("AUSA") Cam Le shows that the Defendant was given an opportunity to cooperate like other defendants in other cases, not that the Government was seeking to inhibit the Defendant's ability to lobby or associate politically;

(6) Emails submitted by the Government reflect good faith plea negotiations by the Government, support its contention that it sought a felony conviction for this Defendant, and demonstrate that months of plea negotiations took place after the encounters with Hattier without any requirement that the Defendant cooperate in a public corruption investigation;

(7) The prosecution's actions are consistent with the plain language of the criminal statute at issue as well as some of the legislative history of that statute; and

(8) Defendant's claim is, in essence, more a claim that he was prosecuted for not cooperating rather than for lobbying or associating under the First Amendment. But case law establishes that refusing to cooperate is not a protected constitutional right, so there can be no selective prosecution claim.

Lastly, with respect to the selective prosecution claim, even if the burden had shifted

back to the Government to prove a legitimate basis for selecting the Defendant for prosecution,

the Government's guidelines, Amundson's declaration, and the weight of the evidence against

the Defendant support this basis.  For this additional reason, the first part of the Defendant's motion is denied.

Additionally, the Court finds that the Defendant has also failed to satisfy the very heavy burden of proving vindictive prosecution.  Because this issue arose in the pretrial context, the Defendant is not entitled to a presumption of vindictiveness. He must instead prove, by a preponderance of the evidence, actual vindictiveness by presenting objective evidence that the prosecutor's actions were designed to punish him for asserting his legal rights.

The Defendant has not done so.  First, the main evidence Defendant relies upon to show punishment is Agent Hattier's alleged statements.  Even assuming he said these things, case law establishes that these statements are not legally imputed to the prosecutors under the facts of this case.  Second, the Court has thoroughly reviewed the record and finds, for the same reasons articulated above, that the prosecutors pursued charges against the Defendant because they thought they had probable cause that the Defendant committed the crimes in question; the AUSAs did not act to punish the Defendant for the exercise of any right.  And third, even if the Defendant had shown that the U.S. Attorney's Office prosecuted the Defendant for not cooperating, case law demonstrates that there is no vindictive prosecution for such conduct under the facts of this case.  For all of these reasons, the Defendant's motion is denied.

## II.    **Procedural History**

On May 12, 2016, the Defendant was indicted by the Grand Jury. (Doc. 1.)  The Indictment alleges that Young was a part-owner of a hotel in Costa Rica, to which he frequently traveled for business and leisure. (Doc. 1 at 1.)  According to the Indictment, on September 4, 2013, Defendant "obtained a video . . . from an associate in Costa Rica that depicted a prepubescent boy . . . engaging in bestiality." (Doc. 1 at 1.)  Defendant allegedly saved the video

to his smart phone and, thereafter, from September 4, 2013, through August 29, 2014, distributed this video "on approximately [nineteen] separate occasions to [twenty-five] different people through the use of his smart phone." (Doc. 1 at 1.) In the summer of 2015, Defendant replaced his old smart phone with an Apple iPhone 6 and allegedly transferred the video from his old phone to his new phone. (Doc. 1 at 1–2.)

The Indictment further claims that, on or before July 23, 2015, Defendant "obtained a [second] video . . . from an associate in Costa Rica that depicted [another] prepubescent boy . . . engaging in bestiality." (Doc. 1 at 2.) According to the Indictment, Young distributed this second video "on approximately [fourteen] separate occasions to [thirteen] different people through the use of his smart phone." (Doc. 1 at 2.) The Indictment alleges that the Defendant possessed both of these child pornography videos "until his phone was taken by law enforcement on or about August 5, 2015." (Doc. 1 at 2.)

The Defendant is charged by the Grand Jury with two counts. (Doc. 1 at 2–3.) Count One alleges that, from on or about September 4, 2013, until on or about July 23, 2015, the Defendant knowingly distributed child pornography using any means and facility on interstate and foreign commerce, including an internet-enabled smart phone, in violation of 18 U.S.C. § 2252A(a)(2). (Doc. 1 at 2.) Count Two alleges that, during the same time, Defendant knowingly possessed images of child pornography of prepubescent minors and minors under the age of twelve that had been transported using any means and facility of interstate and foreign commerce, including a computer and an internet-enabled smart phone, in violation of 18 U.S.C. § 2252A(a)(5)(B). (Doc. 1 at 2–3.)

On May 26, 2016, the Defendant had his initial appearance and arraignment. (Doc. 8.) The Defendant pled not guilty to both counts of the Indictment, and the Defendant was released

on his own recognizance with special conditions. (Doc. 8 at 1–2.)  Trial was set for August 3, 2016. (Doc. 8 at 1–2.)

On May 26, 2016, the Magistrate Judge issued a scheduling order. (Doc. 9.)  The deadline for filing substantive motions was set for June 20, 2016. (Doc. 9.)

On June 21, 2016, the Defendant filed the instant Motion to Dismiss for Selective and Vindictive Prosecution. (Doc. 11.)  On June 24, 2016, the Government filed an opposition to the Defendant's motion. (Doc. 12.)

On June 24, 2016, the Court set an evidentiary hearing for September 15, 2016. (Doc. 14.)  On the same day, the Court continued the previously scheduled pretrial conference and jury trial, both to be reset at a later time. (Doc. 15.)

On August 5, 2016, the Defendant filed a Motion and Incorporated Memorandum for Leave to File Reply Memorandum in Excess of Five Pages. (Doc. 16.)  That motion was granted on August 8, 2016, (Doc. 17), and the reply was filed into the record on the same day. (Doc. 19.)

On August 9, 2016, the Court ordered the Government to file into the record under seal the two pornographic videos identified in the Indictment. (Doc. 18.)  The following day, the Court vacated that order and further ordered the FBI to provide the necessary equipment and videos for the Court to view the videos. (Doc. 20.)  The Court specifically noted that "[t]here will be no substantive communications with FBI representatives regarding the video." (Doc. 20.)  The Court also gave the parties five days to lodge an objection. (Doc. 20.)  Neither side did, and Court reviewed the two videos prior to the September 15, 2016, hearing.

On September 15, 2016, the evidentiary hearing on the instant motion was held.  (Doc. 24.)  Witnesses were sequestered. (Mot. Hr'g Tr., 4–5, Sept. 15, 2016, Doc. 49.)  The Defendant Christopher Young, Agent Maurice Hattier, and Agent Stephen Soli testified, and exhibits were

received into evidence. (Doc. 24 at 1.)  The substance of this testimony and evidence will be discussed in detail in the next section.  The hearing was continued to October 5, 2016. (Doc. 24 at 1.)  The Government was given ten days before the continuation of the hearing to advise the Defendant of any additional witnesses it intended to call other than Forensic Examiner Scott Downie. (Doc. 24 at 2.)   Both parties agreed that additional briefing was necessary and that a transcript would be helpful for preparing the briefs. (Mot. Hr'g Tr., 247–48, Sept. 15, 2016, Doc. 49.)  The Court ordered that, thirty days after the transcript was filed into the record, each party would submit simultaneously additional briefing on the issues, and then each party would have seven days thereafter to respond to the other's main submission. (*Id.*)  Additionally, the Government proffered Exhibits 8-A and 10. (Doc. 24 at 2.)  The Court allowed the Government seven days to file a motion to admit this evidence for the next hearing. (Doc. 24 at 2.)  The Government also allowed the Defendant an opportunity to oppose the motion. (Doc. 24 at 2.)

On September 22, 2016, the Government filed a Motion *in Limine* to Admit Certain Evidence in Opposition to Defendant's Motion to Dismiss for Selective and Vindictive Prosecution. (Doc. 26.)  The Government sought to introduce written communications between defense counsel and government counsel, voicemail messages of defense counsel to government counsel, and an affidavit from Corey R. Amundson. (Doc. 26 at 1.)  Additionally, in conjunction with this motion, on the following day, the Government filed a Motion for Leave of Court to File Compact Disc Containing Audio Recordings Into the Record. (Doc. 27 at 1–2.)  On September 26, 2016, the Court granted the Government's motion for leave. (Doc. 28.) Also on September 26, 2016, the Defendant filed an opposition to the Government's motion *in limine*. (Doc. 29.)

On October 5, 2016, the second evidentiary hearing was held. (Doc. 37.)  The Government's motion *in limine* was granted, and certain exhibits submitted by the Government

14

were admitted. (Doc. 37 at 1.)  Forensic Examiner Scott Downie also testified.  (Doc. 37.)  The Court gave the parties thirty days to file simultaneous briefs from the filing of the transcripts and then fourteen days thereafter to respond to one another. (Mot. Hr'g Tr., 98–99, Oct. 5, 2016, Doc. 36.)   Lastly, the Court encouraged the parties to address certain cases—specifically *United States v. Kent*, 649 F.3d 906 (9th Cir. 2011); *United States v. Williams*, 47 F.3d 658 (4th Cir. 1995); *United States v. Oliver*, 787 F.2d 124 (3d Cir. 1986); and *United States v. Long*, 823 F.2d 1209 (7th Cir. 1987)—involving "the relationship between vindictiveness and a Defendant's refusal to cooperate." (Doc. 37 at 1–2.)

On October 17, 2016, the transcript from the October 5, 2016, hearing was filed into the record. (Doc. 36.)  The transcript from the September 15, 2016, hearing had been previously filed into the record.

On November 10, 2016, the Government filed its Post-Hearing Brief. (Doc. 39.)  On November 16, 2016, the Defendant filed his Post-Hearing Memorandum. (Doc. 40.)  On November 17, 2016, the Government filed a motion to strike the Defendant's Post-Hearing Memorandum (Doc. 41) as being in excess of the page limit allowed by the local rule, which this Court denied on the same day. (Doc. 42.)

To resolve a question submitted by one of the parties and to eliminate any further issues surrounding the page limit, on November 18, 2016, the Court then issued a notice to counsel allowing both parties until November 21, 2016, to amend and/or supplement their Post-Hearing Briefs, with such amendment and/or supplement not to exceed twenty pages. (Doc. 43.)  Replies were limited to ten pages and were due on or before December 5, 2016. (Doc. 43.) Oral argument was set for January 6, 2017. (Doc. 43.)

On December 5, 2016, Defendant submitted his reply brief. (Doc. 45.)  On that day, the Government submitted a motion for leave to exceed the page limit with its reply (Doc. 44), which this Court granted. (Doc 46.)  The Government's reply was filed into the record the next day. (Doc. 47.)

Oral argument was heard on January 6, 2016. (Doc. 48.)  At oral argument, both parties reiterated points made in their briefing.

In addition and most significantly, counsel for the Defendant argued that, on a "common sense level," the Defendant should not have been prosecuted for these crimes.  The Defendant asserted that, on this level, it is clear that others having engaged in similar conduct would never have been charged and that he was only prosecuted because he refused to cooperate in a public corruption investigation.

Counsel for the Government responded that, when Congress enacted the criminal statutes at issue, it did not require that the Defendant be a pedophile or have a prurient interest while distributing the video; Congress could have put a scienter requirement in the law, but it did not. AUSA Cam Le also argued that it is the U.S. Attorney's Office and the Department of Justice that enforces the law, and it is part of its discretion to decide whom to prosecute and under what circumstances it would be warranted.  The Government said that it does not matter if there are 1,000 videos or images of child pornography or two or three; if the facts warrant it, the Government can, in its discretion, pursue those charges, and that is what it did.

The Court advised the parties that it would take the matter under further advisement.  The Court further stated that a ruling would be issued within thirty days.

III.     **Evidence in the Record**

A.  **Individuals Relevant to this Motion**

Defendant Christopher Young is a lawyer practicing in the area of alcoholic beverage control law. (Mot. Hr'g Tr., 5–6, Sept. 15, 2016, Doc. 49.)   Defendant has been an attorney for about twenty years, though he has no criminal justice experience. (*Id.* at 44.)

Defendant testified that, until May of 2016, he was a lobbyist, but, when he got indicted, he "terminated [his] lobbying business and registration because [he] was concerned about [his] clients.  And [he] wanted to make sure [he] didn't put them in an uncomfortable situation." (*Id.* at 6.)  Shantel Wempren is a lawyer with whom Young had a business relationship.  (*Id.*)  They shared clients and office space before terminating their business relationship due to a disagreement, as discussed below. (*Id.*)

Agent Mo Hattier testified that he has been an FBI agent for close to twenty years and that, for his whole career, he has handled white collar matters including "financial, fraud, bankruptcy fraud," and "[fifteen], [twenty] plus" public corruption cases. (*Id.* at 56.)  However, Agent Hatter is not a child pornography investigator; this is the only child pornography case in which he has been involved. (*Id.* at 56–57.)  He has not received specialized training in child pornography cases.  (*Id.* at 58.)

Agent Stephen Soli has been with the FBI for twelve years. (*Id.* at 124.)  He has worked all kinds of criminal and national security cases in that time. (*Id.* at 124–25.) He has handled child pornography cases for seven or eight years. (*Id.* at 125.)  He underwent formalized, specialized training in the form of an annual safeguard certification done once a year, which is more or less a psychological assessment. (*Id.*)  He also did an online covert employee certification. (*Id.*) Agent Soli works in "a division that's a program managed out of headquarters

under the criminal division . . . the Crimes Against Children Section," and he serves that program for the Baton Rouge area. (*Id.* at 125–126.)  He is the only agent right now who serves that program in this area. (*Id.* at 126.)

Agent Soli has worked "maybe" fifteen cases during the past seven or eight years, and he's been the case agent in those cases. (*Id.*)  Soli explained that being a case agent means that "the case is assigned to [him], so [he is] responsible for the management of the file and the administrative responsibilities that come with it and to interact with the United States Attorney's office or the local law enforcement authorities on it." (*Id.*)  Being a case agent also means being tasked with investigating, which includes interviews, evidence collection, and research. (*Id.* at 127.)

Agent Soli testified that Agent Hattier has not participated in any of Soli's child pornography cases in which Soli was the lead agent, but Hattier did participate in the investigation of the Defendant. (*Id.*)  Soli has worked public corruption cases and has worked them with Agent Hattier. (*Id.* at 129.)

Scott Downie is a Computer Forensic Examiner for the FBI. (Mot. Hr'g Tr., 20, Oct. 5, 2016, Doc. 36.)  He has been with the FBI for fourteen years. (*Id.*)  His office is located in New Orleans, and he is "charged with preserving, collecting and analyzing digital evidence." (*Id.*)  He holds a degree in computer engineering from LSU. (*Id.* at 20–21.)  When he joined the FBI in 2002, he was originally a "help desk person," or "I.T. Specialist" which "was just a general catchall for if it had to do with a computer we would go help them out." (*Id.* at 21, 23–24.) After about six months, he joined the group that does computer forensics within the FBI, which is called CART—Computer Analysis Response Team. (*Id.* at 24.)  This required specialized training, including 240 hours of classroom training in which he was taught to identify digital

evidence, how to handle digital evidence, how to extract and collect it, how to give expert

testimony, and how to draw conclusions from evidence. (*Id.* at 24–25.)  It also required a

mentorship under a certified examiner for about a year and a certification process that included

an exam and a mock court case. (*Id.* at 25–26.)  Downie has "touched about all the types of cases

the FBI handles," including child pornography, which he spent about 40% of his time doing

while in the New Orleans FBI Office and about 60% in the Florida FBI office. (*Id.* at 26–27.)

Colonel Walt Green is the U.S. Attorney for the U.S. Attorney's Office for the Middle

District of Louisiana.

Corey R. Amundson is the First Assistant U.S. Attorney and Chief of the Criminal

Division for the U.S. Attorney's Office for the Middle District of Louisiana. (Gov't Ex. 10.)

From 2003 to 2008, he served as the primary child pornography prosecutor in his office and

served as a faculty member in the "Advanced Child Exploitation" course for federal prosecutors

at the DOJ's National Advocacy Center and at the DOJ's Project Safe Childhood National

Conference for federal, state, and local prosecutors and investigators. (*Id.*)

Cam Le and Rene Salomon are the AUSAs in this case.  The Defendant's attorneys are

William Gibbens, Kyle Schonekas, Marci Blaize, and Thomas Taylor Townsend.

### B.  July 31, 2015—Initial Complaint

On July 31, 2015, at 10:48 a.m., Col. Walt Green emailed Corey Amundson and Greg

Fee of the FBI. (Mot. Hr'g Tr., 225–27, Sept. 15, 2016, Doc. 49; Gov't Ex. 8D.)  In the email,

Col. Green said that Jill Craft (a local attorney) had called to report that a female attorney she

spoke with wanted to report an incident. (Mot. Hr'g Tr., 225–27, Sept. 15, 2016, Doc. 49; Gov't

Ex. 8D.)  The email stated:

> Basically, a local lobbyist sent this [attorney] a bestiality video that appears to
> have a juvenile in the video as well.  He has been sexually harassing her and this

was part of the harassment.   Please let us know who could join us at our office next week to debrief her and view her evidence.  She would like to come to my office and I said it was okay.  The [attorney's] name is Shantel Wempren.

(Mot. Hr'g Tr., 227, Sept. 15, 2016, Doc. 49; Gov't Ex. 8D at 2.)

Greg Fee responded on the same day at 11:05 a.m. that he had "referred this to Steve Soli and Charlie. Steve is our resident child porn expert." (Gov't Ex. 8D at 2.)

At 11:09 a.m., the U.S. Attorney responded, "Perfect. We will reach out to Steve." (*Id.*)

### C.  August 3, 2015—Arranging the Meeting with Ms. Wempren

In the same email chain, on August 3, 2015, at 1:21 p.m., Mr. Amundson emailed Steve Soli and AUSA Cam Le stating in part:

Steven and Cam,

Please see the below.  We would like to set up a meeting with Ms. Wempren at the USAO so that you two could interview her.  Walt and I would like to meet with her briefly before your interview.  Steve, would you please reach out to Ms. Wempren to arrange this?

Corey

(Gov't Ex. 8D at 1.)  Steve responded to both Mr. Amundson and AUSA Cam Le, "All, I have arranged to meet Wempren at your office at 10am tomorrow." (*Id.*)

These emails are mostly consistent with Agent Soli's testimony.  Soli testified that he began his investigation into the Defendant in August of 2015. (Mot. Hr'g Tr., 127, Sept. 15, 2016, Doc. 49.)  He was contacted by the U.S. Attorney's Office, which asked him to come to their office and document a complaint from an individual. (*Id.* at 127–29.)

Specifically, Soli testified that he was contacted by Cam Le and advised that this was a case regarding a child pornography complaint. (*Id.* at 129.)  Le contacted Soli because it involved child pornography. (*Id.* at 128.)

### D. August 4, 2015—The Government Meets With Ms. Wempren for the First Time

Agent Soli first spoke to Ms. Wempren, on August 4, 2015, at the U.S. Attorney's Office in Baton Rouge. (*Id.* at 128–30.)   Soli stated that he was not sure if he knew the Defendant's name until he got to the meeting; he did not recall if AUSA Cam Le put that in an e-mail to him. (*Id.* at 130.)  To his recollection, he had no idea what the subject of his conversation with Ms Wempren would be until he sat down with her. (*Id.*)

Agent Soli, AUSA Cam Le, and Ms. Wempren were the only three at the August 4, 2015, meeting. (*Id.* at 131.)  Agent Hattier was not present. (*Id.*)  Soli was included in the meeting because it was a child pornography investigation. (*Id.*) He was taking the initial complaint. (*Id.*)

Agent Soli testified that Wempren reported the following to him:

> That she was either an associate or partner . . . working with or for Mr. Young and that he had sent her this video, which she considered child pornography.  She was concerned about having it, not reporting it.  She described it, then she showed it to me.  I agreed that it . . . in all likelihood, was child pornography and would warrant more investigation.

(*Id.* at 131–32.)  As Soli recalled, Wempren described how she had worked for the Defendant when she was younger, how he had offered her "another employment opportunity recently," which she accepted, and how they had "some history going back to like 2008 or something like that." (*Id.* at 132.)  She made no complaints or accusations about the Defendant being involved in public corruption. (*Id.* at 132–33.)  Soli did not know if Wempren mentioned that the Defendant was involved in politics or being a lobbyist. (*Id.* at 132.)

Agent Soli also stated that he would have had a conversation with superiors to get the authorization for Wempren to consensually record a conversation with the Defendant. (*Id.* at 137.)  Thereafter, Soli told Wempren that, if she was comfortable, she should reach out to the Defendant, arrange a meeting, and "discuss the receipt of this child pornography video with

21

him." (*Id.* at 138–39.)  Soli also explained to her how to use the recording equipment and their

protocol for doing it, and she agreed to do so. (*Id.*)

Based on his interview with Wempren at the U.S. Attorney's Office, Soli said he

requested an investigative file be opened and assigned to him. (*Id.* at 127–28.)  Thereafter, Soli's

supervisor approved the request. (*Id.*)

Soli also prepared a memorandum dated August 6, 2015, describing his and Cam Le's

interview with Ms. Wempren on August 4, 2015. (Def. Ex. 9.)  That document provided in

relevant part:

> On July 23, 2015 at 11:33 pm, Wempren was on the couch with her girlfriend,
> Khristina Gant, when Wempren's phone indicated a message had been received.
> Wempren reviewed the message and determined a video had been sent to her and
> a text message containing the words, "Costa Rica". Wempren recognized the
> message to be from Chris Young's telephone ([phone number redacted]).
> Wempren knew Young to frequent Costa Rica as he is one third owner of a hotel
> there. Wempren played the video and observed it was footage of a young male
> performing a sexual act on a donkey. Wempren responded, "WTF", to which
> Young (or the user of his phone) responded, "Just some video from my last trip to
> CR."
>
> Gant observed the contents of the video as well.  Wempren was concerned about
> the video and responded with disapproval in a text message.
>
> On July 31, 2015 Wempren notified Young she was resigning.  Wempren did not
> discuss the video with Young or give him indication it was the reason for her
> resignation. . .
>
> Note: SA Stephen J. Soli, Jr[.] and AUSA Cam Le reviewed the described video
> on Wempren's phone and agreed it was child pornography.

(Def. Ex. 9 at 1–2.)

Agent Soli also testified that, on August 4, 2015, Agent Hattier ran a rap sheet of the

Defendant.  (Mot. Hr'g Tr., 133–34, Sept. 15, 2016, Doc. 49; Def. Ex. 8.)  Soli did not believe he

asked Agent Hattier to run the rap sheet, and Soli did not know why Hattier ran the rap sheet.

((Mot. Hr'g Tr., 134–35, Sept. 15, 2016, Doc. 49.)

Agent Hattier testified that Agent Soli told him that Ms. Wempren had come in and made a complaint about the Defendant.  (*Id.* at 62.)  Agent Hattier said Soli was informed by AUSA Cam Le that the Defendant had been somebody that had been on Hattier's radar. (*Id.*)

Agent Hattier testified that the Defendant was "definitely of interest to" Hattier given his prior case, even though Ms. Wempren had not said anything about public corruption. (*Id.* at 64.) When asked why it was of interest to Hattier, he stated:

> Well, to the extent that there was allegations that Mr. Young had committed criminal activity and, you know, at some point -- you've been a criminal defense attorney for many years -- you know at some point, an individual in that position may want to attempt to help themselves out by coming forward and providing information.  That was my area of interest.

(*Id.*)

Forensic Examiner Downie testified that, on August 4, he was contacted by his supervisor and told that he would go to Baton Rouge the next day to help with the collection of Defendant's cell phone. (Mot. Hr'g Tr., 27–28, Oct. 5, 2016, Doc. 36.)  He was brought in because there was potentially privileged information on the device, and it is customary to bring in someone from New Orleans in that situation so that there is not someone on the prosecution team handling the evidence. (*Id.* at 28.)

### E.  August 5, 2015—Galatoire's and the FBI Office

#### 1. Defendant's Lunch with Wempren

Defendant testified that, on August 5, 2015, he set up a lunch with Wempren. (Mot. Hr'g Tr., 6, Sept. 15, 2016, Doc. 49.) They "had had a disagreement" and had "decided to terminate [their] business relationship." (*Id.*)  Defendant realized that they "had a bunch of outstanding client matters," so he "reached out to her" and asked if they could get together to discuss the

issues. (*Id.*)  Wempren suggested they meet at Galatoire's Restaurant in Baton Rouge, and they did so. (*Id.* at 7.)

At the meeting, they discussed business, but she also raised the subject of the video Defendant had sent her. (*Id.*)  Wempren characterized the video as child pornography, and Defendant responded, "That's not child pornography. . . . You're crazy.  You know me better than that." (*Id.* at 7, 35.)  Defendant acknowledged at the hearing that the video was of a young man and a donkey. (*Id.* at 7, 35.)  They discussed the video for about ten minutes and then moved on to pending business for thirty-five to forty minutes. (*Id.* at 7–8.)

### 2. Defendant's Initial Encounter and Interview with the FBI Agents

Defendant testified that, when he was finished, he put down his credit card and went outside to smoke a cigarette. (*Id.* at 8.)  He sat down on a bench near the entrance, and he began reviewing text messages and e-mails. (*Id.*)  According to the Defendant, as he was doing this with his head down, FBI Agent David Clarke reached down and took his phone. (*Id.*)  Clarke then introduced himself. (*Id.*) Defendant stood up and asked to see some identification, and, as he did so, he saw Agent Soli approaching. (*Id.* at 8–9.)

The agents told Defendant that he was being investigated for the possession, distribution, and production of child pornography. (*Id.* at 9.)  Defendant testified that it was about the video he had sent to Wempren. (*Id.*)

The agents asked that they walk back to Defendant's car and then if they could sit in it. (*Id.*)  Defendant agreed. (*Id.*)  Agent Clark asked to search his car for guns or weapons, and Defendant said, "No problem." (Mot. Hr'g Tr., 9–10, Sept. 15, 2016, Doc. 49.)

After getting in the car, the agents asked Defendant about the video. (*Id.* at 10.) Defendant described the video to them as a "crude joke." (*Id.*)  Defendant testified that he did not

believe it was child pornography, and "to this day, I do not." (*Id.*)  The agents asked if he sent the video to anyone; at the time, he recalled about eight to ten people, but the Defendant said at the hearing he thought it was "a little more than that, maybe [nineteen] people." (*Id.* at 10.) Defendant also admitted at the hearing that he had seen the Indictment in this case and had received discovery, and he did not disagree with the Government's assessment of how many times he had sent the videos and to whom they had been sent. (*Id.* at 37.)

Defendant also told the agents that he had another video someone had sent him a couple of years before which was similar to the donkey video sent to Ms. Wempren. (*Id.* at 10–11.)  The first video was from 2013, and the second (sent to Ms. Wempren) was received in July 2015. (*Id.* at 11.)  The agents had not known about the 2013 video before Defendant volunteered the information to them. (*Id.*)

Defendant told the agents he believed he received the 2015 video from a friend in Costa Rica named Eduardo Gomez. (*Id.* at 11–12.)  Defendant gave the agents Gomez's name and telephone number. (*Id.* at 12.)  Defendant also told the agents he was not sure about the second (2013) video but that he believed he also received it from Gomez. (*Id.* at 12, 37–38.)[1]

When he met with the agents, Defendant told them that he had no videos similar to the two donkey videos on his phone; "I did not, nor have I ever." (*Id.* at 15.)  Defendant testified that he was asked if he had additional similar videos or photographs on his other devices, and he told them no. (*Id.* at 38.)  Defendant further testified that he offered to give his other devices to the agents to search, but he made no attempt to hand over those additional devices because "[t]hey didn't ask for them." (*Id.* at 38–39.)

---

[1] As will be discussed in detail below, at the September 15, 2016, hearing, the Defendant stated that he was mistaken during this encounter with the FBI about who sent the 2013 video. (Mot. Hr'g Tr., 12–15, Sept. 15, 2016, Doc. 49.) At that hearing, Defendant testified that the 2013 video was sent by Zeid Ammari, not Gomez.

Defendant was given a receipt for his phone in the parking lot at Galatoire's.  (*Id.* at 15–16.)  Agent Soli filled out the form (which was like a carbon copy) and ripped off a copy for the Defendant. (*Id.* at 16; Def. Ex. 1.)  Defendant indicated to Agent Soli that "that is my business phone, that I have no other phone, no other cellular phone, and I'm very mobile" and that Defendant would get a new phone and have the old phone disconnected. (Mot. Hr'g Tr., 16–17, Sept. 15, 2016, Doc. 49.)  Defendant told the agents that the phone was his livelihood and that he needed the phone for work. (*Id.* at 39.)  Defendant testified, "I thought I was very cooperative because I had nothing to hide." (*Id.*)

Defendant acknowledged on cross-examination that he was never placed in handcuffs, that he was free to go after his short conversation with the agents, that the agents were professional toward him, that they never yelled at or threatened him in any way, and that they never pointed a weapon at him. (*Id.* at 35–36.)  Defendant also stated that the conversation with Agents Soli and Clarke inside his car at the Galatoire's parking lot lasted "maybe [ten], [fifteen] minutes." (*Id.* at 39.)

Agent Soli also testified about the meeting at Galatoire's.  Agent Soli decided to use a recorded lunch as "investigative strategy" because he thought it was "more likely to be kind of an honest conversation about what happened and who had access to the phone and who might have done it with this type of conversation as opposed to a law enforcement interview." (*Id.* at 140.)  Soli had previously determined that the material came from the Defendant's phone, but he could not be certain who hit send. (*Id.* at 141.)

Soli stated that, at Galatoire's, he, Special Agent Clarke, Special Agent Robert King, and Scott Downing provided surveillance, which was required in these sorts of operations. (*Id.* at

139.) Agent Soli said that Agent Hattier was not at Galatoire's and that Soli did not remember where Hattier was at that time. (*Id.* at 141–42.)

Agent Soli testified that he instructed Wempren to determine if the Defendant "was in possession of the phone she knew to be his that may have sent . . . the child pornography material." (*Id.* at 140.)  Soli wanted her "to discuss her receipt of it and record his comments, reactions." (*Id.*)  Agent Soli could not listen to Wempren's conversation with the Defendant while it was taking place; it was recorded. (*Id.* at 139.)  Soli later stated that Ms. Wempren either called or texted him as an indication that Defendant was there with the subject phone. (*Id.* at 217–18.)

Agent Soli denied seizing the phone from the Defendant. (*Id.* at 142.)  But Soli did identify the receipt of property that was issued to the Defendant on August 5 that noted Soli seized the phone, and Soli stated that he filled this receipt out during the interview with the Defendant in the Galatoire's parking lot. (Mot. Hr'g Tr., 143, Sept. 15, 2016, Doc. 49; Def. Ex. 1.)  The form was completed in triplicate, with one copy for the Defendant and the original for the file. (Mot. Hr'g Tr., 143–44, Sept. 15, 2016, Doc. 49.)

Agent Soli stated that, during the interview, the Defendant "recognized [Soli's] description of the video and said that [Defendant] had received it at some point. [Soli] believe[d] [Defendant] had said he received another similar video and had then sent those out to other individuals." (*Id*. at 144.)  The Defendant was "pretty cooperative with [Soli] during this time." (*Id.* at 144–45.)  Soli described the interview as lasting fifteen or twenty minutes; he did not "recall it to be a very long interview." (*Id.* at 145.)

Agent Soli testified that the Defendant told him who he got the video from (a cabdriver in Costa Rica), the cabdriver's name, and his telephone number. (*Id.* at 164–65.)  Agent Soli stated

27

that he did not recall specifically sending anyone to the Defendant's office during the Galatoire's lunch, but that is something that they may have done; were they to obtain a warrant, that is what they'd want to know. (*Id.* at 182–83.)

Scott Downie testified that, when he met Agents Soli, Clarke, and King, they explained to Downie that they wanted an examiner to handle the phone because it was likely an iPhone, and iPhones pose certain problems in collecting evidence. (Mot. Hr'g Tr., 28–29, Oct. 5, 2016, Doc. 36.) They did not have a warrant, and they could not do an actual exam or analysis of the phone on site. (*Id.* at 29.) Downie's role was to keep the phone from being locked and keep it in the unencrypted state so that, if they obtained legal authority, they could look at it and then return it. (*Id.* at 29–30.)

According to Downie, they arrived at Galatoire's and parked about sixty or seventy-five feet away from the entrance to the restaurant. (*Id.* at 30–31.) They waited for some time, and, at some point, the Defendant arrived. (*Id.* at 31.) Agents King and Clarke then went inside the restaurant. (*Id.*) Downie stayed in the car. (*Id.* at 30.) "After a little while," the Defendant came out, Agent Soli identified him, and then Agent Soli exited the vehicle and approached him. (*Id.* at 31.) Special Agent Clarke stuck out his hand to shake, and, when the Defendant went to shake it, Clarke took the phone and turned to walk away. (*Id.*) King took the phone straight to Downie. (*Id.*)

Downie put the phone in airplane mode, which "seals it off from other communication . . . [and] basically seals that evidence off so that it's not changed in any way." (*Id.* at 32.) After the phone was in airplane mode, Downie waited about thirty seconds and then swiped left and right to prevent the phone from locking. (*Id.* at 32–33.) He did this for about an hour and a half. (*Id.* at 33.) He did this because, at that point, they did not have the legal authority to go on Defendant's

28

phone and look, but, if it locked, they would lose the evidence; this "preserve[d] the evidence in its current state." (*Id.*)

At some point during the trip from Galatoire's back to the FBI office, Downie was told the Defendant gave consent to search the phone and was given its passcode. (*Id.* at 33–34.) Downie then turned off the auto lock so that it would not lock and encrypt the contents of the phone. (*Id.* at 34.)  He also pulled out relevant information from the phone, such as the make, model, and iCloud accounts to verify it was the Defendant's phone. (*Id.* at 34–35.)  When he arrived at the FBI office in Baton Rouge, he took the phone to the CART lab and connected it to the device that would keep it powered on throughout the night. (*Id.* at 35.)  He then left. (*Id.*)  He did not look at the contents of the phone, either on the trip to the FBI office or when he arrived at the CART lab. (*Id.*)

Agent Hattier testified that he was not at the Galatoire's lunch and was not involved in setting it up. (Mot. Hr'g Tr., 64, Sept. 15, 2016, Doc. 49.)  He was surveilling the Defendant's "office location in the off chance that a search warrant was conducted there for the computers and such." [sic] (*Id.* at 64–65.)  Agent Hattier first said that Agent Soli or one of his team members asked him to go, but he then said "it was just understood that [he] would be involved" given his prior investigation in which the Defendant was prominent. (*Id.*)

### 3. Defendant's Trip to the FBI Office and Agent Hattier's Alleged Inappropriate Comments

According to the Defendant, as he was leaving Galatoire's, Agent Soli asked, "Do you have time to follow us back to our office, we have another agent from another division of our office that would like to speak with you." (Mot. Hr'g Tr., 17, Sept. 15, 2016, Doc. 49.)  Agent Soli did not identify who the agent was, what division he worked with, or why the agent wanted to talk to him. (*Id.*)  Defendant, however, agreed to go. (*Id.*)

29

Defendant stated that he followed the agents from Galatoire's to the FBI office. (*Id.* at 18.)   Agents Soli and Clarke arrived at about the same time, and, after they punched in a code to unlock the door, they all walked into the foyer area of the office. (*Id.*)  Defendant, Soli, and Clark did not go into the main office area though. (*Id.* at 18–19.)

Defendant testified that, "After we entered that foyer area, about one, two, maybe three minutes later, another agent walked in from the outside." (*Id.* at 19.)  That agent was Mo Hattier, who was coming in from the parking lot into the foyer. (*Id.*)

Defendant testified that Hattier introduced himself and said, "Hi, I'm Agent Mo Hattier. . . . I'm the head of the public corruption division for the FBI." (*Id.* at 19.)  Agents Soli and Clarke were around when this happened. (*Id.*)  Defendant's brother John Young was running for Lieutenant Governor at the time, and, according to the Defendant, Hattier asked how Defendant's brother's campaign was going. (*Id.* at 19–20.)

Defendant testified: "I know Agent Soli was holding my phone at the time, and [Hattier] said -- he gestured toward Agent Soli and said, 'Whatever is on that phone doesn't have to become public if you cooperate with us in a public corruption investigation.' " (*Id.* at 20.)  Defendant said he replied, "I don't know anything about public corruption.  There's nothing on my phone except the two videos I've already told these agents about." (*Id.*)  According to the Defendant, Agent Soli commented that, " 'This is your last chance.  Tell us what's on this phone or you're going to be in big trouble.' " (*Id.* at 20–21.)  Defendant responded, " 'Like I told you before, there's nothing else on my phone.' " (*Id.* at 21.) Defendant stated that the meeting in the foyer area of the FBI office lasted "five minutes, at the most." (*Id.* at 40.)

On the other hand, Agent Hattier testified that, at some point, he was informed that the search of the Defendant's office would not occur (Hattier thought this occurred while the other

agents were still at the restaurant), and Hattier was "cut loose" and came back to the office. (*Id.* at 68.) Hattier did not know why a search of the office was not conducted. (*Id.* at 68–69.)

Agent Hattier testified that he was not involved in the setup of the meeting at the FBI office. Hattier stated, "I think he was talking to Agent Soli, and Mr. Young had come in to, I don't know, sign a receipt or do something. And I was informed by Agent Soli that Mr. Young was coming in to the office. And when he arrived, I came out and introduced myself." (*Id.* at 66.) Hattier thinks he had been told by Agent Soli that the Defendant was there. (*Id.*) Hattier said, "I think it was, you know, when I was informed that he was coming in, 'Hey, if you're around, you want to come out and say hi, then I'll let you know when he gets here' sort of thing." (*Id.*)

Hattier did not remember why the Defendant went to the FBI office and said maybe it was to sign off a receipt form or something for his phone. (*Id.*) Agent Hattier said that seizure receipts are "sometimes, not always" done on site, but he would typically bring the seizure receipts with him. (*Id.* at 66–67.) Agent Hattier "really" did not know Defendant's purpose for coming into the office. (*Id.* at 67.) When asked if the purpose of the trip was to meet with Hattier, Agent Hattier stated, "I mean, I hadn't had any contact with him, so I certainly didn't tell him come in so we could meet in person." (*Id.*) Agent Soli did not tell Hattier he was bringing Defendant to the office so Defendant could meet with Hattier; "Agent Soli just told me, 'Hey, Mr. Young is coming in' -- for whatever reason, I can't remember -- 'You know, if you're around when he gets here, I'll let you know and you can come out and introduce yourself.' " (*Id.* at 68.)

On cross examination by the Defendant, Hattier testified that he was trying to make small talk with the Defendant, so, in that context, he brought up the Defendant's brother's run for

Lieutenant Governor.  (*Id.* at 69.)  When asked what he talked about, Hattier testified:

"Introduced myself.  Told him I was on the white collar squad.  I may have even said that I

worked public corruption and that at some point, if he was interested, I would be happy to sit

down and talk to him." (*Id.* at 69–70.)  Though Agent Hattier did not remember the Defendant's

exact words, he was left with the impression that the Defendant "was open to sitting down with

us." (*Id.* at 70.)  Hattier described the interaction as "very short" and said it never progressed to

the point of Defendant saying "yes or no, I have information that would be of interest to you."

(*Id.*)  Hattier stated that Agent Soli was also present at the meeting. (*Id.* at 70–71.)  Hattier

specifically denied saying that "whatever is on that phone doesn't have to become public if you

cooperate with us in a public corruption investigation." (*Id.* at 71.)

On direct examination by the Government, Hattier described the meeting as "very brief.

Less than a couple of minutes, in [his] estimation." (*Id.* at 103.)  Hattier was shown the

Defendant's affidavit, including his own alleged words, and Hattier said it was "absolutely not" a

verbatim quote from him:

> I didn't say it and, secondly, you know, I've been an agent for [twenty] years.
> I'm -- if I don't know anything, one thing I do know is that we're -- as agents,
> we're not in a position to make any kind of -- you know, this type of
> representation to a potential defendant.  I had not had any discussions with you
> [AUSA Cam Le] relating to this case at this point.  I simply was not in a position
> to make any kind of representation like this to [the Defendant].

(*Id.* at 103.)  Hattier stated that the purpose of the meeting was to introduce himself and let the

Defendant "know that we had an interest in sitting down and talking to him further." (*Id.* at 104.)

Hattier said that he was left with the impression that the Defendant was amendable to possibly

talking to the FBI in the future because he said something to the effect of "I've been cooperative

up to this point." (*Id.* at 104.)

On re-cross by the Defendant, Agent Hattier again emphatically denied telling the

Defendant that what was on his phone did not have to become public if he cooperated:

> Absolutely. I had zero conversation with him about what was on the phone, what could happen to him, what couldn't happen to him.  I introduced myself. I told him I worked white collar matters, including public corruption, and that I had an interest in sitting down and talking to him at a future point.  That was the extent of the conversation.

(*Id.* at 120.)

After the meeting, Hattier was "most certain" that he would have told Agent Soli that, if

the Defendant was amendable to sitting down and talking with the FBI, then he might be in a

position to have information that would be of interest to us. (*Id.* at 71.)  According to Hattier,

Soli replied, "I'll let you know if it develops to that point or something like that." (*Id.* at 72.)

Agent Soli testified that he did not remember when he asked the Defendant to talk to

Agent Hattier.  (*Id.* at 146.)  At the hearing, Soli said:

> I just -- I might have asked him, you know, after the first interaction or I might have asked him when we went back and had the consent form signed or I might have asked him to talk to Mo Hattier when he collected his phone the next day.  I can't remember when.

 (*Id.*)  Agent Soli said it was not his idea for the Defendant to talk to Agent Hattier at the field

office; "I think just someone said I'd like to talk to him or Mo would like to talk to him or Mo

asked." (*Id.* at 147.)  Agent Soli did not remember who told him that. (*Id.*)  Soli later testified:

> This is what I'm saying is I know that I invited him to come back to the field office and get his phone, okay? And I don't know if at the Galatoire's interactions, either one of them, I mentioned Mo Hattier or if I didn't mention it until he came and got his phone.  But at one point over the afternoon of the 5th, say, and the 6th when he got his phone, I facilitated that introduction and I had known -- I had come to know Mo and I wanted to talk to him at some point in time.

(*Id.* at 149.)  Soli could not remember when he mentioned that he would like the Defendant to come back to the field office to meet with Agent Hattier. (*Id.*)  Soli may have said " 'It would be a good idea for you to talk to Mo,' . . . but nothing more specific than that." (*Id.* at 153–54.)

Agent Soli testified as to the following about the meeting at the FBI office:

> Well, what I recall about a meeting with Mo Hattier and [Defendant] is that they talked in the lobby or right there in the front of our office and, you know, introduced each other, talked for a little bit and basically agreed to, you know, get together and meet at some other time.  That was all I knew of that . . . meeting or them meeting together.

(*Id.* at 147–48.)  Soli thought Agent King was standing there at the meeting and that "it was a brief interaction." (*Id.* at 148.)  Soli thought that Agent Hattier and the Defendant "might have walked back to the conference room," but he did not know. (*Id.*)  Agent Soli did not know if the words "public corruption" were said; he thought "it was more vague.  You know, hey, I'd like to talk to you about some things I think would be of interest or you could help with or something, that type of language is what I recall." (*Id.* at 149.)  Agent Soli did not know the purpose of the meeting. (*Id.*)  Agent Soli later stated that the conversation "had something to do with [child pornography] in that this was all part of this investigation and the phone and everything, but my understanding was Mo Hattier wanted to talk to him about public corruption investigations." (*Id.* at 152.)  Agent Soli didn't know if Agent Hattier "used that phrase at that meeting." (*Id.*) Agent Soli did not recall Hattier saying he would like Defendant to cooperate in an investigation. (*Id.* at 153.)  Specifically Agent Soli did not recall Agent Hattier saying, "Whatever is on that phone doesn't have to become public if you cooperate with us in a public corruption investigation." (*Id.*)  Agent Soli only remembered "this vague language, like, 'Hey, man, you know, I'd like to get together with you and talk.  I think there's things we need to talk about.' " (*Id.*) Soli did not remember "it being that specific." (*Id.*)  Agent Soli also thought that the meeting between Hattier

and the Defendant occurred the next day when the Defendant was at the FBI office to retrieve his phone.

Agent Soli testified that he never heard Agent Hattier make the statements that were attributed to Hattier in the Defendant's affidavit (specifically, that "whatever is on that phone does not have to become public if you cooperate with us in a public corruption investigation"; that "we can make this go away if you cooperate"; and that "we can wire you up just like you see in the movies"). (*Id.* at 230–31.)  Moreover, Agent Soli said he has never heard Agent Hattier say anything like this in any case he has worked with him over the last eight years. (*Id.* at 231.) Agent Soli said it is not something Soli would say either, "just knowing that I'm not authorized to say that." (*Id.*)

### 4. Defendant's Trip Back to Galatoire's

Defendant testified that, around 3:30 or 4:00 p.m. on the day he went to the FBI office, he received a phone call from Agent Soli. (*Id.* at 21.)  Soli said he had forgotten to give Defendant the consent to search form,[2] so the Defendant had to meet to execute it and receive a copy. (*Id.* at 21–22.)  Defendant met Agent Soli at the Galatoire's parking lot and signed the consent to search form. (*Id.* at 22.) Defendant told Agent Soli that he was concerned about confidential client information, and Agent Soli told Defendant that he could write an exception on the form, which Defendant did. (*Id.*)  Agent Soli took a picture of the form and emailed it to the Defendant. (Mot. Hr'g Tr., 22–23, Sept. 15, 2016, Doc. 49; Def. Ex. 2; Gov't Ex. 5.)

---

[2] The form Soli had previously given the Defendant was a form evidencing the fact that the Defendant's iPhone had been seized. (Mot. Hr'g Tr., 142–43, Sept. 15, 2016, Doc. 49; Def. Ex. 1.)  This second form that Soli needed the Defendant to execute was different and involved the Defendant's consent to search his iPhone. (Mot. Hr'g Tr., 21–23, Sept. 15, 2016, Doc. 49; Def. Ex. 2; Gov't Ex. 5)

Defendant considered this meeting a formality. (Mot. Hr'g Tr., 41, Sept. 15, 2016, Doc. 49.)  He had already given the agents verbal consent to search his phone and had even given them his password to get into the phone. (*Id.*)  This meeting lasted maybe five minutes. (*Id.*)

Agent Soli provided similar testimony.  Soli said that he had verbal consent from the Defendant to search the phone, and he took the phone back to the FBI office. (*Id.* at 145.)  However, he realized that he had not gotten the Defendant to sign a consent to search form or perhaps did not have one with him; in any event, he had to go back and meet the Defendant again at Galatoire's and have him sign a consent form allowing for search of the phone. (*Id.*)  Defendant signed the consent form at the second meeting in the Galatoire's parking lot. (Mot. Hr'g Tr., 146, Sept. 15, 2016, Doc. 49; Def. Ex. 2.)

Agent Soli testified that he told the Defendant, "regarding extraction from his phone, only in the most general terms . . . I believe I explained to him . . . we'll just be collecting or looking at information that is related to child pornography investigation, not reviewing any type of communication documents with your clients." (Mot. Hr'g Tr., 154–55, Sept. 15, 2016, Doc. 49.)  Soli never stated that he would be looking at information on the phone relative to public corruption. (*Id.* at 155.)

### F.  August 6, 2015

#### 1. Downie's Work on Defendant's iPhone—Extracting the Files and Removing the Videos

Forensic Examiner Downie testified that, on the morning of August 6, Agent Clarke asked him to preserve the contents of the phone, to collect the information on it, and to make a copy of it. (Mot. Hr'g Tr., 35–37, Oct. 5, 2016, Doc. 36.)  Downie "used a cellebrite, [which is] a physical device that's meant to copy information from a cell phone.  [He] did a file system extraction so that it would just extract all the files in the user data section of the phone into --

36

onto a thumb drive." (*Id.* at 35–36.)  Downie explained, "The cellebrite device will go on the phone and extract all the files that exist in the user data section of the phone and copy them to a thumb drive so that [CART Examiners] can analyze them." (*Id.* at 36.)  Only the data files are copied, not the operating system. (*Id.*)  The process took an hour or two. (*Id.* at 37.)

Only CART examiners have access to the CART lab. (*Id.* at 36.) At that time, that would have included Forensic Examiner Downie, Special Agent Larry Jones, and Forensic Examiner and Trainee Aaron Skipper. (*Id.*)

Downie explained that it is important to have an image copy rather than working off the actual device because "anything you do on a cell phone you're actually changing the evidence. So any time you open messages or open this or open that you're always changing it." (*Id.* at 37.) This "minimize[s] the amount of changes and collect[s] the evidence at its pristine state[.]" (*Id.*)

After he made the copy, Downie took the image copy and made a copy of it so that he would have a "master copy image" that would "go to evidence control." (*Id.*) He would work off the copy of the copy. (*Id.*)

After Downie made the copies, he spoke with Special Agent Soli and asked him to triage the evidence, which means to "find out kind of what we're dealing with"; that is, whether child pornography is present and, if so, how much and what is the nature of it? (*Id.* at 38–39.)  His software takes all the files in messages, texts, and e-mails and puts them in "containers," and he would have containers for videos and graphics. (*Id.* at 39.)  He then did a manual review of all the pictures and videos that were in those two containers. (*Id.* at 39–40.)  He reviewed only those files because that is where the multimedia is stored; they were only looking for pictures and videos of child pornography. (*Id.* at 40.)

Downie's review showed "two pictures of a young girl that were not sexual in nature and . . . two videos of -- that [he] believe[d] were possibly child pornography." (*Id.*)  Downie then extracted the videos from the images and brought them to Special Agent Downie so that he could review them and determine "whether or not that was child pornography and that it was something that they would actually carry forward with the prosecution." (*Id.*)  Soli determined the videos were "actually child pornography and so those were relevant to the investigation." (Mot. Hr'g Tr., 40–41, Oct. 5, 2016, Doc. 36.)

For the two pictures, Downie had to find the chat message to determine the context; here, the Defendant talked about being in love with the young girl, so Downie presented that to Soli, who said that, "given that it was possible child exploitation[,] that was relevant to their investigation." (*Id.* at 41.)  Downie testified that everyone has pictures of relatives on their phone, so he has to determine the context in which the pictures were sent back and forth. (*Id.*)  Here, the person Defendant was talking with mentioned that the girl could not be sixteen or fifteen, so that registered as something that possibly needed to be investigated. (*Id.* at 41–42.)

Downie testified that Agent Soli had asked him if it was possible to return the phone that day. (*Id.* at 42.)  Downie stated:

> Special Agent Soli explained that the [Defendant's] business was run through that phone and that that phone was key to his business and that he did not have a backup of it, so if we took that phone that we would be basically taking his business from him.  So he asked if it was a possibility that we could return that phone."

(*Id.*)  That is also why the initial triage was done. (*Id.*)  Downie testified:

> Q:   And what did you tell Special Agent Soli?
>
> A:   So I instructed him that, yes, given that it was so few, . . . there was two videos, there was multiple versions of the video with different names throughout the phone, but I could go in there and delete those videos and

delete the message chains that involved those videos and most likely remove those videos from the phone so that we could -- he could return it.

Q:      When you say, most likely, I sense some hesitation.  Can you explain that?

A:      Standard Bureau policy is that whenever we get a device that has contraband, that device is destroyed.  And that guarantees that media will not be -- child porn will not be returned back out in the wild.  Now destroyed doesn't necessarily mean physically destroyed.  With an iPhone we can either factory reset it or wipe it or something so that we can give back that physical device without any content on it.

Q:      And is that's -- why in this case did you guys not follow the typical policy of destroying the device or wiping the device?

A:      Anytime we come across child pornography there's always other victims that aren't child pornography victims.  For instance, when we seize the computer of a husband and we go to process that computer, even if he's sent and processed [and] goes to jail, the wife may call us and say, hey, can I get all of the pictures of my children because that's where we stored all the pictures of our children.  And then we're forced to determine of [sic], well, by policy we're supposed to destroy all of that information to guarantee that nothing comes out, but we don't want to create another victim of a family that now has lost their entire series of pictures.

Businesses that have someone that's using a business computer and they have child porn on that computer. Do we go destroy that computer and erase all of the files for that business? We're always trying to minimize the ancillary effects of that investigation.  And in this case with him having his business on the phone and people that require his legal services would be on that phone, if we destroy it then they become victims as well because they may lose information that they had.

So it was made -- the decision was made by Stephen Soli to go ahead and do our best to clean the information off of there, remove the videos, remove the chats that had those videos in them and then return the cell phone to him without any child pornography on it.

Q:      So what did you do after your conversation with Special Agent Soli then?

A:      So I went back to where I had the image with the software and everywhere where I found a video, go find that video in the chat log, find that chat on the phone and delete it and then go delete the video and then go to the next video, find it, find where it was used in a chat, go find that chat on the phone, delete it and go through all of the videos like that.

(Mot. Hr'g Tr., 42–44, Oct. 5, 2016, Doc. 36.)

Downie then explained how there were multiple versions of the video on the phone: "as the person is using their phone, the phone is making multiple copies of that video. So you might have the same content, but it might have six or seven or eight different file names based on how it was used on the phone." (*Id.* at 45.)

When Downie went through to remove the child pornography videos from the phone, he did that physically on the device. (*Id.*) First, he would use his results to find a video of child pornography and find the chat stream where the video was mentioned. (*Id.* at 45–46.) Then, on the phone, he would find the chat stream, delete the entire chat between those people, and repeat the process for the next video and related chat. (*Id.*) So, every video that he found in his software that was identified by Agent Soli as child pornography, he would "go find that on the phone and delete that entire chat stream that dealt with that video." (*Id.* at 46.) He deleted the whole chat stream rather than the video because there were about 250,000 messages on the phone, and he was asked to return the phone that day; looking through each message would have been "very, very time consuming and the deletion of a chat stream provided a better opportunity that that message would not be undeleted or recovered, so I made the decision to delete the entire chat conversation where a video of child porn appeared." (*Id.* at 46.) Downie relied on his software to read the video file, and then he found those versions of the video files that were read by the software. (*Id.* at 46–47.)

Downie did not look at other data within the device, and he did not look at e-mails. (Mot. Hr'g Tr., 47, Oct. 5, 2016, Doc. 36.) No child pornography came from e-mails, so he did not open any. (*Id.*) He also did not delete the stream of messages with the young girl, because that was not contraband by law. (*Id.* at 47–48.) He did review that stream. (*Id.* at 48.)

Downie also explained what a filter team is; it is when the FBI "collect[s] evidence that could possibly have attorney-client privileged information in it.  We would take that evidence and send it through a filter team so that they would basically either remove out the privileged material or only extract the material that is not privileged." (*Id.* at 48.)  Here, Downie said he "serve[d] de facto as a filter forensic agent." (*Id.* at 49.) Downie explained how he acted as a filter:

> So in that process I looked through the pictures and the videos to determine that content of what was relevant, extract the conversations that were relevant and outside of that if I opened something that turned out to be a message that was attorney-client privileged information, I could then exclude that, make sure that it wasn't in those results and that I wouldn't corrupt the prosecution team by coming across that material.
>
> So by taking those results and extracting out the things that were possibly relevant for his investigation, giving that to the case agent it excludes him from any material that could have been attorney-client privileged information.

(*Id.* at 59–60.)

Downie shared with Agent Soli the videos themselves and the context of the pictures of the young girl. (*Id.* at 49.)  Downie testified that he "extracted all of the conversations involving child porn[ography] and all of the conversations involving the pictures of [the young] girl . . . for . . . Soli to review." (*Id.*)  Downie further testified, "So what I did is any chat conversation where a video appeared, I extracted that entire conversation for him to review." (*Id.*)  So, if the Defendant sent the video in 2015 but there was a chat stream of three years, the entire conversation would be extracted. (*Id.* at 49–50.)  Given the number of messages, it was beyond Downie's scope to "go back and pick out which ones in the conversation were relevant and which ones were not relevant." (*Id.* at 50.)  It was simpler to extract the entire conversation. (*Id.*)

Downie explained that "context is really important" because it "usually gives intent" and relevance to the investigation. (Mot. Hr'g Tr., 50, Oct. 5, 2016, Doc. 36.)

Downie admitted that he made a copy of the entire phone and everything on it except the operating system, despite the fact that the physical copy of the consent to search form excluded attorney-client privileged material. (*Id.* at 67.) Additionally, Downie acknowledged that there was no official filter team in place, though he said he "was designated as the one to extract only the information that was relevant to his investigation." (*Id.* at 68.) Downie said his instructions were to make an image of the phone, and "[t]here is no tool that will let [him] filter attorney-client privileged upfront. There's no button on the tool that says only collect non-privileged information." (*Id.* at 68; *see also id.* at 87–88.) Downie continued: "the only way to extract and preserve information from that phone is to copy all of the data from the user section, that's the only option [he has]. It's either examine the phone or collect the information from it and leave the phone intact." (*Id.* at 68–69.) Downie "chose to make an image of that phone, to preserve the contents of the phone as they were and then take that image and only extract the items that pertained to child pornography or child exploitation." (*Id.* at 69)

Downie stated that he did not review the entire extraction report. (*Id.*) He segregated out the items pertaining to child pornography or exploitation and provided a copy to Special Agent Soli. (*Id.*) The copy was redacted with the multimedia files deleted in case Soli needed to provide an attorney copy. (*Id.*) Downie was aware that this extraction report went to the attorneys for the government. (*Id.* at 69–70.) Downie did not see any attorney-client privileged information in the conversations he reviewed, but he did not review the entire stack. (*Id.* at 70.) He reviewed the material around the child porn and the pictures of the young girl. (*Id.* at 70–71.)

But Downie extracted the entire conversation between Jessica Starns (attorney with the ATC) and the Defendant, which ranged from April 9, 2013, through August 5, 2015. (*Id.* at 71–72.) That constituted 106 pages of the extraction report. (*Id.* at 73.) Yet Downie only reviewed

the messages surrounding the child porn, so he could not say he conducted any type of privilege review of those 106 pages. (*Id.* at 73–74.)

Downie did not know if any of the texts he downloaded were clients of the Defendant. (*Id.* at 74.)  No one sat down with Downie and told him what law the Defendant practiced so that he could make a determination if he came across a privileged communication. (*Id.*)

Downie further testified that it was not normal protocol to return the phone to the Defendant; normally, he would keep the actual phone as evidence and not give it back where it could be destroyed or deleted. (*Id.* at 75.)  When asked if Agent Soli told him that third parties could be damaged, Downie stated:

> [Agent Soli] explained that [Defendant's] business revolved around that phone and that his client's files were on that phone and that he did not have a backup of that phone.  So if we were to take the phone, seize it and later subsequently destroy it, even seizing [a] portion of it, he would not have the information that he needed for his clients.  Implying that that would cause problems with his business.
>
> So that business itself is an entity.  Just like people are entities, we view businesses as entities as well, they have rights as well.  So in order to try to sustain the business, while yet gathering the information that we needed, collect the information we needed, trying to balance that of not disrupting a business, not hurting a third party, to actually give the phone back after it was cleaned up.

(*Id.* at 76.)

The Defendant's attorney introduced the two CART extraction requests. (Mot. Hr'g Tr., 77–79, Oct. 5, 2016, Doc. 36; Def. Exs. 19 & 20.)  The first request was to preserve evidence on the phone, and the second was to analyze the phone and extract the contents. (Mot. Hr'g Tr., 77–79, Oct. 5, 2016, Doc. 36.)  The second form says "consent" for legal authority, but there's no exception for attorney-client privilege because it is a drop-down box form. (*Id.* at 79.)  The form stated, "Extract identified child pornography video and related messages/contacts," and Downie

43

interpreted this as "the message conversation." (Mot. Hr'g Tr., 79, Oct. 5, 2016, Doc. 36; Def.
Ex. 20.)

Downie testified, "my role was to identify the child porn and extract the conversations
where the transmission of that child porn occurred and to identify child exploitation and extract
the conversations and context of where that child exploitation might have occurred." (*Id* at 85.)
Downie was asked if "it was up to the case agent to figure out which of the actual conversations
were actually relevant to the child pornography?", and he responded, "Yes, sir." (*Id.*)

Downie also testified that, other than the role he described, he has not spoken to any of
the agents in this case about this matter. (*Id.* at 87.) He did not provide any analysis of what was
distributed and when it was distributed. (*Id.*)

### 2. Defendant Gets His Phone Back, and Agent Soli Tells the Defendant That Defendant Is Not a Child Pornographer

Agent Soli testified that, when "whatever Forensic Examiner Downie had done was
complete, and [Soli] was ready to return the phone to [the Defendant][,] [Soli] reached out to
[AUSA] Cam Le and updated her on what was going on." (Mot. Hr'g Tr., 229, Sept. 15, 2016,
Doc. 49.) Soli testified that Downie had told him (something like) Downie did not need the
phone anymore because Soli "had been telling [Downie], you know, do it as quickly as possible
and let [Soli] know when [he] can get Mr. Young his phone back." (*Id.*) Downie had used the
term "extraction, the exam." (*Id.*)

Agent Soli conferred with AUSA Cam Le, and, on August 6, 2015, at 8:46 a.m., she
wrote to Steve Soli the following instructions:

Steve:

After our conversation, I conferred with the U.S. Attorney. We agree that the
phone can be returned to Mr. Young with the condition that the child pornography

is removed from the device.  Also, when you have a chance, please forward an opening request to the FAUSA/Criminal Chief, Corey Amundson.

Sincerely,
Cam T. Le.

(Mot. Hr'g Tr., 229–30, Sept. 15, 2016, Doc. 49; Gov't Ex. 8E.)

The Defendant testified that he heard from Agent Soli on the morning of August 6. (Mot. Hr'g Tr., 24, Sept. 15, 2016, Doc. 49; Def. Ex. 3.)  At 8:55 a.m., Agent Soli asked the Defendant via email to call him, and, when the Defendant did, Soli said that they had finished with the Defendant's phone and that they wanted to make arrangements for him to get it back. (Mot. Hr'g Tr., 24, Sept. 15, 2016, Doc. 49; Def. Ex. 3.)  Defendant testified that Agent Soli said there was only one video on his phone, and Defendant reminded him there were two. (Mot. Hr'g Tr., 24, Sept. 15, 2016, Doc. 49.)  Defendant claimed that Agent Soli said he'd email Defendant " 'later today when we finish going through some of your -- the rest of your e-mails.' " (*Id.*)

At 2:20 p.m., Agent Soli emailed Defendant again stating that they were done with his phone and that Defendant should contact him to make arrangements for its return. (Mot. Hr'g Tr., 25, Sept. 15, 2016, Doc. 49; Def. Ex. 4.) An hour later, the Defendant met Agent Soli at the same lobby of the FBI office which Defendant had gone to the previous day. (Mot. Hr'g Tr., 25, Sept. 15, 2016, Doc. 49.)

Agent Soli similarly testified that he did not recall exactly what the conversation was when he talked to the Defendant after the 8:55 a.m. email. (*Id.* at 150–51.)  However, it was "fair to say it was either come pick up your phone; we're going to be done with it today or it was . . . Mo Hattier would like to meet you.  You want to come talk -- would you be willing to come talk with him?" (*Id.* at 151.)

Defendant testified that he met only with Agent Soli. (*Id.* at 25.)  Agent Soli gave

Defendant back his phone and another form evidencing the fact that the iPhone was returned to

the Defendant. (Mot. Hr'g Tr., 25–26, Sept. 15, 2016, Doc. 49; Def. Ex. 5.)  Defendant testified

that Agent Soli returned the phone to him without his request. (Mot. Hr'g Tr., 41, Sept. 15, 2016,

Doc. 49.)

Additionally, according to the Defendant, he asked Agent Soli what Soli thought about

what he found on the phone. (Mot. Hr'g Tr., 26–27, 42, Sept. 15, 2016, Doc. 49).  Defendant

testified that Agent Soli responded, "If you're asking if I think you're a child predator or a child

pornographer, no, but I do think you're politically incorrect." (Mot. Hr'g Tr., 26–27, 42, Sept.

15, 2016, Doc. 49).  Defendant interpreted this to mean that he was not a child predator or

pornographer. (Mot. Hr'g Tr., 43, Sept. 15, 2016, Doc. 49.)

Defendant admitted that Agent Soli made no explicit promises to him. (*Id.* at 43–44.)

However, Defendant believed he made an implicit promise that he would not be prosecuted. (*Id.*

at 43.)  Additionally, the Defendant never asked Agent Soli, "is the Government going to

prosecute me?" (*Id.* at 44.)  Agent Soli also did not say, "I will recommend to the U.S.

Government or any local prosecutors not to prosecute you." (*Id.* at 45.)

Defendant testified that the meeting lasted "maybe five, ten minutes." (*Id.* at 42.)

Defendant described Agent Soli's demeanor as "very pleasant." (*Id.*)

Agent Hattier testified that he may have been told at the time that the phone was given

back pretty quickly. (*Id.* at 72.)  Hattier explained, "I know [Defendant] was concerned about the

number of contacts that he had on his phone and basically that was his -- his livelihood." (*Id.*)

Agent Hattier later expanded on that, stating that it was his understanding that the Defendant's

"livelihood was on that phone.  He's a lobbyist.  He's an attorney.  All of his contact information is on the phone, and he was concerned about getting it back as quickly as he could." (*Id.* at 105.)

Agent Hattier did not know that Agent Soli told the Defendant that Soli did not think Defendant was a child pornographer, and Hattier had no specific recollection of being told that. (*Id.* at 72–73.)  Hattier did not remember having any discussions with Agent Soli concerning whether the Defendant should be prosecuted for child pornography. (*Id.* at 73–74.)

Agent Soli testified that he did not have an idea of what was on the phone at the time it was returned to the Defendant. (Mot. Hr'g Tr., 156, Sept. 15, 2016, Doc. 49.)  Soli could not be certain when Downie told him what on the phone was of interest to Soli's investigation. (*Id.*)  Downie only presented Soli with a report of things that were related to Soli's investigation. (*Id.* at 157.)  The report provided text communications with a female and two videos and maybe a photo or two. (*Id.* at 157.)  It was not a thick report and had only a few very short comments. (*Id.* at 157–58.)  Anything Soli read related to the child pornography investigation. (*Id.* at 158.)  The report was named something along the lines of a CART Forensic Review or Exam Report. (*Id.*)  The report had less than one hundred text messages on it. (*Id.*)  None of the text messages related to Troy Hebert, the ABC Board, or individuals obtaining liquor licenses. (*Id.* at 158–59.)

Agent Soli stated that he remembered the Defendant asking him questions about what he thought about the video. (*Id.* at 162.)  Soli also remembered the Defendant saying, "I'm not a pedophile and these type of things." (*Id.*)  Soli testified, "I told him that, you know, I didn't think he was necessarily, you know, a pedophile or this or that, you know," but Soli told Defendant that Defendant was politically incorrect. (*Id.*)  Agent Soli does not remember telling anyone else at the FBI about that conversation. (*Id.* at 162–63)

On direct examination by the Government, Soli explained why he said that:

Well, you know, I don't -- as far as the cases I work, and the level of child pornography activity and production and stuff I've seen that what I would call – who I would describe as a pornographer would be a producer.  And, you know, as far as my interaction with Mr. Young, when I discussed what I thought he was or was not, for the most part, I was trying to just put him at ease and, you know, almost used like a minimizing technique of what he was engaged in.

(*Id.* at 197–98.)  When asked what a minimizing technique is, Soli further stated:

So if I interview somebody that is involved in criminal activity, I typically do not, during that interview, act like it's an extremely serious matter and the worse thing you could have ever done and you're a horrible person, you know. I try to kind of put them at ease with some empathy and, look, this isn't the worse thing in the world.  We can work through this type attitude.

(*Id.* at 198.)  Agent Soli was not offering a legal opinion as to whether it was a violation of federal law, and he did not communicate that this was not a violation of federal law to the Defendant. (*Id.*)

Soli characterized his interaction with the Defendant as, "Hey, this is -- to some degree it's a problem and you should also consider talking to Mo Hattier because there's a problem here." (*Id.* at 198–99.)  By "problem," Agent Soli meant "this is illegal activity," and he felt like he communicated that with the Defendant. (*Id.*)

### G. August 7, 2015—Limited Extraction of Shantel Wempren's Phone

A "Report of Examination" dated August 20, 2015, indicates that, on August 7, 2016, Agent Soli made a request for the New Orleans CART examiner "to extract [the] identified child pornography video and related messages/contacts" from Shantel Wempren's phone. (Def. Ex. 23.)  The "Summary of Results" section indicated that "The requested video was located.  The video, *related iMessages*, and the related contact information was extracted and provided in an electronic examination format." (*Id.* (italics added).)  In the "Details of Examination" section, the report states:

Using UFED's Physical Analyzer, an Advanced Logical Data Extraction was successfully performed from the iPhone. After extracting the data, *a series of iMessage chats* were identified between Shantel Wempren and Chris Young. The iMessage string began on July 18, 2012 and continued through August 4, 2015. *Six message entries identified as connected with a video attachment received on July 23, 2015 at 11:33 pm, CDT were extracted with the video.*

(*Id.* at 2 (itatalics added).)

### H. Between August 7, 2015 and October 28, 2015

#### 1. Videos Still on the Phone

Defendant testified that, at some point after he got his phone back, he determined that the donkey video was still on it. (Mot. Hr'g Tr., 27, Sept. 15, 2016, Doc. 49.)  Defendant accidently discovered the video when he was texting someone he had already sent one of the videos to; his history popped up, and the video was still there. (*Id.*)

On August 11, 2015, after the Defendant got a new phone, he gave his phone to his attorneys. (*Id.*)  Defense counsel advised him to preserve the phone. (*Id.*) Defendant was not sure when his attorneys notified the Government, and he was not aware of the fact that his counsel refused to hand over the phone to the Government on multiple occasions. (*Id.* at 45–46.)

Agent Hattier did not have a specific memory of when he learned that the phone still had the video on it.  (*Id.* at 111.)  Hattier thought that he learned that from AUSA Cam Le, but then he said "we learned" it from one of the Defendant's attorneys. (*Id.* at 111.)  Prior to this, Hattier did not know that the child pornography videos were still on the phone. (*Id.* at 112.)  He later stated that, though he really could not speak on the issue, "it was the misimpression of Agent Soli -- I'm speaking for him -- that the videos had been removed.  And it wasn't until later on during the Government's interactions with defense counsel that we learned, in fact, that the videos had not been deleted." (*Id.* at 121–22.)  Hattier said that, at some point, AUSA Cam Le told defense counsel that the Government needed the phone back, and there was some resistance.

(*Id.* at 122.)  The Government eventually issued a Grand Jury subpoena, and defense counsel

provided the phone. (*Id.*)

Agent Soli testified that, when he returned the phone to the Defendant, he did not know

that the videos were still on it.  (*Id.* at 175.)  He learned this from AUSA Le a few months before

the September 15, 2016, hearing of this matter. (*Id.*)  Agent Soli said this was not the normal

procedure, and it was not intentional:

> I think the two contributing factors to that one is a misunderstanding on my part
> on exactly what had been done with the phone.  And then, two, is a kind of a
> break from the usual protocol and how I handle this material and devices that
> resulted in it being returned with the videos in place, which shouldn't have been
> done.

(*Id.* at 176.)  Soli further explained:

> It was expedited[,] and I hadn't submitted the device for a full CART exam where
> there's usually any media devices like that would be processed by CART and
> ensured that they're suitable for return or they're scheduled for destruction.  And
> in this case, in kind of an expedited effort to get [Defendant] his phone back
> because he had expressed concerns about his livelihood and needing the phone to
> conduct his business, I returned it quicker than I usually do.

(*Id.*)  Soli did not know anything about the phone after he gave it back. (*Id.* at 177.)

Agent Soli later testified that he returned the phone within twenty-four hours of it being

taken and that he acted so rapidly "[b]ecause [Defendant] was . . . expressing concerns about,

you know, his attorney-client privilege and privacy in his profession and that the phone was

important to his livelihood and he needed it back immediately." (*Id.* at 199.)  Agent Soli was

trying to accommodate the Defendant's desires and concerns. (*Id.*)  Soli said a case is not

typically handled that way, and it is not their policy to return devices to defendants when they

have child pornography on them. (*Id.* at 199–200.)  Soli did not knowingly do that here, and he

expected any child pornography material to be deleted or extracted from the phone before being

released. (*Id.* at 200.)

Agent Soli requested that Downie "extract any files or information related to child pornography, child pornography investigation." (*Id.* at 201.)  Soli used the word "extract," and, by that, he intended "extract" to mean that "it would be taken off the phone and preserved and certainly not left behind for release back to anybody." (*Id.* at 201.)

Moreover, before he released the device to the Defendant, Agent Soli did not access the device to see if the child pornography was still on it. (*Id.*)  When asked why, Soli first said he was sensitive about not reviewing anything unrelated to child pornography, but he then said, "to be honest, it just hadn't really crossed my mind to go like double check to make sure child pornography had been removed." (*Id.* at 201–02.)  His expectation was that the child pornography had been removed. (*Id.* at 202.) Soli said it is important to return the phone without child pornography on it because "we don't want it out in society to be, you know, shared again." (*Id.*)  It was not Soli's intention to disseminate the phone back with the prohibited material on it. (*Id.*)  Moreover, Soli and Downie did not "sit around and define, between each other, what the word 'extraction' meant." (*Id.* at 205.)

Additionally, when asked about the instructions AUSA Cam Le had given him on August 6 about returning the phone without the child pornography on it, Agent Soli stated:

Q:   So when you returned the phone, were you intending to comply with these instructions?

A:   I was intending to comply with them.  I thought I was.

Q:   And, again, why was it -- it turns out that that caveat was not carried out?

A:   That's right.

Q:   Why not?

A:   An error, inadvertent mistake, misunderstanding between myself and Downie.

(Mot. Hr'g Tr., 230, Sept. 15, 2016, Doc. 49; Gov't Ex. 8E.)

51

Soli stated that he made it clear to Forensic Examiner Downie that Downie should be careful because the Defendant was a lawyer. (Mot. Hr'g Tr., 205–06, Sept. 15, 2016, Doc. 49.) Soli also testified that he was sensitive to the contents of the phone; the Defendant was cooperating, and Soli was trying to honor the terms of their agreement not to review anything that was not related to child pornography. (*Id.*)  To Soli's knowledge, no one went on the phone and accessed it for the purpose of searching for child pornography other than Forensic Examiner Downie.

### 2. The Case Agent in this Investigation

Agent Hattier stated that, at some point between August and October of 2015, Agent Hattier replaced Agent Soli as case agent. (*Id.* at 81–82.)  By at least April of 2016, Agent Soli likely resumed being the case agent. (Mot. Hr'g Tr., 96, Sept. 15, 2016, Doc. 49.)

Agent Soli similarly stated that, around September or October of 2015, Agent Hattier replaced him as case agent. (*Id.* at 159–60.)  Soli also testified that, in April of 2016 (or shortly after), the case was reassigned to him after Hattier's promotion. (*Id.* at 171.)

Agent Soli said the reassignment to Hattier was done because Agent Hattier "had -- apparently, in [his] understanding, had established some working relationship with [the Defendant] and that investigation was being conducted and [Hattier] would just take it over." (*Id.* at 160.)  Soli testified:

Q:     Was he taking it over because it was becoming a public corruption case?

A:     That's what I believed.

Q:     Do you know whether or not Agent Hattier investigates child pornography cases?

A:     I don't know if he has.  I don't believe -- I don't believe him to.

Q:     So the case went from a child pornography case to a public corruption case and so you were removed?

A:     Yes.

(*Id.*)   Soli stated that he "had the impression that [Hattier] had met with [the Defendant,] and there was investigative activity related to . . . public corruption and the violations that [Hattier] works.  And there was an agreement that . . . [Hattier] was more active in the investigation than me, so it should be on his squad." (*Id.* at 160–61.)   Hattier's squad is the one that conducts public corruption investigations, and it has nothing to do with child pornography. (*Id.* at 161.) When asked who would investigate the child pornography case, Soli stated: "Well, there was no further child pornography investigation to be done on my end, but they could do that if they want.  I mean, they're not prohibited from it, but the case was better suited, was my understanding, you know, under [Hattier], under that squad." (*Id.*)

## I.   October 7, 2015—Agent Hattier's Review of the Cell Phone

On October 7, 2015, Agent Hattier personally reviewed what had been taken off the phone, and, two days later, he wrote a report. (Mot. Hr'g Tr., 81–83, Sept. 15, 2016, Doc. 49; Def. Ex. 13.)  When Hattier was asked if he was reviewing the text messages for more than child pornography, he stated:

> I mean -- my process was identified with the filings were for the particular videos in question, and I just did a search and find, you know, edit find, edit find for each occasion when those videos had been distributed to other folks.  So I did that. Now, with respect to his communications with . . . Ms. Starns, with respect to his communication, text messages back and forth with her, I didn't review the entirety of that, but I did look at some of those, you know, kind of -- just to kind of get an understanding, a better -- a better picture of the nature of their kind of contact with each other.

(Mot. Hr'g Tr., 82, Sept. 15, 2016, Doc. 49.)

53

It should be noted that Hattier conducted this review before meeting with the Defendant's attorneys on November 5, 2015. (*Id.* at 83.)  At the November 5, 2015, meeting, Agent Hattier told defense counsel that only text messages that had to do with child pornography had been reviewed. (*Id.* at 83.) Hattier said, "That still, to this day, is my understanding, that that's how the CART exam process was conducted and the stuff that we were given access to related to the child pornography." (*Id.* at 81.)

However, at the September 15, 2016, hearing, Agent Hattier was shown his October 9, 2015, report, and it indicated that he had reviewed a conversation between the Defendant and his sister concerning Troy Hebert. (Def. Ex. 13 at 1.)  Agent Hattier then testified that, if the video was shared at some point in the text conversation history, the entirety of the text communications were downloaded by the CART examiner, and he thought he just reviewed "a portion before and after to just kind of get the context of how the video was shared, the reaction by the person and such." (Mot. Hr'g Tr., 84, Sept. 15, 2016, Doc. 49.)

Hattier's report also mentioned a September 5, 2013, text that had a reference to the ATC, so that "caught [Hattier's] attention, given [his] prior investigation, and [he] reviewed it." (*Id.* at 84.)  Hattier reiterated that his public corruption investigation was closed but that, because the Defendant had "come up quite prominently in that prior investigation," the ATC was of interest to him. (*Id.* at 85–86.)  When asked why he told Defendant's attorneys that only communications involving child pornography had been reviewed, Agent Hattier said:

> No. My -- My representation to you [(*i.e.*, defense counsel)] -- my understanding was you guys were concerned about us looking at Mr. Young's communications with his legal clients, and that's what I was telling you, is that I didn't review anything, to my knowledge, that was him discussing attorney-client privileged communications with someone else.

(*Id.* at 86.)

Hattier was then shown his FBI report from the November 5, 2015, meeting with ASUA

Cam Le and defense counsel wherein he said that "[o]nly those communications which involve

the transmission of child pornography have been reviewed." (Mot. Hr'g Tr., 86–87, Sept. 15,

2016, Doc. 49; Def. Ex. 11 at 2.)  Hattier then testified:

> Q:      But you reviewed communications that involved more than just child
>         pornography or just the alleged child pornography, correct?
>
> A:      Well, I mean, to get a better context of the nature of the relationship with
>         the person whom he shared the video with, yes.  I looked at -- I didn't
>         simply just look at: Okay, on this date, at this time, that particular video
>         went out to this person, and that was the extent of my review.  I looked at
>         a broader picture of the nature of the conversation he's having with that
>         person.  But, again, as I say in here, you know, sensitive to the attorney-
>         client stuff, I'm not aware of, myself, reviewing any privileged
>         communications between [Defendant] and any of his clients.
>
> Q:      But you only tried to get a broader view when it pertained to public
>         corruption; is that right?
>
> A:      Yeah, I mean, to an extent.  I think I would have only made reference to it
>         in this particular report or in the prior report you referenced if – if it had
>         potentially some nexus to public corruption, yes.

(Mot. Hr'g Tr., 87, Sept. 15, 2016, Doc. 49.)  Hattier went through many of the communications

in his report, and he said that part of the review was identifying who the people were. (*Id.* at 88–

89.)

Hattier then pointed to the September 30, 2013, entry, which had some information about

the person being a marketing representative at a credit union. (Mot. Hr'g Tr., 89, Sept. 15, 2016,

Doc. 49; Def. Ex. 13 at 2.)  Hattier stated that the information "would have been helpful to us

later on if we were to try and locate and contact that person." (Mot. Hr'g Tr., 89, Sept. 15, 2016,

Doc. 49.)  But Hattier then admitted that it was "certainly also of interest" that the individual had

"asked for [Defendant's] assistance in obtaining a liquor license." (Mot. Hr'g Tr., 89, Sept. 15,

2016, Doc. 49; Def. Ex. 13 at 2.)  Hattier was asked, "So the only two things that caught your

interest had to do with the ATC and Troy Hebert?", and Hattier responded, "Yes." (Mot. Hr'g Tr., 90, Sept. 15, 2016, Doc. 49.)

On direct examination by the Government, Agent Hattier explained that the CART examiner extracts the information that he reviewed. (*Id.* at 106.) Hattier did not have full access to everything on the phone. (*Id.*) Hattier had access "to the text conversation histories that, in the CART examiner's opinion, contained information relevant to the child pornography video"; that is, if the CART "examiner identified a video being shared by [the Defendant] with someone else, the examiner captured the entirety of that text conversation history from start to finish, however long, whether it was a month, a year or five years, it was captured." (*Id.*) The information was useful to "see kind of what the nature of [the Defendant's] relationship is with that person, what kind of response or comment went along with the video. And then also with respect to Ms. Starns . . . given her employment with -- at ATC, [Hattier] was interested in reviewing that also." (*Id.* at 106–07.) Hattier did not decide which text messages or images were made available to him, and he did not review any communications with people who did not receive the child pornography videos. (*Id.* at 107.) He would "identify the video name, do a search for that and every conversation that that video name showed up in," and then review it. (*Id.*)

### J. October 28, 2015—The Target Letter and Hattier's Second Alleged Set of Inappropriate Comments to the Defendant

Three months later, on October 28, 2015, Defendant again heard from Agent Hattier. (*Id.* at 28, 46.) Hattier told the Defendant he had a letter he needed to give to the Defendant, and the Defendant needed to sign for it. (*Id.* at 28.) They made arrangements to meet a couple of hours after the call at the Gatti's Pizza parking lot in Baton Rouge, at the corner of Perkins and Essen. (*Id.* at 28, 46.)

56

Only Hattier and Defendant were present at this meeting. (*Id.* at 29, 46.)  Defendant

stayed in the car. (*Id.* at 29.)  He rolled down the window, and Agent Hattier walked up to the car

and gave Defendant a target letter. (*Id.*)  The letter stated in relevant part:

> Dear Mr. Young:
>
>      This office is in the process of investigating you for violations of federal
> criminal law.  At this point, there is evidence to believe that your conduct violated
> Title 18, United States Code, Sections 1462 and 2252A, among other statutes and
> regulations.
>
>      As a courtesy to you, I am now available to discuss this matter with you
> and/or your attorney.  Should you desire to attempt to resolve this matter prior to
> further action by this office, you or your attorney may contact me, at the above
> telephone number, within seven (7) days from your receipt of this letter.  If you
> are represented by an attorney, please show this letter to your attorney.
>
>                          Sincerely,
>
>                          J. Walter Green
>                          UNITED STATES ATTORNEY
>
>                          [*Cam Le's handwritten signature*]
>                          Cam T. Le
>                          Assistant United States Attorney

(Def. Ex. 6.)  At the hearing, Defendant understood one of those statutes "is obscenity and the

other one is child pornography." (Mot. Hr'g Tr., 29, Sept. 15, 2016, Doc. 49.)

According to the Defendant, when Agent Hattier gave him the target letter, Hattier said,

" 'We can make this go away if you cooperate with us.  We can . . . We can wire you up like you

see in the movies and help us collect information on public officials.' " (*Id.*)  Defendant said he

replied, " 'I don't know anything about any -- anything -- you know, public corruption related to

public officials.' " (*Id.* at 30.) Hattier responded, " 'You've been lobbying for [twenty] years.

Certainly someone has offered you something or you have offered them something during the

past [twenty] years.' " (*Id.*)  Defendant then said, " 'I have never been asked anything improper,

nor have I offered anyone anything improper.' " Hattier asked about Troy Hebert and said,

" 'He's a good friend of yours. Y'all travel together.  Certainly you know something about

him.' " (*Id.*)  Defendant stated, " 'I do not,' " and he expressed no interest in wiring up for the

Government. (*Id.*)

On cross examination, the Defendant was asked about his affidavit, in which he stated the

same thing and purportedly quoted Agent Hattier.  (*Id.* at 47.) Defendant said he did not take

notes, but he remembers that Hattier said that. (*Id.* at 47–49.)  Defendant also stated that he

understood Hattier's statement to mean that the prosecution of the two videos would go away if

he wore a wire and tried to collect evidence against public officials. (*Id.* at 48–49.)  Defendant

"absolutely" believed that Agent Hattier's statements meant that he would not be prosecuted if

he cooperated. (*Id.* at 49.)  Defendant said he felt pressured by the exchange, though Agent

Hattier was not threatening or harassing. (*Id.* at 50–51.)

On the other hand, Agent Hattier testified that AUAS Cam Le asked Hattier to deliver the

target letter to the Defendant. (*Id.* at 74.)  Agent Hattier said he told the Defendant the letter was

in reference to the videos that were on his phone, and Hattier did not think that the letter

mentioned anything about public corruption. (*Id.*)

Hattier testified that he delivered the target letter to the Defendant because, at that time,

he was more involved in the child pornography investigation. (*Id.* at 74–75.)  When asked why

he took over for Agent Soli, Agent Hattier stated:

> I think at that point, the general thought was that there weren't that many more
> steps to be taken as part of the child pornography investigation and that if at some
> point, Mr. Young decided to sit down and talk to us about public corruption and
> other matters, I was probably the more appropriate person for him to sit down and
> talk to.

(*Id.* at 75.)  Hattier then testified:

Q:     You were in the best position to leverage a child pornography investigation and potential charges over [Defendant's] head to get him to cooperate with you in your public corruption investigation; isn't that right?

A:     I don't know if I would use the word "leverage."  I think prosecuting decisions are made by the U.S. Attorney's Office.  My -- I think my value was I would have been more familiar and knowledgeable about names that he might mention if he sat down and talked to us, activity [sic].  I was -- I was in a better position to sit down and ask informed questions of [Defendant] relating to public corruption.

Q:     But I thought that this case was about child pornography?

A:     Yeah, and again, I'm only speaking for myself, but at that point, I was not aware of that many more steps to be taken as part of a child pornography investigation.  The evidence was on the phone, the evidence of who he distributed the videos to was on the phone.  You know, I did take certain steps of identifying who the other folks were that received the videos from him.  We were in the process of identifying those people, but personally, I did not see this prolonged investigation.  I didn't see it as that many more steps that had to be taken in the child pornography investigation.

Q:     When you gave [Mr. Young] the target letter did you tell him you could make this go away if he cooperated?

A:     No.

Q:     You're sure about that?

A:     I'm absolutely sure.

Q:     Did you tell him you could wire him up, just like you see in the movies?

A:     No, I didn't use those words.  The context was I had had a short conversation with [the Defendant].  He's sitting in his car vehicle, I'm standing outside.  I gave him the letter, told him what it was about.  I also informed him that we were interested in sitting down with him at some point if -- if that was something he was amenable to.  And once our interaction was completed, before he pulled off . . . I did stop him briefly and said to the extent that he was, you know, open to the idea or wanted to sit down and talk to us about public corruption that, although I couldn't control what he -- what he said or what he did, it would probably be more beneficial to him not to let other folks know that he had had contact with us.  And I may have, as an example, said: "For instance, if other individuals are aware that you're talking to us, your ability to, you know, do a report in -- covertly is going to be diminished.

Q:  Did you ask him at that meeting about Troy Hebert?

A:  I did. Well -- I was going to say, I don't know if I'd call it a question. Basically I was telling Mr. Young, "Given your employment and your position, you know, we think that you may have information of interest to us."

And he was like, "Oh, well, you know, what kind of information?"

"Well, you know, maybe at some point in the past, somebody has asked you for something. Maybe you don't know directly. Maybe you've just heard about that sort of thing going. That would be information that would be of interest to us."

"Well, I don't know that I would have anything."

And I -- you know, "For instance, I understand you're -- you know, you're very close to Mr. Hebert and that you guys travel overseas together." And at that point, Mr. Young started to try and say, "Well, yeah, but he pays his own way" -- I wasn't -- my intention was not to conduct an interview of Mr. Young at that point. I was actually heading to a doctor's appointment.

So when he started to make statements about, "I can't do this" or "Mr. Hebert pays for his travel," I cut him off and said, "I'm not interested in doing an interview right now. We'll talk about that at a later point."

(*Id.* at 75–78.)

Agent Hattier testified that he wrote a report of the incident and that it did not mention Troy Hebert. (*Id.* at 78.) While it was not standard practice to leave things out, "in that instance, [the reference to Hebert] was in passing" and was just Hattier "offering [Defendant] an example of what [Hattier] -- the type of information that [Hattier] thought [Defendant] could provide, and [Hattier] chose to leave it out of the report." (*Id.* at 78–79.) Hattier thought it was "inconsequential at that time."; Hattier testified, "I wasn't conducting an interview and I -- quite simply, I wasn't trying to nail him down to certain statements." (*Id.* at 79.) Hattier was just "planting the seed in his mind that we had an interest in sitting down and talking to him." (*Id.* at

79.) "Again, the thrust of it was, 'We have an interest in sitting down and talking to you.  We think, given your -- you know, your profession and the people you associate with, it's our belief that you may have information that would be of interest to us." (*Id.*)  Hattier even said he encouraged the Defendant to talk to an attorney, give the attorney the letter, and then get back with Hattier at a later point." (*Id.* at 80.)  But Hattier admitted that he had no intention to want to interview the Defendant about the child pornography case; Hattier wanted to talk about public corruption.  (*Id.*)  Hattier stated, "in my view, right or wrong, the child pornography was -- was done.  I mean, it was on the phone.  We saw who he distributed it to. . . . That evidence was there.  It was not necessary to try and further develop that through him." (*Id.*)

On direct examination by the Government, Hattier stated that the entire encounter lasted five or six minutes. (*Id.* at 108.)   Hattier went to the meeting alone because he was going to a doctor's appointment at the Baton Rouge Clinic and did not want to "inconvenience another agent . . . for what was going to amount to a very brief encounter." (*Id.*)  Hattier stated that he initially called the Defendant by phone to let him know he had a letter to deliver. (*Id.*)  Hattier then sent Defendant a text message saying that Hattier was in the parking lot of Gatti's Pizza. (*Id*. at 108–09; Gov't Ex. 7.)  When Hattier saw the Defendant pull up, Hattier exited his vehicle and approached the Defendant. (Mot. Hr'g Tr., 109, Sept. 15, 2016, Doc. 49.)  Defendant rolled down his window and talked to Hattier through the driver's window.  (*Id.*)  Hattier handed the Defendant the letter, "gave him a chance to review it[,] . . . let him know that it was in relation to the videos that were on his phone, and then it proceeded from there." (*Id.*)

Hattier was also asked about the Defendant's affidavit. (*Id.*)  Hattier denied saying, "We can make this go away if you cooperate." (*Id.*)  Hattier again provided context for the "wire you up" comment, explaining that, to the extent other individuals became aware of his contact with

the FBI, that would diminish Defendant's ability to help himself do recordings. (*Id.* at 109–10.)

But Hattier would not have said, "We'll wire you up just like you see in the movies." (*Id.* at 110.)

Hattier testified that his only encounters with the Defendant were on August 5, 2015 (when Hattier met the Defendant in the foyer of the FBI office), and on October 28, 2015 (when Hattier handed Defendant the target letter). (*Id.* at 101, 110.)

Hattier also insisted that at no point did he tell the Defendant that there would be no prosecution if the Defendant cooperated. (*Id.* at 112.)  When Hattier was asked how he knew this, Hattier stated:

> Well, first of all, that's not something I would have -- I would have done, you know, as an agent, working with -- the U.S. Attorney's Office makes those decisions.  I wasn't in a position to make that kind of representation to him.  I was encouraging him to get with counsel and to re-contact us.  And, you know, telling him you are going to be -- or you're not going to be prosecuted if you cooperate and/or vice versa, you are going to be prosecuted if you don't cooperate is just not something I would have told him.

(*Id.*).  Hattier also did not remember making any kind of recommendations about prosecutions. (*Id.* at 113.)  He did not speak to anyone in the U.S. Attorney's Office to recommend that the Defendant not be prosecuted or that charges should be pursued. (*Id.* at 113.)

Hattier stated that he had no notes from his conversation with the Defendant. (*Id.* at 119.)  However, Hattier prepared a separate, short 302 report documenting the delivery of the target letter. (*Id.*).  Again, that 302 report does not mention Troy Hebert. (*Id.*)  Hattier testified that that was because, at that stage, he did not want to commit the Defendant to making statements and because Hattier was not interviewing the Defendant. (*Id.*)

Again, Agent Soli testified that he never heard Agent Hattier say the statements that were attributed to Hattier in the Defendant's affidavit. (*Id.* at 230–31.)  Moreover, Agent Soli said he

has never heard Agent Hattier say anything like this in any case he has worked with Hattier over the last eight years. (*Id.* at 231.) Agent Soli said these statements are not something Soli himself would say, "just knowing that I'm not authorized to say that." (*Id.*)

### K. Beyond October 28, 2015

#### 1. Defendant's Interaction with the FBI since the Target Letter

The target letter stated that the Defendant needed to contact the U.S. Attorney's Office within seven days, and Defendant told Agent Hattier that he would do that. (Mot. Hr'g Tr., 30–31, Sept. 15, 2016, Doc. 49; Def. Ex. 6.) Defendant said he turned the matter over to his attorneys. (Mot. Hr'g Tr., 31, Sept. 15, 2016, Doc. 49.)

Since October 28, 2015, Defendant has had no contact with any of the FBI agents. (*Id.* at 51.) Agent Hattier has not called the Defendant once since that date. (*Id.* at 51.)

Since that date, all contact or discussions that the Defendant has had with the Government has been through his counsel and with the prosecutors in this matter. (*Id.* at 52.) Moreover, since defense counsel became involved, every conversation about cooperation or plea negotiations has happened through his counsel. (*Id.*) Defendant was aware that his lawyers and the government talked about different options that they would consider allowing him to plea to a bill of information. (*Id.*) But Defendant would not characterize them as plea discussions "because [he] was never negotiating. . . . [T]hat was [his] instructions to [his] lawyers [was] that there was no -- nothing to negotiate." (*Id.*) Defendant was presented with different options, but he declined to accept them and understood the consequences of declining to accept other charges. (*Id.* at 53.)

Defendant was asked at the hearing, "After October 28th, 2015, which is the last time you had contact with any of the FBI Agents, any conversations about resolving the case, did that

involve a requirement that you cooperate in a public corruption investigation?" (*Id.* at 54.)  He

responded, "I don't recall that being a requirement, no." (*Id.*)

### 2. November 5, 2015—The Meeting Between the Government and the Defendant's Attorneys

On November 5, 2015, Agent Hattier and AUSA Cam Le met with defense counsel.

(Def. Ex. 11.)  Def. Ex. 11 is type-written notes from that meeting.  According to the notes,

"Schonekas and Gibbens [(defense counsel)] said they were not interested in reviewing the

evidence of child pornography that had been recovered from the cell phone of their client, Chris

Young." (Def. Ex. 11 at 1.)  The notes also explained that Schonekas did not bring Young's

phone with him, despite the Government's request. (*Id.*)  But Schonekas had the phone at his

office, and Young lacked access to it. (*Id.*)

Upon request, Hattier explained his understanding of the procedures used to remove the

videos from Young's phone, and this would likely require the phone to be wiped or factory reset.

(*Id.* at 1–2.)  According to the notes, "Schonekas said that Young was concerned about losing

access to his contacts and other employment related data." (*Id.*)  The notes stated, "Writer

[Hattier] acknowledged that it had been a mistake for the FBI to return Young's phone to him

without having first removed the contraband." (*Id.* at 2.)

The notes then said that Hattier provided an overview of the "CART process" used to

make an image of Young's entire phone and how the evidence of the pornography was extracted.

(*Id.*) The complete image was being stored in evidence and will not be accessed by the

investigative team. (*Id.*)  The notes further provided:

> The government is aware of Young's employment as an attorney and is being
> sensitive not to infringe on the attorney-client privilege. Only those
> communications which involve the transmission of child pornography have been
> reviewed.

(*Id.*)  The CART work was only done after a consent to search form was signed by Young. (*Id.*)

Def. Ex. 11 further stated how, upon request, Hattier summarized the conversation he had with Young when he delivered the target letter. (*Id.*)  The summary explained:

> Among other statements, Writer [Hattier] informed Young that the government felt that, given his employment and associations, he may be in possession of useful information relating to corruption and that the government was interested in speaking to him further.  At the time, although he claimed not to have any information, Young expressed an interest in a future meeting.  Only truthful information was desired.  The government did not want Young to fabricate any information.

> It was in this context that Writer had mentioned the name of Troy Hebert as a public official regarding whom Young might have information.  Young had responded that he and Hebert were close friends and that they frequently travelled together.  Young had also stated that Hebert always paid for his own travel.  Further, Young had been asked not to discuss the matter with Hebert or anyone else. Schonekas and Gibbens were informed that the FBI had previously received allegations that Young's clients regularly received favorable treatment from Hebert's office.

> At no point did Writer represent or convey to Young that he would get a free pass if he were to provide useful information to the government; or that he would get prosecuted if he were unable to provide any assistance.  Writer made no promises or representations to Young as to the applicable charging options.

(*Id.* at 2–3.)  Hattier testified that this was a summary of his contact with the Defendant when he served the target letter. (Mot. Hr'g Tr., 115–16, Sept. 15, 2016, Doc. 49.)

According to the notes, AUSA Cam Le then discussed the relevant statutes, including obscenity and possession and distribution of child pornography. (Def. Ex. 11 at 3.) Schonekas referenced the U.S. Attorney's Manual for child pornography prosecutions and said that Young's activity did not warrant prosecution. (*Id.*)  When Schonekas said Young was not a danger to children, Cam Le told both attorneys that "it appeared, from the phone data, that Young had been communicating with a young girl in Costa Rica." (*Id.*)

Schonekas stated that it was his understanding that Young was told by the agents that he

was not the typical child pornographer and that he was described by the agents as not being politically correct.  (*Id.*)  According to Hattier, Schonekas and Gibbens also said Young should not be prosecuted because:

> Young is not a guy who trades or seeks out images of child pornography; a felony conviction would strip Young of his law license; mere publication of a charge of this nature would be devastating to Young's career; and Young had acted stupidly and has a bad sense of humor.

(*Id.*)

Schonekas said he did not think Young had any information or knowledge of corruption matters. (*Id.*) Schonekas also explained why, under the current campaign finance rules, bribery and corruption were not necessary. (*Id.* at 3–4.)

Schonekas offered to make Young available for an interview but wanted assurances that Young would not be prosecuted. (*Id.* at 4.) The notes continued, "AUSA Le said no such assurance could be made. AUSA Le was open to providing Young with a proffer letter to cover the interview.   The attorneys responded that was not acceptable.  Anything less than no felony conviction would be acceptable to Young and the attorneys." (*Id.*)

AUSA Cam Le stated that no final decision had been made on prosecution and that she would keep the defense attorneys in the loop. (*Id.*)   She asked defense counsel to do their own research. (*Id.*)  She "added that, in general, she does not take lightly charging someone with a violation that has a mandatory minimum and requires registry as sex offender." (*Id.*)

The notes then stated:

> Gibbens said he felt that the government's decision whether or not to charge Young was being predicated on whether Young could provide any useful assistance on corruption matters. Later in the meeting, Gibbens said he felt like Young was being extorted by the government and that, if the government chose to move forward, they (defense team) would be forced to mount an aggressive defense.

AUSA Le and Writer disagreed with the attorney's characterization. It was explained to the attorneys that the government felt there was sufficient evidence to charge Young with a crime. The only decision at issue was what statute to charge and how many counts. Young was simply being given an opportunity to help himself by providing useful information; no different from any other criminal defendant.

AUSA Le explained that some thought had been given to the timing of when to approach Young. Although she had initially considered charging Young first, it was ultimately decided to serve Young with a target letter so that he could be given an opportunity to cooperate before others knew of his status as a defendant. AUSA Le further indicated that it is fairly rare to issue target letters in child pornography cases.

AUSA Le made it clear that the evidence indicated that Young had possessed and distributed child pornography. The phone data indicated that Young had distributed the videos on over [thirty] separate occasions.

In closing, AUSA Le expressed concern about the strong rhetoric that had already been communicated by Schonekas. It was her hope that both sides could remain in contact. Schonekas and Gibbens agreed. Schonekas said he would determine whether Young's phone was backed up to any other devices. Schonekas will also make the phone available to the government upon receipt of the subpoena.

The attorneys were thanked for their time and the meeting was concluded.

(Def. Ex. 11 at 4–5.)

Hattier further testified about the notes.  He stated that he often meets with defense counsel and the prosecutors. (Mot. Hr'g Tr., 114, Sept. 15, 2016, Doc. 49.)

Hattier testified that, once it was brought to the Government's attention that the videos were still on the phone, they wanted to have the phone given back to them so they could remove the videos. (*Id.* at 115.)  Defense counsel did not bring the phone to the meeting, and the Government had to get a subpoena for it.

As indicated above, Hattier's notes state, "Schonekas offered to make Young available for interview by the government, but said that he wanted an assurance that Young would not be prosecuted. AUSA Le said that no such assurance could be made." (Def. Ex. 11 at 4.)  Hattier's

testimony was consistent with the notes. (Mot. Hr'g Tr., 116, Sept. 15, 2016, Doc. 49.)

Defendant did not get that assurance. (Mot. Hr'g Tr., 116, Sept. 15, 2016, Doc. 49; Def. Ex. 11 at

4.)

Hattier acknowledged that he did not sign an affidavit in connection with this motion, but

he stated that decision was made by the U.S. Attorney's Office. (Mot. Hr'g Tr., 116–17, Sept.

15, 2016, Doc. 49.)  Hattier also stated that he had no concerns about being recorded and that his

testimony recounted what was said to the best of his recollection. (*Id.* at 117.)  Hattier knew that,

in reciprocal discovery, the Government had asked in the week before the hearing if there were

any recordings of him, but he was not concerned about that. (*Id.* at 118.)  Hattier said that his

testimony is the same as it was when he met with defense counsel. (*Id.*)

Hattier was asked at the hearing why his short 302 did not mention Troy Hebert but his

report of the November 5 meeting did, and Hattier explained that defense counsel asked for an

exact summary of what was discussed, so Hattier provided it. (*Id.* at 120.)  Agent Hattier was not

trying to conceal Hebert's name; he told defense counsel that. (*Id.*)  Hattier also "absolutely" told

the Defendant's attorneys "that we were interested in certainly sitting down and talking to

[Defendant] about whatever information he may have about public corruption matters." (*Id.*)

### 3. January 5, 2016—Plea Negotiations

On January 5, 2016, counsel for the Defendant wrote to AUSA Cam Le requesting that

the Defendant be placed on pre-trial diversion. (Gov't Ex. 8A-1.)  The letter highlights the

Defendant's career, reputation, lack of a criminal record, and "the singular incident involved."

(*Id.*)

### 4. January 26, 2016—Plea Negotiations

On January 26, 2016, at 10:49 a.m., AUSA Cam Le emailed Agent Hattier the following:

I just spoke with Attorney Kyle Schonekas. I told him that we are unable to offer pre-trial diversion in this or any other child exploitation type matter. Given the unique circumstances, I offered a plea to obscenity. I advised that the deadline for accepting is Friday morning. I'll keep you posted.

(Gov't Ex. 8A-2.)

Additionally, on the same day at 11:03 a.m., Marci Blaize, counsel for the Defendant, emailed AUSA Cam Le asking what statute Le was proposing in the bill of information so that Blaize could do a guideline calculation for the Defendant. (Gov't Ex. 8A-3.) AUSA Le replied within minutes, "18 U.S.C. 1462, using an interactive computer service for transporting obscene materials. 5 year statutory max." (*Id.*) Defense counsel replied asking whether Ms. Le believed a particular cross reference in the guidelines would apply, and Le replied that she did. (*Id.*) Blaize then said, "Okay, let me do some common core math and get back with you!" (*Id.*) The entire exchange took about twenty minutes. (*Id.*)

### 5. February 3, 2016 – The Government's Interview with Jessica Starns

On February 3, 2016, Agent Hattier also interviewed Jessica Starns. (*Id.* at 97.) Agent Hattier admitted that the interview was "primarily about the ATC and [Hattier's] public corruption investigation." (*Id.*) They discussed the receipt of the video, but most of the interview related to her prior employment with the ATC. (*Id.*) Starns suspected no wrongdoing by the Defendant. (*Id.*) Hattier chose to email Starns because of her prior employment at the ATC and because her name had previously come up in his prior investigation. (*Id.* at 97–98.)

### 6. February 4–12, 2016—Plea Negotiations

On Thursday, February 4, 2016, Blaize emailed AUSA Cam Le asking, "I know tomorrow is my drop dead date. I will be in your office at 10 for a debriefing with Paul. Let's talk then. I know I will have time to talk. . . ." (Gov't Ex. 8A-4.) On the same day, AUSA Le responded, "I'm in DC and will be back on Monday. What's the deal?" (*Id.*)

On Friday morning, Blaize responded:

Basically if we have to decide today then it's a no to the offer. However, in an attempt to keep the lines of communication open, Kyle and Billy [(defense counsel)] would like to come back to BR and meet with you and they would also like an audience with Walt [(the U.S. Attorney)]. Kyle said he is penning a letter to you today or Monday stating this officially.

(*Id.*)  Later on February 5, at 4:10 p.m., AUSA Le replied, "Walt said that he would meet with them.  Please give me some dates and I will help arrange a meeting." (Gov't Ex. 8A-5.)  Blaize replied, "Thanks Cam.  Will do on Monday.  Have a great weekend." (*Id.*)

On the following Monday, February 8, AUSA Cam Le emailed defense counsel in the morning with dates that the U.S. Attorney was available to meet with them. (Gov't Ex. 8A-6.)  In the afternoon, defense counsel responded with a date and time and said, "I doubt that it will take more than an hour.  Thanks for your help in arranging the meeting." (*Id.*)  Le replied, "I'll let the U.S. Attorney know," and Schonekas answered, "Thanks." (*Id.*)

In the afternoon of Friday, February 12, 2016, AUSA Le wrote the following email to Blaize:

Thank you for making the time to speak with me this afternoon. I know you have a very full schedule. In preparation of the meeting with the U.S. Attorney, I would ask that you look into 47 U.S.C. § 223(a)(1)(A), interstate transmission of obscenity/child pornography with intent to annoy, abuse, threaten, or harass another person. While this charge is a felony, the statutory maximum sentence is 2 years imprisonment and, importantly, it does not have the sex offender registration requirement. I've only recently identified this statute, so I do not profess to be an expert. Nevertheless, this may be an option to consider.

(Gov't Ex. 8A-7.)  Later that afternoon, Blaize responded:

I have forwarded this information onto my client. I have never seen this statute either. Learn something new every day. I plan to attend the meeting on Monday, schedule permitting. If anything changes I will let you know.

(*Id.*)

### 7. Meeting Between Defense Counsel, the U.S. Attorney, the First Assistant U.S. Attorney, and the Prosecutor

In his declaration, Corey Amundson discussed the meeting that took place between defense counsel, himself, and Col. Walt Green. (Gov't Ex. 10 at 2.)  The declaration provides that, "[p]rior to indictment, and at the request of defense counsel, the U.S. Attorney and [Amundson] met with defense counsel and one of the line prosecutors to discuss the matter." (*Id.*)  The declaration continues:

> During the meeting, we formally rejected a defense request for pretrial diversion (which, to my knowledge, has never been given to a child pornography offender in the history of the district), explained our view that the offense conduct necessitated a felony conviction, and solicited input from defense counsel on available felony offenses for a potential plea.

(*Id.*)

### 8. May 12, 2016—Indictment

As stated above, on May 12, 2016, the Defendant was indicted by the Grand Jury. (Doc. 1.)  He faces one count of distributing child pornography and one count of possessing child pornography. (*Id.*)

## L.   Other Aspects of the Investigation

### 1. Why Not Search Other Devices?

Agent Hattier admitted that it was normal in child pornography investigations to look at a subject's electronic devices, computers and iPads and things of that nature. (*Id.* at 69.)  He also admitted that there were no additional searches conducted in this case. (*Id.*)

Agent Soli also stated that the Defendant's other devices were not examined. (*Id.* at 177–78.)  Soli reviewed his 302 memo from the interview with Ms. Wempren, particularly where she said the Defendant had "an IMAC computer, an iPad and an Apple laptop computer." (Mot. Hr'g

Tr., 178, Sept. 15, 2016, Doc. 49; Def. Ex. 9 at 2.)  Soli stated that, to his knowledge, those items

were not seized or examined. (Mot. Hr'g Tr., 178, Sept. 15, 2016, Doc. 49.)

Soli stated that, early in the process following the August 4 interview with Wempren, he

began working on an application and affidavit for a search warrant of the Defendant's phones

and electrical devices. (*Id.* at 178.)  Soli thought that the application or affidavit made its way to

a judge. (*Id.* at 179)  Soli then stated that he got the affidavit or application to the assistant U.S.

Attorney, but he did not know if he had a copy. (*Id.* at 180.)  Soli testified:

> Q:   What is your understanding as to what happened once that was submitted
>      to the court?
>
> A:   [It] [i]s that the judge was not going to -- as I recall, it was the judge was
>      not going to authorize that broad of scope of search warrant execution:
>      You know, office, home, that type of thing.  So it was okay to just get a
>      warrant for the -- for the device that we certainly know, you know, is
>      associated with sending this material.  But then that -- we did not need to
>      do that.  We just -- with consent from Mr. Young, we did not pursue a
>      search warrant any further.

(*Id.*)  Soli stated that he routinely submits search warrant applications to the court to seize items

like what was mentioned by Ms. Wempren. (*Id.* at 181.)  It is typical in child pornography cases

to get someone's laptop, iPad, or computer to search for child pornography. (*Id.* at 181–82.)

After the Galatoire's lunch, after the Defendant admitted to having sent the videos, and

after Soli saw the videos, Soli did not again submit an application to the Court for a search

warrant.  (Mot. Hr'g Tr., 182, Sept. 15, 2016, Doc. 49.)Soli stated he did not feel there was

probable cause that there was other material on other devices; if the judge did not think there was

probable cause before, the judge would not think there was after Soli's conversation with the

Defendant. (*Id.* at 182–83.)  Soli never went back to the judge. (*Id.* at 183.)

Soli also did not ask for consent for the other devices or bring them up in a meeting. (*Id.*

at 184.)  When asked why, Soli stated, "I guess that I was satisfied with where the investigation

was at at that time. I don't know, but I didn't ask." [sic]  (*Id.* at 184.)   Soli acknowledged that

child pornography is one of the highest priorities at the DOJ and that the FBI would be interested

if there was information on those devices about production, further distribution, or other people

that were not referenced on the phone. (*Id.* at 184–85.)

Soli stated he searched for child pornography on devices that he believed he had cause to

search. (*Id.* at 213.)  He thought he had legal authority to search the Defendant's phone. (*Id.*)  He

did not believe he had authority to search his office, his office computers, or devices like iPads,

computers, or desktops at his home. (*Id.*)  He submitted a search warrant affidavit to do that, and

authority was not granted. (*Id.*)  Soli testified:

> Q:   And why did you cause the taking from Mr. Young of his phone as he sat
> and smoked a cigarette outside of Galatoire's?
>
> A:   I believed I had probable cause to seize it and secure it and, you know, we
> knew that it was an iPhone and there's unique considerations there about
> once those type of devices lock up, it can be difficult or impossible to
> unlock them.  And so it was important that Scott Downie have input in
> how to secure -- you know, get this phone and get it secured so that it
> could be accessed when and if legal authority to search it was obtained.
>
> Q:   And in this case, you got a consent to search in substitution of a need for a
> judicially authorized magistrate's permission to move forward; is that
> correct?
>
> A:   That's correct.

(Mot. Hr'g Tr., 214, Sept. 15, 2016, Doc. 49.)

Agent Soli testified that Ms. Wempren had told him that the phone number she associated

with the Defendant had transmitted a child pornography video to her. (*Id.* at 215.)  She gave Soli

the phone number and the video, and that the video file had a phone number attached to the

transmission. (*Id.* at 215–16.)  Soli was able to determine that the phone number was Chris

Young's. (*Id.* at 216.)

That, standing alone, did not make him conclude that the Defendant had been the person transmitting the information; it lead him to believe that he needed to develop more information that the Defendant was indeed the person who sent the video and that that device that transmitted the video needed to be seized. (*Id.*) He also needed to ensure that the Defendant was in possession of the phone and to engage him in a conversation about the transmission of the child pornography. (*Id.* at 216–17.) Soli stated that Ms. Wempren either called or texted Soli as an indication that the Defendant was there with the phone that Wempren knew to be the Defendant's phone, and, according to Soli, this confirmed they felt they had probable cause to seize that phone. (*Id.* at 217–18.)

After getting this information, he instructed Agent Rob King and/or Dave Clarke that they were to seize the phone when Defendant was manipulating it. (*Id.* at 218.) That would indicate the phone was unlocked, and the agents needed it while it was unlocked to keep it in that configuration. (*Id.* at 218.) Clarke and King were positioned in Galatoire's, sitting at the bar, and they had visual contact of the Defendant and Ms. Wempren. (*Id.* at 219.)

## 2. Why Not Follow Up with Other Recipients? (And Other Inaction)

Soli also did not follow up with the individuals that received the videos from the Defendant, so he did not know whether those individuals shared that video with others. (*Id.* at 185.) Soli was interested in that information at the time of the September 15, 2016, hearing, and he probably would have followed up had he stayed as case agent. (*Id.*) Additionally, Soli would have probably run a background check on the individuals to whom the Defendant sent the video. (*Id.* at 185–86.) But Soli did not do that when the case was opened. (*Id.* at 186.)

At the September 15, 2016, hearing, Agent Soli testified that he thought that Agent Hattier compiled criminal history and motor vehicle reports on everyone that received the video.

(Mot. Hr'g Tr., 186, Sept. 15, 2016, Doc. 49.)  Soli acknowledged that it was important to find out if the individuals had forwarded the videos to other people because they would be considered for a child pornography distribution or receipt investigation. (*Id.* at 186–87.)  Soli stated that he was planning to find that out, but he did not know what efforts Hattier took to find out. (*Id.* at 187.)  When asked for an explanation as to why this has not been done so far, Soli stated, "I -- I just can't offer you an explanation of why that -- you know, a definitive answer: it was not done because of this.  It just has not been done." (*Id.*)

Soli further testified, "It is routine that based on, say, the exam of an individual's computer in a child pornography investigation that we will set leads to other offices where we believe there were recipients and, say, conduct action deemed appropriate or consider for initiation of an investigation." (*Id.* at 188.)  But that routine practice was not done in this case.  Soli further testified:

> Q:      Is one of the reasons why you didn't follow up with some of the individuals is because you didn't find Mr. Young to be a child pornograph[er], as you mentioned to him?
>
> A:      Yeah, I did not find him to be, you know, a child pornographer.

(*Id.*)

Meanwhile, Hattier admitted that the FBI only interviewed two individuals who had received the video: Ms. Wempren and Ms. Starns. (Mot. Hr'g Tr., 90, Sept. 15, 2016, Doc. 49.)  At the time of the September 15, 2016, hearing, Hattier was not aware of anybody at the FBI talking to anyone that Ms. Wempren identified.  Hattier testified:

> [T]o be fair to our side, from the point of our meeting with [defense counsel] going forward, I think we were in plea negotiation stage.  So there was a time period where essentially we stood down from conducting further investigation because we were actively having plea negotiations with you guys.

(*Id.* at 95–96.)

Additionally, Agent Hattier admitted that, while he was case agent, he did nothing to determine whether anyone who received the video sent it to anyone else. (*Id.* at 98.)  Hattier testified, "It just wasn't on my radar screen.  It just wasn't on my radar screen.  I don't -- the allegations at that point was just relating to [Defendant] and his -- his distribution of the videos and that's -- frankly, I wasn't -- I wasn't asked to do that." (*Id.*)  Hattier also said, "Eventually we would have gotten out and talked to them.  But no, when I was involved with the case, I did not." (*Id.* at 98–99.)  As of the day of the September 15, 2016, hearing, Agent Hattier had not talked to anyone who received the video, except for Ms. Starns. (*Id.* at 99.)  Hattier testified:

> Q:   Agent Hattier, were you instructed by the U.S. Attorney's Office not to interview any other recipients of the video?
>
> A:   No, not specifically.  I just -- we had a list of things that, you know, we had talked about doing and that just wasn't on the top of the priority list.  But, again, I did take steps to identify who those folks were.  So we were, in my mind, slowly moving in that direction to put ourselves in a position to be able to go out and locate and interview those folks.  I just had not done it during my involvement.
>
> Q:   And no one told you to do it?
>
> A:   Right. Like I said, it wasn't -- it wasn't the highest thing on the priority list at that point.

(*Id.* at 99–100.)

Agent Soli testified that he did not know the number of people the Defendant sent the video to but would say it was "in the teens or [twenties]." (Mot. Hr'g Tr., 167, Sept. 15, 2016, Doc. 49.)  He has contacted "one or two, trying to serve them a trial subpoena[;]" (*Id.*)  Jessica Starns was one. (*Id.*)  The other was not Ms. Wempren. (*Id.* at 168.)  Soli could not remember who, and, when he realized trial was not going forward, he did not follow up. (*Id.*)   Soli further testified:

Q:    So why haven't you -- have you attempted to contact any of the other people that were sent the video?

A:    No.

Q:    Why not?

A:    No specific reason.  I have -- I have them all identified associated with the phone numbers that the video went to and they'll be interviewed at some point.

Q:    Well, aren't you interested in knowing what they have to say now?

A:    Yes.

Q:    But you weren't interested in what they had to say right after --

A:    I have not interviewed them yet.

Q:    And so do you know if Agent Hattier contacted any of those individuals when he took over your case last fall?

A:    I want to say that he -- I think when I tried to serve the trial subpoena, I was told that they -- that the attorney representing -- I think it was Starns, said she had already participated in an interview.  So I would guess that would have been Mo.  That's all I really know about.

Q:    That the only interview that you know of that was conducted by Mr. Hattier?

A:    That I can say I know happened, yes. I don't know if Mr. Hattier was interviewing all of those people that got the video or if he interviewed another one or two of them. I don't know.

(Doc. 168–69.)  Soli did not know that the video was sent to about thirty-eight people, and Soli has only interviewed Ms. Wempren. (*Id.* at 169.)  Additionally, some of the people on the list were only identified by their first name, and Soli has not tracked down those individuals and identified who they were. (*Id.* at 170.)  Soli said, "And I thought -- I believed that all phone numbers that the video went to, some process has been served to identify the individual associated with service to that phone.  I thought that task had been done . . . [by] . . . Hattier."

[sic] (*Id.*)  Soli assumed that Agent Hattier interviewed some of the people the video was sent to and was able to identify everyone that the video was sent to. (*Id.* at 170–71.)

Soli stated that, when Agent Hattier was lead agent, more work could have been done on the case. (*Id.* at 196.)  More work also could have been done when Soli got the case back. (*Id.*)  Soli testified:

> Q:    Is that -- is that the normal procedure, to let a case sit for the better part of
>       a year before you start interviewing individuals?
>
> A:    That -- that is not a description of normal procedure, no.

  (*Id.*)

Outside of the request to the National Center for Missing and Exploited Children (discussed below) and conducting one interview, Soli did not know of any other action Agent Hattier took with regard to the investigation of child pornography, though Soli said that does not mean that there was not any. (*Id.* at 173.)  Soli then said he did not recall there being any child pornography investigative activity in the file.  Soli saw no interviews of Jeff Young, Keiffer Young, Judy Pontin, Tracy Stevens, Gary Solomon, Tiffany Salter, John Neal, Kelly Diggins, Amanda Chris, Zeid Amarri, Frankie Ruiz, Robert Waters, Anne Hustler, Bob Shipley, Caitlyn Young, Claude Mauberret, or John Williams. (*Id.* at 173–75.)  Since being made case agent, Soli has not interviewed any of those people or called any of them to set up an interview. (*Id.* at 175.)  No one Soli worked with has contacted those folks. (*Id.*)

Agent Soli later stated again that he was given approximately twenty to thirty subpoenas to serve, possibly more, and some of those included some of the names previously listed. (*Id.* at 210.)  He served one of the subpoenas on Starns' attorney and had scheduled to serve another but did not; "I was notified that the trial had been postponed or I wasn't sure if we were ever going to go to trial or what was going to happen from here on out." (*Id.* at 210.)

### 3. The National Center for Missing and Exploited Children Request

Hattier also submitted the videos to a center that cross-checked those videos against known child pornography, but the report is dated November 12, 2015. (Mot. Hr'g Tr., 90–91, Sept. 15, 2016, Doc. 49; Def. Ex. 14.)   Agent Hattier could not remember whether he submitted the form for the report before or after his meeting with the Defendant's attorneys. (Mot. Hr'g Tr., 91, Sept. 15, 2016, Doc. 49.)  Hattier testified that he waited until November because, "when [he] met with the prosecutor and discussed steps to be taken, this was one of the things on the list, but there wasn't a ton of work to be done on the child pornography investigation." (*Id.* at 92.)  The results of the report were that "[t]hey were unable to match the videos that were on [the Defendant's] phone with any known child pornography data." (*Id.*)  Hattier's understanding of the report is that the FBI is "asking the center to take the videos that were recovered from his phone and to attempt to match those against known child pornography." (*Id.* at 92–93.)  The Defendant's name also did not match any results in their database, and Hattier said that meant he was not known to them as a child pornographer. (*Id.* at 93.)

Agent Soli initially thought that he submitted the videos to the National Center for Missing and Exploited Children to determine if the videos were ever associated with another investigation and if the children in them had been identified.  (*Id.* at 172.)  Soli identified the November 12, 2015, report that Hattier testified about as being the one from this case. (Mot. Hr'g Tr., 172, Sept. 15, 2016, Doc. 49; Def. Ex. 14.)  Soli also testified that Hattier had in fact made the request for the NCMEC report, but Hattier had asked Soli how to do it. (Mot. Hr'g Tr., 172, Sept. 15, 2016, Doc. 49; Def. Ex. 14.)  Soli walked Hattier through the process because Hattier was unfamiliar with how to submit it and prepare it; Soli was the resident child

pornography agent in that office. (Mot. Hr'g Tr., 172, Sept. 15, 2016, Doc. 49.)  Still, at the time,

Soli was no longer the lead agent on this case. (*Id.* at 173.)

### 4. The Young Girl in Costa Rica and the Legat Request

Roughly a week after Defendant received the target letter, his attorneys met with the U.S.

Attorney's Office. (*Id.* at 31.)  Defendant acknowledged that an allegation was made that he was

communicating with a young girl in Costa Rica, but Defendant denied that this occurred. (*Id.* at

31–32.)  He admitted to communicating with a woman in Costa Rica named Keilyn Nunez. (*Id.*

at 32.)  Defendant contacted Ms. Nunez and asked for a copy of her driver's license and birth

certificate, and she provided these to him. (*Id.*)  The documents were introduced at the

September 15, 2016, hearing, and they indicate that her birthday was in 1991, making her

twenty-four years of age. (Mot. Hr'g Tr., 33, Sept. 15, 2016, Doc. 49; Def. Ex. 7.)

Defendant denied communicating with minors in Costa Rica and said he only

communicates with his nieces and nephews in the United States. (Mot. Hr'g Tr., 34, Sept. 15,

2016, Doc. 49.)  His relatives have no objections to Defendant being around these nephews and

nieces. (*Id.*)

Defendant did not recall saying something to the effect that Nunez was fifteen, but, if he

did, he would hope the FBI agents would do something about it. (*Id.* at 55.)

Agent Soli was asked if the Defendant was being investigated for illegal or inappropriate

activity with children, and he responded that that was still being investigated. (*Id.* at 189.)  Soli

stated that one of the videos was accompanied by a message that said something to the effect of,

"this is from my last trip to Costa Rica." (*Id.* at 189.)  This is why Agent Soli initiated the

investigation—because the message gave some indication that Defendant may have shot the

video rather than just possessing it. (*Id.*)  The forensic examiner also told Soli there was a

reference to sexual contact with a fifteen-year-old girl, and there was a picture of a girl that may or may not have been that age. (*Id.* at 189–90)  Soli said these things warranted more investigation to determine if Defendant had had sexual contact with a juvenile.  (*Id.*)

In June of 2016, Agent Soli initiated a follow up with the cabdriver in Costa Rica who sent Defendant the video.  (*Id.* at 163–64.)  Soli asked their foreign Legat office in Panama to contact Costa Rican authorities and asked for an interview and assistance in identifying the child in the video. (*Id.* at 164.)  Soli also asked them to interview a business partner of the Defendant and to identify the female with whom Defendant was communicating. (*Id.*)  Agent Soli did this when Hattier became supervisor and the case was reassigned to him. (*Id.* at 164–65.)  Soli testified:

> Q:     So in the time period between August and June, you weren't conducting any investigation into the child pornography case?
>
> A:     No.
>
> Q:     Was anyone?
>
> A:     I don't know, but I don't believe so.  I'd have to just look and see if there were documented investigative activities.
>
> Q:     Where would you look to find that?
>
> A:     The case file?

(*Id.* at 165.)  No one asked Soli to contact the Costa Rican authorities; he did it on his own accord as a "natural investigative thing." (*Id.* at 166.)

Soli did get a partial response from Panama; there was contact with Costa Rican authorities, detectives have been assigned, and they have talked to Interpol and identified "maybe some people." (Mot. Hr'g Tr., 166–67, Sept. 15, 2016, Doc. 49.)

But the only thing Soli did for further investigation was review the CART exam, submit it to the national center, and then lead to Panama; Soli did not seize the other electronic devices. (*Id.* at 190.)  Soli said he was building probable cause, but, then the CART exam showed that the Defendant did not shoot the video with his phone. (*Id.* at 190–91.)  On August 4 or 5, Soli did not follow up about the Costa Rican girl; however, since that time, Soli had the lead to the Legat office in Panama. (*Id.* at 191–92.)

Agent Soli further testified that "Legat" stands for the "Legal Attache" office, in which the FBI has been afforded a right by a foreign government to set up an office in another country to be a liaison with their law enforcement. (*Id.* at 207–08.)  Soli stated that he sent the videos to the agents who staff the Legat office in Panama with the request to coordinate with Costa Rican officials to identify the boys in the videos. (*Id.* at 208.)  Soli stated that the Legat office provided the videos to Costa Rican authorities, who accepted them and said they would initiate an investigation into the kids' identities. (*Id.*)  Soli also assisted them in attempting to identify Keilyn (or "a possible [fifteen]-year-old girl associated with the phone number") and in identifying and interviewing a business partner of the Defendant. (*Id.* at 209.)  No preliminary results had been received from the Panamanian Legat at the time Soli testified. (*Id.*)  Soli asked the authorities to make contact with the cabdriver, Mr. Gomez, but he had not received results on that yet. (*Id.*)  As it stands now, the request is pending. (*Id.* at 209–10.)

Agent Soli admitted that he made the Legat request after the Defendant filed the instant motion. (*Id.* at 233–34.)  He would have normally done it "during the investigation." (*Id.* at 234.)

## 5. Did the FBI Know That Zeid Ammari Sent One of the Videos? And More on Why the Videos Were Not Removed

On August 4, 2015, in the Galatoire's parking lot, Defendant told the FBI agents that he was not sure who sent him the second (2013) video. (*Id.* at 12, 37–38.)  At that time, Defendant told the FBI that he believed he received it from Gomez. (*Id.* at 12, 37–38.)

However, Defendant testified at the September 15, 2016, hearing that he was mistaken; he had actually received the 2013 video from a friend and client named Zeid Ammari, who lives in New Orleans. (Mot. Hr'g Tr., 12–13, Sept. 15, 2016, Doc. 49.)

The Defendant said he realized on September 14, 2016 (the day before the hearing) that the video came from Ammari. (*Id.* at 13.)  Defendant realized this as he was going through discovery provided by the Government (all of his text messages). (*Id.*)  Defendant introduced Def. Ex. 17 into evidence, which was the record of Defendant's text messages provided by the Government through discovery.  According to that document, when Ammari sent him the 2015 video, Ammari said "Look what I found.  This was Marv back in Afghanistan when he was 16," and the video was sent on September 4, 2013. (*Id.* at 13–14; Def. Ex. 17.)  Defendant replied, "That's awesome…u sure that's not Bogalusa, Louisiana..?" [sic] (Def. Ex. 17.)  Defendant testified that he forwarded that video to ten to fifteen people. (Mot. Hr'g Tr., 14, Sept. 15, 2016, Doc. 49.)  Nevertheless, when the Defendant spoke to the agents at Galatoire's, his recollection at that time, before he reviewed discovery, was that Mr. Gomez had sent both videos because it was similar to other jokes and pictures that Gomez had sent. (*Id.* at 14–15.)

Agent Soli testified that he reviewed all of the videos and pictures as part of the CART report,[3] including the September 4, 2013, text message from Ammari with the contents, "Look at

---

[3] The report provides the date, time stamp, the phone number, and maybe a saved contact name. (Mot. Hr'g Tr., 192–94, Sept. 15, 2016, Doc. 49; Def. Ex. 17.)

what I found….. This was Marv back in Afghanistan when he was 16." (Mot. Hr'g Tr., 193, Sept. 15, 2016, Doc. 49; Def Ex. 17.)  Soli testified that it appeared that Zeid Ammari actually sent the child pornography video to the Defendant on that date. (Mot. Hr'g Tr., 193–94, Sept. 15, 2016, Doc. 49; Def Ex. 17.)  Soli stated that he did not send Ammari's information to the authorities in the New Orleans area to interview Ammari about this video, and Soli had no explanation or specific reason why, despite the fact that the transmission, possession, and distribution of child pornography is the priority of the DOJ and FBI. (Mot. Hr'g Tr., 194, Sept. 15, 2016, Doc. 49.)

Soli later stated that, until he looked at the document at the hearing, he did not actually recall that Mr. Ammari had sent the 2013 video to the Defendant, but Soli testified, "but I'm sure I knew it at the time." (*Id.* at 211.)  Soli further said, "When I just looked at that right now, I kind of felt like I had forgotten it if I knew it." (*Id.*) Since Soli now knew it, there would be potentially further investigation of Mr. Ammari for distribution of child pornography.

Agent Soli stated that the first time he had a conversation with the AUSAs about possibly prosecuting or investigating Mr. Ammari was when Soli testified at the hearing; to his recollection, that "issue was never raised before today." (*Id.* at 235–36.)

Downie testified about Def. Ex. 17, specifically the September 4, 2013, text from Zeid Ammari. (Mot. Hr'g Tr., 51–52, Oct. 5, 2016, Doc. 36.)  Downie said that a video usually has the first frame of the video so that you can see its contents, but the video sent on September 4, 2013, did not because the software did not know what type of file it was, so it just gave a generic icon; the software knew it was a multimedia based file extension, but it did not know what it was, so it had given the video a generic icon. (*Id.* at 52–53.)

Downie testified that, when he did his review with the software, this video was not identified for him as a video. (*Id.*)  Therefore, he did not look at it, and he did not bring it to Agent Soli's attention. (*Id.* at 53.)

Downie also prepared a report dated September 20, 2016, to determine if the video in Def. Ex. 17 was child pornography and, if it was, to explain why that video (IMG_2343.Mov) was not identified as such during the forensic exam. (Mot. Hr'g Tr., 53–55, Oct. 5, 2016, Doc. 36; Gov't Ex. 3.)  Downie determined that it was in fact similar to the content of the previous video. (Mot. Hr'g Tr., 55, Oct. 5, 2016, Doc. 36.)  Defendant then testified that he was able to figure out what happened with the video:

> The next page, or actually the two pages [of Gov't Ex. 3], is the list of videos as they're rendered by my software and it puts them in alphabetical order, and so where that video [(IMG_2343.Mov)] would be it does not show up in that list, indicating that that video -- I had never seen that video as a video.  It was in a chat stream.  It was that multimedia icon, but it was never presented as a video file or reviewed in my -- when I reviewed for child pornography using this videos' bucket, it just didn't show up there.

(Mot. Hr'g Tr., 56, Oct. 5, 2016, Doc. 36; Gov't Ex. 3 at 4–5.)  One of the pages of Gov't Ex. 3 showed the different chat streams on the Defendant's phone; the highlighted chat stream was where the video appeared, "but that video did not show up in the videos' container." (Mot. Hr'g Tr., 56, Oct. 5, 2016, Doc. 36; Gov't Ex. 3 at 4.)

Downie also explained that IMG_2343.Mov was not removed when he was physically going through the phone to remove child pornography. (Mot. Hr'g Tr., 56, Oct. 5, 2016, Doc. 36.)  Downie said that it was in the chat stream with the fifteen-year-old girl conversation, so, while it was extracted and while that chat stream was identified as relevant, he thought it was not contraband so he did not go back and delete the whole chat stream. (*Id.* at 56–57.)  Downie did not intend to leave the child pornography on the phone. (*Id.* at 57.)  Moreover, as far as Downie

knew, Agent Soli would have no reason to know that IMG_2343.Mov was still on the phone. (*Id.* at 57–58.)  Downie realized the image was left intact on the phone when AUSA Cam Le asked him to investigate further in September 2016. (*Id.* at 57.)  Downie said that, prior to AUSA Le bringing Def. Ex. 17 to his attention, he had not opened and reviewed that particular image folder or video folder because:

> The context of my exam was to determine that if a message stream was relevant to the investigation or not.  Once I determined it was relevant, I didn't go read all of the messages in that chat stream.  I didn't review all of the content, open up all the pictures, all the videos, all the other attachments that were in that entire conversation.
>
> Once I identified it as relevant, it got put in the relevant bucket and that was my -- mine [sic] was not to analyze the evidence to determine guilt or innocence, it was just to determine is this something that the prosecution should have access to or not.

(Mot. Hr'g Tr., 58, Oct. 5, 2016, Doc. 36.)  The conversation was relevant because of the pictures of the young girl and the discussion of the Defendant being in love with her; "And after identifying that as a relevant conversation, I didn't go back and open up all the files or even read all of the messages that were in that conversation." (*Id.* at 58–59.)  The entire stream was given because, anytime there is child pornography, there could be many conversations before or after that which have something relevant for the case agent to "determine . . . whether or not that was something to go through the prosecution or not." (*Id.* at 59.)

On cross examination by the Defendant, Downie stated that on page four of his report (Gov't Ex. 3), Downie indicated that he wanted to extract all copies of Image 2288 (Mot. Hr'g Tr., 63, Oct. 5, 2016, Doc. 36).  The image was on page 1562 of his extraction report. (Mot. Hr'g Tr., 63, Oct. 5, 2016, Doc. 36; Def. Ex. 22 at 1562.).  Then, on page 1629 of the report, there is another Image 2288. (Mot. Hr'g Tr., 64, Oct. 5, 2016, Doc. 36).)  But Downie said that, in the phone, files can have the same name but not the same content, so, without opening a video,

Downie could not determine if that was actually the video or a different video. (*Id.*)  Downie did not open the video, and the software did not identify it as a video. (*Id.*)

Then, on page 1629 of the extraction report, Mr. Ammari sent a text message on July 24, 2015, with the name IMG_2288.mov.  (*Id.* at 65–66.)  Downie had identified a video with that name as a child pornography video on the Defendant's phone. (*Id.* at 66.)  But Downie did not know whether he opened the July 24, 2015, video or not.  (*Id.*)  He explained:

> When I went and preserved the information, the items I found that were child porn I bookmarked their conversations.  If there was other videos or other images in that conversation I may or may not have opened those.  So it's very difficult when you ask me, did I open this video.  Even though it's the same name, I don't know if I opened this specific video or if it was another one of the same name.

(*Id*. at 66–67.)  But he could now tell the video was sent by Mr. Ammari. (*Id.* at 67.)

In the Defendant's post-hearing brief, he points out that the CART extraction report "shows the **same** 'generic icon' for every video that Mr. Young allegedly distributed." (Doc. 40 at 12 (citing Def. Ex. 22 at 5, 8, 15, 47, 213, 333, 368, 1111, 1419, 1539, 1552, 1629, 1661, 1662, 1675, 1696, 1711, 1720, and 1740).)  These videos do in fact have a generic icon.

Later, Downie reiterated his testimony.  Downie stated that the phone was returned to the Defendant with all of the conversations from the extraction report removed, except for two. (Mot. Hr'g Tr., 89, Oct. 5, 2016, Doc. 36.)  "And that was the conversation involving the young girl in which it was stated that he loved her and the actual conversation with that girl, because the pictures . . . exchanged didn't constitute contraband." (*Id.*)

### 6. DOJ Guidelines and the Policy of the U.S. Attorney's Office for the Middle District of Louisiana

The U.S. Attorney's Manual provides, in part, the following about child pornography prosecutions:

**9-75.020 - General Prosecution Policies and Priorities**

*Prosecution of all crimes involving the sexual abuse or sexual exploitation of children and the distribution of child pornography is strongly encouraged.* Investigation has shown that many individuals who produce, import or consensually exchange child pornography do so repeatedly and with full knowledge that it is illegal to do so. In addition, many of these individuals engage in child sexual abuse or would like to do so, given the right opportunity. Many of these people also intentionally engage in occupations or activities that bring them into frequent contact with children. Finally, many people use child pornography to encourage their child victims to engage in sexual activity. *In evaluating such cases, consideration should be given to,* inter alia*, characteristics of the material, such as the age of the involved child, the type of conduct depicted, the number of involved children, the quantity of the involved material, whether violence or force is used against the child, and characteristics of the target, such as whether the target currently is engaging in sexual activity with children, whether the target is the parent or guardian, or is in a position of trust with the depicted children, whether the target has shown the material to children, whether the target is making money from the conduct, whether the target has committed any prior offenses involving child sexual abuse or exploitation, and the safety of the community.*

Prosecution of large scale distributors of obscene material who realize substantial income from their multi-state operations also is encouraged. Prosecution priority should be given to cases in which there is evidence of involvement by known organized crime figures. However, prosecution of cases involving relatively small distributors can have a deterrent effect and would dispel any notion that obscenity distributors are insulated from prosecution if their operations fail to exceed a predetermined size or if they fragment their business into small-scale operations. Therefore, prosecution of such distributors also may be appropriate on a case-by-case basis. In evaluating obscenity cases, substantial deference should be given to the United States Attorney's determination of the viability of the case based upon the factors set forth in *Miller v. California*, 413 U.S. 15 (1973).  Under the legal test of obscenity set forth in that case, material is obscene if, taken as a whole, the average person in the community would find that the material appeals to the prurient interest of its intended audience, depicts sexual conduct in a patently offensive way, and a reasonable person would find the material, taken as a whole, lacks serious literary, artistic, political or scientific value.

[updated April 2000]

(Gov't Ex. 1. (emphasis added).)

Agent Soli's testimony touched on these guidelines. Soli stated that, throughout his

investigation (both when he first started the case and later on when he inherited it back), he never

came across any evidence that the Defendant had used violence or force against a child, that he

had shown the video to children, or that he made money from the distribution or possession of

the video.  (Mot. Hr'g Tr., 195, Sept. 15, 2016, Doc. 49.)  Soli further testified:

> Q:  Has there been any evidence that Mr. Young possessed this video or
> distributed this video for any sexual purpose?
>
> A:  That's hard to answer.  I know he distributed it for whatever purpose.
>
> Q:  But throughout your investigation, both before and now, you haven't
> found any evidence that would support -- that would support the belief that
> he's a child pornographer, in your own words?
>
> A:  No, I don't consider him a child pornographer.

(*Id.* at 195–96.)

The Middle District of Louisiana Prosecution Guidelines for the United States Attorney's

Office (July 2014) provide:

> 8. <u>CHILD PORNOGRAPHY</u>: (Title 18, United States Code, Sections 2251, 2252)
> *We will generally prosecute child pornography offenses*, with particular emphasis
> on crimes involving one of the following factors:
>
> a.  Production of child pornography;
>
> b.  Permitting a child under the target's care to engage in the production of
> child pornography;
>
> c.  Advertising child pornography;
>
> d.  Transporting, receiving, or *distributing child pornography involving one
> or more prepubescent children*;
>
> e.  Possession or solicitation of more than 50 images of child pornography
> involving one or more prepubescent children;
>
> f.  The target has a criminal history involving child pornography or sex
> offenses; or
>
> g.  Other evidence exists that the target is a pedophile.

(Gov't Ex. 2 (italics added, underline in original).)

Corey R. Amundson submitted a declaration in connection with this matter. (Gov't Ex.

10.)  Mr. Amundson drafted the internal guidelines for his office for child pornography

prosecutions, which were enacted around 2005. (*Id.*)  Amundson stated that these guidelines

provide, among other things, that the office should prosecute matters involving "transporting,

receiving, or distributing child pornography involving one or more prepubescent children." (*Id.*

at 1–2.)  Amundson explained:

> The instant prosecution is consistent with those guidelines. On approximately
> [thirty-three] separate occasions, the defendant distributed videos depicting two
> different prepubescent boys engaging in sex with animals.  The child pornography
> laws are designed to protect the most vulnerable in our society from not only
> sexual abuse, but from the exploitation of that abuse by those who would take and
> distribute visual depictions of it.

(*Id.*)

Amundson stated that he and the U.S. Attorney "reviewed and approved the indictment in

the instant matter."  (*Id.* at 2.)  They did so "based solely on the offense conduct and the

applicable law," and "[n]o impermissible factors were considered, such as race, ethnicity,

gender, or religion." (*Id.*)  Moreover, "[t]he fact that the defendant did not provide information to

law enforcement concerning possible public corruption was not a factor in the decision to

prosecute the defendant. " (*Id.*)

Regarding the plea negotiations, Amundson further declared:

> 8. Prior to indictment, and at the request of defense counsel, the U.S. Attorney
> and I met with defense counsel and one of the line prosecutors to discuss the
> matter. During the meeting, we formally rejected a defense request for pretrial
> diversion (which, to my knowledge, has never been given to a child pornography
> offender in the history of the district), explained our view that the offense conduct
> necessitated a felony conviction, and solicited input from defense counsel on
> available felony offenses for a potential plea.

(*Id.*)

Lastly, Amundson said the following about the relationship between this prosecution and other child pornography cases in this office:

> 9. To my knowledge, our office has declined to prosecute a child pornography matter only based on insufficiency of the evidence or the fact that the matter was being handled by another prosecutor's office.

> 10. To my knowledge, our office has never declined to charge a child pornography matter because the suspect cooperated in any matter, including public corruption. In those instances when a child pornography defendant has provided substantial cooperation, we have asked the court for consideration at sentencing.

(*Id.*).

## 7. The Agent's Role

Agent Soli testified that he does not decide who gets prosecuted, how they get prosecuted, or what they get charged with. (Mot. Hr'g Tr., 211, Sept. 15, 2016, Doc. 49.) Moreover, in this case he did not decide what the Defendant was charged with, how he should be prosecuted, when he should be prosecuted, or who the prosecutor should be on the case. (*Id.* at 211–12.)

Agent Soli further testified that, in the course of his investigation, he did not make any decisions based on race, gender, sexual orientation, religion, or ethnicity. (*Id.* at 212.) He also did not make any decisions as a result of the Defendant either cooperating with or failing to cooperate with Hattier or anybody else. (*Id.* at 212–13.) Soli "did [not] recommend to prosecutors in this case at any point in time that either his jumping through hoops or not jumping through hoops for anybody should result in him being prosecuted in a certain way[.]" (*Id.*)

However, Agent Soli testified that he make some decisions regarding the investigation, including when he could file a Legat request, when he can run an individual's background check, and when and where he may interview witnesses. (*Id.* at 234–35.)

### 8. Similarities (or Dissimilarities) To Other Cases

Agent Soli stated that, in other child pornography cases, he has submitted requests to the National Center for Missing and Exploited Children, submitted requests to Legats around the world, done consensual monitoring, and has sometimes taken quick actions to protect victims (*Id.* at 220–21.)  Further, there have been occasions in other child pornography cases where investigations have taken months to conclude. (*Id.* at 221.)

Soli also stated that, of the child pornography cases he has participated in (fifteen or more where he was the case agent), only one has gone to trial. (*Id.* at 222.)   Some of those have been the subject of negotiations between the prosecutors and the defense attorneys, and some of the negotiations have taken time. (*Id.*)  During the period, sometimes he pauses working on the case "to let it work its way out in the legal process." (*Id.*)  Other times, he kept working on it. (*Id.* at 222–23.)  Soli has done child pornography cases where there have been pictures only and others where there were videos and pictures. (*Id.* at 223.)

Soli stated that, based on his experience with fifteen or more case, there was nothing outside the norm or unusual about the Defendant's case regarding the child pornography investigation.  "A complaint had came in [sic], said they received it, and I initiated an investigation on the -- who we believed to be the distributor." (*Id.* at 224.)

Agent Soli also testified about the Steve Mannear case.  (*Id.*)  Mannear was a lawyer. (*Id.*)  In that case, there were concerns about attorney-client privileged materials, and some devices were returned that were determined to have no contraband. (*Id.* at 225.)  Soli did not think the Mannear case was treated differently than the Defendant's case; "Just that each case is unique." (*Id.*)

However, Agent Soli later stated that his involvement in the Mannear case was "very little." (*Id.* at 236.)  Moreover, Mannear had more videos, and Agent Hattier was not the lead agent on that case. (*Id.*)  Further, Agent Soli denied that an offer not to prosecute was made to Mr. Mannear or that he would be helped out in any way if he participated in a political corruption investigation, though Soli stated, "I've never heard of that." (*Id.* at 237.)  Additionally, a taint-team was assembled to ensure there was no contact with attorney-client privileged information, but none was assembled in Mr. Young's case. (*Id.* at 237.)  However, Agent Soli reviewed the affidavit for the search warrant and recalled that a taint-team was intended for this investigation, had the warrant been signed by the magistrate. (Mot. Hr'g Tr., 239–41, Sept. 15, 2016, Doc. 49; Gov't Ex. 12 at 21–25.)  Soli said he probably conferred with AUSA Cam Le, who was preparing the affidavit, but he did not discuss it with Downie. (Mot. Hr'g Tr. 242, Setp. 15, 2016, Doc. 49.)

Agent Soli admitted that the Defendant's case is the only child pornography investigation in which he has been removed as lead agent and Agent Hattier has been placed on the case. (*Id.* at 232.)

However, Agent Soli testified that his telling the Defendant he was not a child pornographer or pedophile was not unusual:

> I would say that the language that I used with Mr. Young is typical in interviews with subjects of these investigations: something to the effect of, you know, you're not a bad person, but you made some mistakes or this and that.  And I don't think you're -- you know, that's just a standard interview technique.

(*Id.* at 232.)  Agent Soli acknowledged that he made these statements, not in an interview, but just as a comment, but he said that he has "probably" said that to other individuals he has investigated for child pornography, though he could not give a "date, a time, a name." (*Id.* at 233.)

Agent Soli testified that, of the twenty to thirty people he had subpoenaed, he had interviewed none of them prior to preparing to serve them with subpoenas.  (*Id.* at 235.)  Soli thought "that it's probably not typical" to subpoena individuals that he had never spoken to. (*Id.*) Ordinarily, such witnesses are interviewed. (*Id.*)

Forensic Examiner Downie testified that he has done hundreds of child pornography investigations. (Mot. Hr'g Tr., 76, Oct. 5, 2016, Doc. 36.) He stated that he has given the phone back the same day "probably on the order of ten – [ten] to [twelve] times." (*Id.* at 76–77.)

Other testimony regarding alleged dissimilarities in the investigation and handling of Defendant's case with other child pornography investigations is found in Section III.L. and will not be repeated here.

### 9. Location of the Copy of the Phone

As of October 5, 2016, the copy of the Defendant's phone is in evidence control. (*Id.* at 77.)  Any agent can obtain it from there. (*Id.*)

### IV.   Discussion

#### A.  Selective Prosecution

##### 1. Parties' Arguments

###### a.   Defendant's Original Memorandum in Support (Doc. 11-1)

Defendant argues that he was "selectively investigated and vindictively prosecuted because he is a lobbyist who has working relationships with former Louisiana ATC Commissioner Troy Hebert and other public officials." (Doc. 11-1 at 2.) Defendant argues that the Government threatened him with child pornography prosecution because he exercised his constitutional right to lobby public officials and because they "cynically decided" he had to

know about public corruption. (*Id.*) Defendant was vindictively indicted with these charges "[w]hen [he] was unable to comply with the government's demands[.]" (*Id.*)

The Defendant cites to the United States Attorney's Manual, Title 9, Section 75.020, which lists considerations to be given when determining whether to prosecute child pornography cases.  Defendant claims that he does not fit any of these "target characteristics," and Agent Soli even told him that he was not a pedophile or child pornographer.  The FBI's forensic analysis shows that the Defendant never searched online for child pornography and that the videos on the Defendant's phone were not on the government's child pornography database.  The Government has not done an age analysis on the alleged victim or bothered to search the Defendant's computers and other electronic devices "because it clearly has no concern that [Defendant] poses a risk to the safety of children or the community."  (Doc. 11-1 at 7.)

Though the Defendant "concedes that the United States Attorney's Manual is not binding on the government, it is probative of the government's good faith in charging [Defendant] with child pornography offenses.  Moreover, the DOJ has developed its prosecution guidelines for good reason: to comport with the legislative intent of the child pornography statutes." (Doc. 11-1 at 7.)  That legislative intent allegedly requires a prurient interest, and, as Agent Soli has conceded, the Defendant is not a pedophile or child pornographer. (*Id.* at 7–8 (citing S. Rep. No. 104-358, p. 22 (1996)).)

Defendant also cites to other cases from this district as evidence of wrongful prosecution. The Defendant argues that, in the cited cases "and many other[s] . . . , the government has prosecuted individuals who possessed and distributed child pornography over extended periods of time for sexual reasons." (Doc. 11-1 at 8–9.)  Conversely, Defendant "was not seeking out images of child pornography and . . . clearly did not have a sexual interest in the materials." (*Id.*

at 9.)  The Defendant argues that the Government cannot provide a prosecution "remotely similar to this one." (*Id.*)

Defendant acknowledges that, in the Fifth Circuit, there is a "presumption that a criminal prosecution is undertaken in good faith" and that a defendant "bears a very heavy burden in demonstrating invidious purpose which invades or overrides that prosecutorial discretion." (Doc. 11-1 at 9 (citation omitted).)  However, Agent Soli told the Defendant that he was not a child predator, and Soli returned the phone with the video still on it. (*Id.*)

Defendant says that, "[a]lmost a year later, the government has indicted [the Defendant] with possession and distribution of child pornography[,]" and the "only intervening event was that [Defendant] refused to 'wire up' for the government's political corruption specialist Agent Hattier." (*Id.* at 9.)  Defendant says the "government's improper motives are clear: it has charged [Defendant] for actions that fall outside the child pornography statute and the DOJ guidelines and in retaliation for his refusal to cooperate with a separate investigation." (*Id.*)

### b.  Government's Original Opposition (Doc. 12)

The Government argues that the "Defendant is being prosecuted, in accordance with DOJ guidelines, because he repeatedly distributed child pornography videos involving prepubescent children–not because of his political connections and his refusal to cooperate with" the FBI. (Doc. 12 at 1.)

The Government then provides background about the DOJ's commitment to prosecuting child sexual exploitation offenders.  The Government states, "The Department of Justice and the United States Attorney's Office for the Middle District of Louisiana are committed to the safety and well-being of every child and place a high priority on combating sexual exploitation of minors." (*Id.* at 2.)  "Through a network of federal, state, and local law enforcement agencies and

non-governmental advocacy organizations, DOJ's Project Safe Childhood attempts to protect children by investigation and prosecuting offenders involved in child sexual exploitation." (*Id.*) The "cornerstone" of this program in this district "is the tireless effort to identify, investigate, and prosecute those who possess, receive, distributed, transport, and/or produce child pornography," which is "crucial in punishing [criminals] and also deterring future offenders from taking advantage of children." (*Id.*)

The Government asserts that this prosecution is within the U.S. Attorney manual guidelines.  That manual states:

> Prosecution of <u>all crimes</u> involving the sexual abuse or sexual exploitation of children and the <u>distribution of child pornography</u> is strongly encouraged. Investigation has shown that many individuals who produce, import or consensually exchange child pornography do so repeatedly and with full knowledge that it is illegal to do so.

(*Id.* at 5 (quoting USAM § 9-75.020 (underline by Government)).)  The Government argues "[t]here is no exception for distributors like the defendant who think child pornography is funny." (*Id.*)

The Government asserts that the "Defendant's repeated and egregious conduct"— possessing child pornography for two years and intentionally distributing it to about thirty-eight individuals on thirty-three separate occasions—is "exactly the type of criminal activity that warrants federal prosecution," regardless of whether the Defendant thought it merely "offensive" or "distasteful" or lacked a "prurient interest." (Doc. 12 at 5–6.)

The Government correctly notes that a selective prosecution claim requires a defendant to show discriminatory effect and a discriminatory purpose, and it asserts that the Defendant has shown neither here.  As to the first, the Defendant has made no showing that he was treated differently from other individuals committing similar crimes.  "More specifically, defendant has

offered no proof that the government has failed to prosecute any individual where the evidence established distribution of child pornography." (Doc. 12 at 6 (citing *United States v. Brewer*, 681 F.2d 973, 975 (5th Cir. 1982).)  The Government argues that people like the Defendant who "intentionally and repeatedly distribute child pornography" to many people or who "keep child pornography for years" are "consistently prosecuted." (Doc. 12 at 6–7.)  The Government argues there is no evidence that "there are, or even were, other persons who engaged in essentially the same conduct and went uninvestigated or unprosecuted." (*Id.* at 7 (citing *United States v. Armstrong*, 517 U.S. 456, 569 (1996) ("defendant [is required] to produce some evidence that similarly situated defendants of other races could have been prosecuted, but were not, and this requirement is consistent with our equal protection case law."))).)

The Government also argues that the Defendant has failed to show he is a member of a protected class.  The Government writes, "Apparently, defendant believes that the Constitution affords special protection to politically-connected lobbyists." (Doc. 12 at 7.)   The Government thus argues that the Defendant cannot show discriminatory purpose.

### c.  Defendant's Post-Hearing Memorandum (Doc. 40)

The Defendant contends that "the government improperly threatened Mr. Young with a child pornography prosecution because AUSA Le and Agent Hattier viewed him as a potential government informant against Troy Hebert." (Doc. 40 at 12.)  The Defendant contends that he was "singled out because of his position as a lobbyist" while others like Zeid Ammari "were ignored by the government." (*Id.*)

The Defendant argues that Agent Hattier's denial that he said "we can make this go away if you cooperate" should not be believed because of the numerous contradictions in his testimony. (Doc. 40 at 13.)  These include:

- Agent Hattier said he got involved in the case at the request of Agent Soli to run a routine background check, while Agent Soli denied making the request, and AUSA Le said she asked Agent Hattier to get involved. (Doc. 40 at 2 (citing Mo. Hr'g Tr., 59, 62–63, 65, 102, 134, Sept. 15, 2016, Doc. 49).)

- Agent Hattier denied setting up the meeting with the Defendant on August 5.  But Agent Soli denied that it was his idea and said, "I think just someone said I'd like to talk to him or Mo would like to talk to him or Mo asked." (Doc. 40 at 13 (citing Mo. Hr'g Tr., 147, Sept. 15, 2016, Doc. 49).)

- Agent Hattier said he did not have a public corruption investigation open, but Agent Soli testified that it "went from a child pornography case to a public corruption case." (Doc. 40 at 13 (citing Mo. Hr'g Tr., 160, Sept. 15, 2016, Doc. 49).)

- Agent Hattier told Defense counsel at the November 5, 2015, meeting that he only reviewed child pornography communications, but he admitted at the hearing that he reviewed ATC related communications. (Doc. 40 at 8, 14 (citing Mo. Hr'g Tr., 81– 84, 90, Sept. 15, 2016, Doc. 49; Def. Exs. 11 & 13)

- Agent Hattier omitted from his report a discussion about Troy Hebert. (Doc. 40 at 14 (citing Mo. Hr'g Tr., 78, Sept. 15, 2016, Doc. 49).)

The Defendant further argues that "the government did **nothing** to advance a child pornography investigation until after Mr. Young refused to be extorted, and even then it was only cosmetic." (Doc. 40 at 14.)  The Government only furthered the child pornography investigation after the November 5, 2015, meeting with the Defendant's attorneys.

The Defendant argues that similarly situated individuals were not prosecuted.  The Government did nothing to investigate Mr. Ammari or the other thirty-eight recipients to whom the video was forwarded.  Moreover, the cases of *United States v. Brown* and *United States v. Mannear*, both of which are relied upon by the Government, are distinguishable:

- Brown "sent sexually suggestive text messages to his [fourteen]-year-old cousin and solicited and received a nude photograph from her." (Doc. 40 at 15 (citing Doc 40-1 at 34–35).)

- Brown possessed two videos of an adult male "massaging the vaginal area" of two young girls while they were sleeping, and the Government contended at the detention hearing that they were made by Brown's molesting his daughters. (Doc. 40 at 15 (citing Doc. 40-1 at 113).)

99

- Brown possessed a nude photograph of his thirteen-year-old daughter. (Doc. 40 at 15 (citing Doc. 40-1 at 97).)

- Mannear admitted that he used "peer-to-peer software program to download a large quantity of child pornography over the Internet" over a three-year period. (Doc. 40 at 15.)

- In *Mannear*, several devices were seized through a warrant, and the Government confirmed they seized "well over six-hundred (600) images and videos containing child pornography through the Internet." (Doc. 40 at 15.)

Additionally, while the Government submitted a chart of other child pornography prosecutions, the Defendant submitted his own chart (Doc. 40-2) demonstrating that these cases are different from the Defendant's in that "it is clear that Mr. Young is not a pedophile or a child pornographer, just as Agent Soli said.  He did not solicit the two videos at issue, nor did he possess or distribute them to satisfy prurient interests." (Doc. 40 at 16.)

Moreover, the Defendant argues that the Government failed to address *United States v. Lovejoy*, a case purportedly similar to his that was not prosecuted. (*Id.* at 16.)  According to the Defendant, "[i]n *Lovejoy*, the government determined that the defendant was not a pedophile or a child pornographer and dismissed the case.  Here, the government determined that [Defendant] was not a pedophile or a child pornographer but prosecuted him anyway." (*Id.*)

Finally, the Defendant argues that he was treated differently because "he exercised his constitutional rights to lobby the ATC, and as a result held value to the government's public corruption squad." (*Id.*)

### d.  Government's Post-Hearing Brief (Doc. 39)

The Government states preliminarily that the Defendant "knows that he is being prosecuted because he engaged in illegal child sexual exploitation by repeatedly distributing, over a two-year period of time, graphic child pornography bestiality videos to his friends, family,

clients, and colleagues." (Doc. 39 at 1.)  The Defendant is being prosecuted for the

"overwhelming evidence of his guilt, including forensic evidence and his own admission."  (*Id.*)

The Government denies any improper motive.

The Government maintains that the "Fifth Circuit [has] rejected a claim of selective

prosecution because [a] defendant failed to show that 'he was prosecuted for conduct which

other persons, similarly situated, were *not generally prosecuted*." (Doc. 39 at 2 (citing *United

States v. Johnson*, 577 F.2d 1304, 1308–09 (5th Cir. 1978) (emphasis by Government)).)  The

Government claims that the Defendant has failed to show that he has been prosecuted for

conduct that is "ordinarily ignored." (*Id.* (citing *Johnson*, 577 F.2d at 1308–09; *United States v.

Benson*, 941 F.2d 598, 611–12 (7th Cir. 1992)).)  The Government argues that child pornography

is a high priority with the DOJ and the U.S. Attorney's Office for the Middle District of

Louisiana.

Defendant has presented no evidence that the office in this district "*ordinarily* fails to

prosecute other child pornography offenders." (Doc. 39 at 2.)  The Government has shown that,

in the past ten years, there have been forty-four federal criminal cases involving child

pornography in this district. (*Id.* (citing Gov't Exs. 4 and 4A.)  The Government argues that the

Defendant is "minimizing his repeated and egregious criminal conduct" (*Id.* at 2–3 (citing Doc.

11-1 at 7–9).)  The Government also relies upon Corey Amundson's declaration, which states

that child pornography matters are not prosecuted only when there is an "insufficiency of the

evidence or the fact that the matter is being handled by another prosecutor's office." (Doc. 39 at

3 (citing Gov't Ex. 10).)   Given the overwhelming evidence against the Defendant, he has not

overcome the presumption that the prosecution acted in good faith.

Concerning discriminatory purpose, the Government maintains that the Defendant is not being prosecuted for a protected characteristic.  Rather, Defendant claims he is being prosecuted for his refusal to cooperate, but there is no protected right not to cooperate. (Doc. 39 at 4 (citing *Roberts v. United States*, 445 U.S. 552, 558 (1980)).)

Additionally, the investigation arose from an "unsolicited referral from a local attorney to the U.S. Attorney." (Doc. 39 at 4 (citing Gov't Ex. 8D; Mo. Hr'g Tr., 226-28, Sept. 15, 2016, Doc. 49).)  After the meeting, Agent Soli "furthered the investigation by, among other things, conducting and/or causing database inquiries on Young, preparing to make a consensual recording between Young and Ms. Wempren, submitting Ms. Wempren's phone for forensic analysis, and drafting an omnibus search warrant affidavit." (Doc. 39 at 4 (citations omitted).) The next day, the agents then confronted Young, who consented to a search of his phone. Moreover, the Defendant admitted to Wempren that he sent the child pornography videos to her and others.  Moreover, later forensic analysis showed that, over a two-year period, the Defendant distributed the video thirty-three separate times to thirty-eight different people.  The Government concludes:

> In summary, Young's colleague reported his criminal conduct to the authorities, the FBI conducted its investigation, and, consistent with guidelines of both DOJ and the USAO-MDLA, prosecutors pursued charges based on the overwhelming evidence uncovered by the FBI. In short, there is nothing in the investigation or prosecution of this case that indicates that it was motivated by discriminatory purpose.

(Doc. 39 at 5 (citations omitted).)

### e.  Defendant's Response to the Government's Post-Hearing Memorandum (Doc. 45)

The Defendant begins by asserting that the Government "failed to address *any* of the facts proven at the evidentiary hearing." (Doc. 45 at 1 (emphasis in original).)  The Defendant argues:

> In other words, contrary to the government's current argument that it always
> prosecutes child pornography, the evidence established that the government was
> willing to decline prosecution in this child pornography matter if [the Defendant]
> provided "something" on a public official, that the government intentionally
> failed to pursue leads on at least [thirty-two] other potential child pornography
> cases related to [Defendant's], and that the government has never prosecuted a
> case factually similar to [Defendant's].

(Doc. 45 at 2.)  The Defendant rejects the notion that the FBI's conduct cannot be attributable to

the prosecutors when:

> (1) AUSA Le brought Agent Hattier—who is not a child pornography
> investigator—into the case in the first place; (2)  AUSA Le and Agent Hattier,
> together, told Mr. Young's counsel on November 5, 2015 that Mr. Young's phone
> was 'only' being reviewed for the transmission of child pornography, when it
> clearly wasn't; and (3) the child pornography case was closed and converted to a
> public corruption matter while the U.S. Attorney's Office was involved.

(Doc. 45 at 2 (underline in original).)

The Defendant argues that the key issue is not whether the Defendant refused to

cooperate; rather, the Government is selectively prosecuting the Defendant "by targeting him in

the first place 'due to his position as a lobbyist' because 'he exercised his First Amendment right

of political associations with certain individuals.' " (Doc. 45 at 3 (citing Doc. 19 at 5–6).)  The

Defendant cites to case law indicating that individuals cannot be prosecuted based on "arbitrary

classifications," *United States v. Armstrong*, 517 U.S. 456, 464, 116 S. Ct. 1480, 134 L. Ed. 2d

687 (1996), and for, among other things, their "participation in political activity," *United States

v. Hastings*, 126 F.3d 310, 313 (4th Cir. 1997) (citing *United States v. Marcum*, 16 F.3d 599, 602

(4th Cir.1994); *United States v. Berrios*, 501 F.2d 1207, 1211 (2d Cir.1974)).

Here, the Defendant has been singled out "on the 'arbitrary classification' that he

participates in political activity as a lobbyist." (Doc. 45 at 4.)  The Defendant explains:

> The First Amendment guarantees the right to petition the government, and the
> Supreme Court has long recognized "that the right to lobby is constitutionally
> protected." *F.C.C. v. League of Women Voters of Ca.*, 468 U.S. 364, 405 (1984).

> *See also Smith v. Arkansas State Highway Emp., Local 1315*, 441 U.S. 463, 464 (1979) (stating that the "First Amendment protects the right of an individual to speak freely, to advocate ideas, to associate with others, and to petition his government for redress of grievances").

(Doc. 45 at 4.)  Defendant notes that Hattier specifically testified that, "Again, the thrust of it was, 'We have an interest in sitting down and talking to you. We think, given your – you know, **your profession and the people you associate with**, it's our belief that you may have information that would be of interest to us.' " (Doc. 45 at 4 (emphasis by Defendant) (citing Mot. Hr'g Tr., 79, Sept. 15, 2015, Doc. 49).)

Additionally, the Defendant says there is direct evidence that similarly situated people were not prosecuted—specifically, Zeid Ammari and the other thirty-eight recipients of the videos.  The Government's failure to pursue Mr. Gomez shows its position "that it consistently investigates and prosecutes all child pornography is disingenuous." (Doc. 45 at 5 n. 1.) Moreover, *Lovejoy* presents indirect evidence, and *Brown* is distinguishable.

Lastly, the Defendant asserts that the Court should compare the Government's conduct before and after the instant motion was filed.  After, the Government maintains that child pornography is a high priority; before, Hattier says that this case could "go away" if the Defendant cooperated.  Now, the Government says the evidence is overwhelming, but, during plea negotiations, the Government offered an obscenity charge.

### f.  Government's Reply to the Defendant's Post-Hearing Memorandum (Doc. 47)

The Government begins by stating:

> Proof of discriminatory intent requires proof that the Government acted because of, not merely in spite of, the protected characteristic of the defendant. See Wayte v. United States, 470 U.S. 598, 610 (1985); Lewis, 517 F.3d at 26. The exercise of First Amendment rights may serve as a basis for selective prosecution claims, but only where a prosecution is made with the purpose of quelling speech. United States v. Scott, 521 F.2d 1188, 1195 (9th Cir. 1975); see also United States v.

Ojala, 544 F.2d 940, 945 (8th Cir. 1976); United States v. Catlett, 584 F.2d 864, 868 (8th Cir. 1978); United States v. Crowthers, 456 F.2d 1074, 1080 (4th Cir. 1972). Against this legal backdrop, Young fails to explain how his prosecution for child pornography distribution and possession quells his "First Amendment right of political association."

(Doc. 47.)  The Government also maintains that the Defendant has failed to cite to any statute or case law recognizing the right to lobby public officials as a protected right, "[n]or has Young offered any proof that he was targeted for prosecution because of his job as a lobbyist or his association with any public official." (Doc. 47 at 2.)  The Government says Defendant has failed to "produce even a shred of evidence that the decision to prosecute him was motivated by discriminatory purpose on the part of prosecutors." (*Id.*)

The Government also asserts that he has not shown that similarly situated individuals, not exercising their "First Amendment right of political association," were not prosecuted. (*Id.*)  The Government explains:

> To be " similarly situated" for purposes of a selective prosecution claim means to be similarly situated in all respects material to the decision to prosecute. See United States v. Lewis, 517 F.3d 20, 27 (1st Cir. 2008); United States v. Deberry, 430 F.3d 1294, 1301 (10th Cir. 2005); United States v. Olvis, 97 F.3d 739, 744 (4th Cir. 1996). In other words,
>
> > [a] "similarly situated" person for selective prosecution purposes [is] one who engaged in the same type of conduct, which means that the comparator committed the same basic crime in substantially the same manner as the defendant–so that any prosecution of that individual would have the same deterrence value and would be related in the same way to the Government's enforcement priorities and enforcement plan–and against whom the evidence was as strong or stronger than against the defendant.
>
> United States v. Smith, 231 F.3d 800, 806 (11th Cir. 2000) (emphasis added).

(Doc. 47 at 2–3.)

The Government argues that Gomez and Ammari are not "similarly situated." Gomez is a "foreign national living outside the jurisdiction of the United States," and "there is absolutely no

credible evidence that he distributed child pornography to Young, let alone [thirty-eight] different individuals over a two-year period." (Doc. 47 at 3.)  Defendant told the FBI that Gomez sent both videos, though the forensic review did not corroborate this. (*Id.*) The night before he testified, Defendant "realized" that Ammari and not Gomez had sent the second video to the Defendant. The Government maintains it is disingenuous to consider Gomez similarly situated.

Regarding Ammari, the Government asserts that the Defendant fails to explain why the U.S. Attorney's Office for the Middle District of Louisiana "would either be able to charge Ammari or have the same interest in doing so." (Doc. 47 at 4.)  Defendant was in a better position to know Ammari distributed the videos, yet he did not "realize" this from the forensic evidence until recently.  Moreover, Forensic Examiner Downie explained that the Government's software did not recognize IMG_2343 as a video and, therefore, the Government did not know that Ammari had sent the 2013 video to Young until he testified in September 2016.  The Government maintains that, "Given the fact that no member of the defense team has ever bothered to review the forensic or master image copies of Young's iPhone kept in evidence at the FBI, there is no basis for Young's assertion that the Government intentionally ignored Ammari's conduct." (Doc. 47 at 4.)  Further, the evidence against Young is stronger; the Government lacks evidence that Ammari distributed the video to thirty-eight different individuals over a two-year period.  "Given the presumption of regularity that attaches to prosecutorial decisions, the only proper inference to be made is that the Government pursued a course of action warranted by the evidence.  Young's contentions otherwise rest on nothing more than speculation and surmise" (*Id.* at 4 (citing *United States v. DiStefano*, 129 F. Supp. 2d 342, 348 (S.D.N.Y. 2001) ("[A]lthough [defendant] hypothesizes that evidence against [uncharged comparators] was

'easily ascertainable and most certainly unavoidable,' he offers no evidence regarding the quality or quantity of such evidence.").)

The Government argues that *Lovejoy* is distinguishable; "[t]here is no evidence that Lovejoy committed the same crime as Young, *i.e.*, Lovejoy did not repeatedly distribute child pornography bestiality videos to [thirty-eight] individuals over a two-year period." (Doc. 47 at 5.)  Conversely, "Lovejoy allegedly filmed young boys, some of whom were naked, at Tulane's University's athletic center to show his girlfriend the 'chaos' in the locker room." (Doc. 47 at 5 (quoting Gov't Ex. 14).)  There, the AUSA "reviewed the evidence and determined that 'the lack of evidence renders further prosecution of this matter unwise and impractical." (Doc. 47 (quoting Gov't Ex. 15).)  On the other hand, in this case, the prosecutors reviewed the evidence and determined that, "consistent with DOJ and MDLA policies," prosecution was warranted, and a grand jury returned a true bill.

The Government concludes by citing to case law supporting the proposition that they may prosecute individuals because of their political prominence. (Doc. 47 at 5–6.)  It further explains:

> [T]he reality resulting from limited law enforcement and judicial resources is that not every criminal violation of the United States Code can be prosecuted. The decision as to which crimes and criminals to prosecute is entrusted by the Constitution not to the judiciary, but to the executive who is charged with seeing that laws are enforced.

(Doc. 47 at 6 (quoting *Smith*, 231 F.3d at 807 (citing U.S. Const. Art. II, § 3)).).

## 2. Analysis

 "A selective-prosecution claim is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution." *Armstrong*, 517 U.S. at 463, 116 S. Ct. at 1486.  This

constitutional constraint is "imposed by the equal protection component of the Due Process Clause of the Fifth Amendment." *Id.*, 517 U.S. at 463, 116 S. Ct. at 1486 (citing *Bolling v. Sharpe*, 347 U.S. 497, 500, 74 S. Ct. 693, 694–95, 98 L. Ed. 884 (1954)).  Under this constraint, "the decision whether to prosecute may not be based on an unjustifiable standard such as race, religion, or other arbitrary classification." *Id.* (citing *Oyler v. Boles*, 368 U.S. 448, 456, 82 S. Ct. 501, 506, 7 L. Ed. 2d 446 (1962)).

In *Armstrong*, the Supreme Court explained that a selective prosecution claim "requires a defendant . . . to show that federal prosecutorial policy had both a discriminatory effect *and* a discriminatory intent[.]"  *United States v. Hall*, 455 F.3d 508, 523 (5th Cir. 2006) (emphasis in original).   Thus, there are two requirements for a selective prosecution claim. *See United States v. Hoover*, 727 F.2d 387, 389 (5th Cir. 1984) (citing *United States v. Greene*, 697 F.2d 1229 (5th Cir. 1983)); *United States v. Webster*, 162 F.3d 308, 333 (5th Cir. 1998).  "First, a defendant must 'make a *prima facie* showing that he has been singled out for prosecution while others similarly situated and committing the same acts have not.' " *Hoover*, 727 F.2d at 389 (quoting *Greene*, 697 F.2d at 1234); *see also Webster*, 162 F.3d at 333–34.  "Second, a defendant 'must then demonstrate that the government's discriminatory selection of him for prosecution has been invidious or in bad faith in that it rests upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights." *Hoover*, 727 F.2d at 389 (quoting *Greene*, 696 F.2d at 1234); *Webster*, 162 F.3d at 334 (citing *United States v. Sparks*, 2 F.3d 574, 580 (5th Cir. 1993)).  "If a defendant meets both of these requirements, then the burden shifts to the government to demonstrate a legitimate basis for selecting the defendant for prosecution." *Hoover*, 727 F.2d at 389 (quoting *Greene*, 697 F.2d at 1235).

"In making these requisite showings, the defendant must rebut the presumption that the government made its decision to prosecute in good faith and in a nondiscriminatory manner." *Webster*, 162 F.3d at 334 (citing *Hoover*, 727 F.2d at 389). "[T]he mere exercise of some selectivity by the government in instituting prosecutions is not in itself prohibited by the constitution." *Hoover*, 727 F.2d at 389.  "The decision to prosecute one person instead of another is a proper exercise of executive discretion, and [the Court is] both reluctant and restricted in any review of prosecutorial decisions." *Id.* (citations omitted). "Thus, a defendant 'bear[s] a very heavy burden in demonstrating invidious purpose which invades or overrides that prosecutorial discretion.' " *Id.* (quoting *Greene*, 697 F.2d at 1235). "To dispel the presumption of prosecutorial good faith, a criminal defendant must present clear evidence to the contrary." *Webster*, 162 F.3d at 334 (citations and internal quotations omitted). Indeed, "making such a prima facie showing of selective prosecution is a difficult task," and "few parties have succeeded in shifting the burden of proof to the government." *Greene*, 697 F.2d at 1235 (5th Cir. 1983) (citations omitted).

The U.S. Attorney's constitutional and statutory authority and discretion were described in the introduction of this ruling and need not be repeated here.  However, the Court would like to reiterate "why courts are properly hesitant to examine the decision of whether to prosecute." *Armstrong*, 517 U.S. at 465, 116 S. Ct. at 1486 (citation and quotations omitted).  The Tenth Circuit summarized these considerations nicely:

> Caution is required when evaluating selective-prosecution claims. The defendant is asking the judiciary to exercise power over a "special province" of the executive branch, a province in which, for good reason, the executive possesses broad discretion. *Armstrong,* 517 U.S. at 464, 116 S. Ct. at 1480 (internal quotation marks omitted). The decision to prosecute "is particularly ill-suited to judicial review." [*Wayte v. United States*, 470 U.S. 598, 607, 105 S. Ct. 1524, 84 L.Ed.2d 547 (1985).] "Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake." *Id.;*

*accord Armstrong,* 517 U.S. at 465, 116 S. Ct. 1480. Moreover, judicial review of prosecutorial decisions can "chill law enforcement by subjecting the prosecutor's motives and decisionmaking to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy." *Armstrong,* 517 U.S. at 465, 116 S. Ct. 1480. Accordingly, "the presumption of regularity supports . . .  prosecutorial decisions and, in the absence of clear evidence to the contrary, courts presume that [prosecutors] have properly discharged their official duties." *Id.* at 464, 116 S. Ct. 1480 (internal brackets and quotation marks omitted). As the Supreme Court has noted, "the standard [for proving a selective-prosecution claim] is a demanding one." *Id.* at 463, 116 S. Ct. 1480.

*United States v. Deberry*, 430 F.3d 1294, 1299 (10th Cir. 2005)

Having carefully considered the law and the facts in the record, the Court finds that, even if the Defendant had proven discriminatory effect (which seems virtually impossible given the unique facts and circumstances of this case), he has failed to sustain his burden of proving that that the Government acted with a discriminatory purpose.  The Court will address each requirement (effect and purpose) in turn, though it will base its decision only on the latter.

### a.  Discriminatory Effect

As stated above, to prove the first element (discriminatory effect), "a defendant must show that other similarly situated individuals could have been, but were not, prosecuted." *See Prosecutorial Discretion*, 45 Geo. L.J. Ann. Rev. Crim. Proc. 271, 277 n. 703 (2016); *see, e.g., Webster*, 162 F.3d at 334 ("In *Armstrong*, the Court stated, 'The vast majority of Courts of Appeals require the defendant to produce some evidence that similarly situated defendants of other races could have been prosecuted, but were not, and this requirement is consistent with our equal protection case law."); *United States v. Darif,* 446 F.3d 701, 708 (7th Cir. 2006) (finding that the district court did not abuse its discretion by determining that the defendant was not similarly situated because he was "arguably more culpable" than his spouse and because, unlike his spouse, he did not agree "to accept immunity in exchange for testimony against" the defendant).

Before turning to the facts of the case, there are two additional aspects of the discriminatory effect standard that warrant discussion. Fifth Circuit case law appears to hold that, to prove discriminatory effect, a Defendant must provide evidence of more than a few similarly situated persons. *See Hoover*, 727 F.2d at 388–89 (finding that the defendant met his burden of proving the first element of the test because "[o]ver three hundred air traffic controllers failed to report to work in the Houston area; yet only three individuals, including [the defendant], were prosecuted."); *United States v. Tibbetts*, 646 F.2d 193, 195–96 (5th Cir. 1981) (finding no selective prosecution of a tax protestor partly because: "Due to limited resources of the government, there will always be some tax evaders and tax protestors who elude prosecution by the government. This factor is not sufficient to show selective prosecution."); *United States v. Brewer*, 681 F.2d 973, 975 (5th Cir. 1982) (same); *United States v. Hayes*, 589 F.2d 811, 819 & 819 n.4 (5th Cir. 1979) (finding that Defendant failed to satisfy first prong of the selective prosecution test because he only presented evidence of three other cases in which there was no federal prosecution after a state prosecution had been pursued in good faith); *United States v. Johnson*, 577 F.2d 1304, 1308–09 (5th Cir. 1978) ("[Defendant] urged . . . that he was singled out for prosecution because he was a prominent figure in the so-called tax protest movement. The simple answer to [this] argument is that the conduct for which he was prosecuted is not *ordinarily* ignored. Testimony here reflects that known tax reporting violations are not ignored and are, in fact, prosecuted to such an extent as prosecutorial resources allow." (emphasis added)).

But other Courts have indicated that discriminatory effect can be shown with evidence of a single similarly situated person who was not prosecuted. *See United States v. James*, 257 F.3d 1173, 1179 (10th Cir. 2001) ("To prove discriminatory effect in a race-based selective

prosecution claim, a defendant must make a credible showing that a similarly-situated individual of another race could have been prosecuted for the offense for which the defendant was charged, but was not."); *Chavez v. Illinois State Police*, 251 F.3d 612, 637 (7th Cir. 2001) (finding that the first prong was met when the plaintiff proved he was similarly situated to one other individual who was not pulled over); *United States v. Mesa-Roche*, 288 F. Supp. 2d 1172, 1184–85 (D. Kan. 2003) ("courts have required a defendant to make a credible showing that a similarly situated individual of another race or ethnicity could have been subjected to the same law enforcement action as the defendant, but was not." (citations omitted)); *Nixon v. United States*, 703 F. Supp. 538, 571 (S.D. Miss. 1988), *aff'd*, 881 F.2d 1305 (5th Cir. 1989) (denying a motion for selective prosecution because, "Petitioner has not shown that he was singled out for prosecution while another similarly situated person was not prosecuted.")

The second major issue with discriminatory effect is the standard for determining whether an individual is similarly situated for purposes of a selective prosecution claim. On this issue, different circuits have articulated substantially similar standards.

"Defendants are similarly situated when their circumstances present no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them." *United States v. Venable*, 666 F.3d 893, 900–01 (4th Cir. 2012) (citing *United States v. Olvis*, 97 F.3d 739, 744 (4th Cir. 1996)); *see also Deberry*, 430 F.3d at 1301 (relying on *Olvis* and articulating same standard). The Fourth Circuit has "rejected a 'narrow approach' " and instead recognized that "all relevant factors" must be considered in assessing whether individuals are similarly situated for equal protection purposes. *Venable*, 666 F.3d at 901 (quoting *Olvis*, 97 F.3d at 744). "Of particular significance here, a court cannot only consider the other persons' 'relative culpability,' but must 'take into account several factors that play

important and legitimate roles in prosecutorial decisions.' " *Id.* (quoting *Olvis*, 97 F.3d at 744).

The Fourth Circuit then provided nine examples of such considerations.[4]

The Eleventh Circuit has held:

"[A] 'similarly situated' person for selective prosecution purposes [is] one who engaged in the same type of conduct, which means that the comparator committed the same basic crime in substantially the same manner as the defendant–so that any prosecution of that individual would have the same deterrence value and would be related in the same way to the Government's enforcement priorities and enforcement plan–and against whom the evidence was as strong or stronger than that against the defendant." [*United States v. Smith*, 231 F.3d 800, 810 (11th Cir. 2000).] In a different context–when a Title VII plaintiff complains she was treated differently than a similarly situated co-worker–we have required the plaintiff and the employee she identifies as a comparator to be similarly situated "in all relevant respects." *Wilson v. B/E Aerospace, Inc.,* 376 F.3d 1079, 1091 (11th Cir. 2004) (citing *Holifield v. Reno,* 115 F.3d 1555, 1562 (11th Cir. 1997)). As we have explained, the comparator must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer. *Wilson,* 376 F.3d at 1091; *see Silvera v. Orange County Sch. Bd.,* 244 F.3d 1253, 1259 (11th Cir. 2001). The same considerations apply in a challenge based upon selective prosecution because, in all but an exceedingly narrow number of cases, a court is not free to second-guess the prosecutor's exercise of charging discretion.

*United States v. Brantley*, 803 F.3d 1265, 1271–72 (11th Cir. 2015), *cert. denied,* 136 S. Ct.

1833, 194 L. Ed. 2d 837 (2016).

Lastly, the First Circuit has articulated a similar standard:

Although we have not previously provided a distinct definition of the term "similarly situated" in the selective prosecution context, classic equal protection principles light our path and limn the attributes of one who is similarly situated. *See Armstrong,* 517 U.S. at 465, 116 S. Ct. 1480. A similarly situated offender is one outside the protected class who has committed roughly the same crime under

---

[4] These factors include:

(1) a prosecutor's decision to offer immunity to an equally culpable defendant because that defendant may choose to cooperate and expose more criminal activity; (2) the strength of the evidence against a particular defendant; (3) the defendant's role in the crime; (4) whether the defendant is being prosecuted by state authorities; (5) the defendant's candor and willingness to plead guilty; (6) the amount of resources required to convict a defendant; (7) the extent of prosecutorial resources; (8) the potential impact of a prosecution on related investigations and prosecutions; and (9) prosecutorial priorities for addressing specific types of illegal conduct.

*Venable*, 666 F.3d at 901 (citing *Olvis*, 97 F.3d at 744).

roughly the same circumstances but against whom the law has not been enforced. *See id.* at 469, 116 S. Ct. 1480. In configuring the pool of similarly situated offenders, "*no fact should be omitted to make it out completely.*" *Id.* at 466, 116 S. Ct. 1480 (quoting *Ah Sin v. Wittman,* 198 U.S. 500, 508, 25 S. Ct. 756, 49 L. Ed. 1142 (1905)) (emphasis in original).

To be sure, this statement cannot be taken literally. The focus of an inquiring court must be on factors that are at least arguably material to the decision as to whether or not to prosecute. Material prosecutorial factors are those that are relevant-that is, that have some meaningful relationship either to the charges at issue or to the accused-and that might be considered by a reasonable prosecutor. *Cf.* [*Cordi-Allen v. Conlon*, 494 F.3d 245, 250–51 (1st Cir. 2007)] (requiring comparators to be similarly situated "in all relevant aspects" in a civil "class of one" context); *Perkins v. Brigham & Women's Hosp.,* 78 F.3d 747, 751 (1st Cir. 1996) (stating in employment discrimination context that comparator must be similarly situated in "material" respects). Unrelated, irrelevant, or trivial factors cannot meet the materiality requirement and, therefore, cannot be built into the configuration of the pool.

The bottom line, then, is that a district court should assess every material fact in rendering its judgment as to which offenders should be deemed similarly situated. *See Olvis,* 97 F.3d at 744 (explaining that "defendants are similarly situated when their circumstances present no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them").

A multiplicity of factors legitimately may influence the government's decision to prosecute one individual but not another. *See Wayte,* 470 U.S. at 607, 105 S. Ct. 1524; *see also Magana,* 127 F.3d at 9 (listing representative factors). These may include, inter alia, the comparability of the crimes, the similarities in the manner in which the crimes were committed, the relative efficacy of each prosecution as a deterrent, and the equivalency of the evidence against each prospective defendant. *See United States v. Smith,* 231 F.3d 800, 810 (11th Cir. 2000); *see also United States v. Peterson,* 233 F.3d 101, 105 (1st Cir. 2000) (considering individuals' relative levels of participation in illegal scheme).

*United States v. Lewis*, 517 F.3d 20, 27–28 (1st Cir. 2008).

Because the Court is basing its decision on the selective prosecution claim on discriminatory purpose, the Court need not make a determination on the discriminatory effect question.  However, the Court wishes to make the following comments.

Considering the above standards and the unique facts and circumstances of this case, the Court finds that the Defendant's burden is practically impossible.  The Court has reviewed the

summaries of the cases submitted by the parties to show the similarity (or lack thereof) of this case to the other child pornography cases in this district. (Gov't Exs. 4 & 4A; Def. Ex. 2, Doc. 40-2.)  The Court has also considered the *Mannear* and *Brown* cases addressed by the parties. Lastly, the Court has analyzed the above case law; in some, hundreds committed similar conduct to a defendant and only one was charged.

The Court finds this case distinguishable from all other cases.  The Court agrees with the Defendant that his conduct appears to be significantly less severe than the conduct of the other child pornography cases in this district.  This case involves an individual who possessed and distributed two child pornography videos on multiple occasions with no sexual motive.  It strikes the Court as highly unlikely that an individual would be prosecuted under such circumstances absent extraordinary circumstances, which likely explains why the Government could not point to any other similar prosecutions.  If all such similar or identical cases have never been charged, how can this Defendant prove what he needs to prove?

The Defendant has made a valiant effort by identifying the following as "similarly situated": (1) Gomez; (2) Ammari; (3) the thirty-eight recipients, and (4) Lovejoy.  But even these are inadequate.

First, the Defendant has only identified two people who distributed child pornography: Gomez and Ammari.  Even assuming Gomez and Ammari were "similarly situated," it is questionable whether this number of such persons would be sufficient under the above Fifth Circuit case law.

Second, even assuming Defendant had shown an adequate number, it is also questionable whether these individuals are "similarly situated" under the law.  Gomez is outside the

jurisdiction of the United States Attorney's office for the Middle District of Louisiana; as the Defendant seems to concede, Gomez cannot not be prosecuted for the crime in question.[5]

With respect to Ammari and the thirty-eight recipients, the difficulty of Defendant's burden becomes even more prominent.  The evidence appears clear and unrebutted that the Defendant sent two pornographic videos to about thirty-eight individuals on thirty-three separate occasions over a two-year period.  Conversely, the only evidence in the record is that Ammari sent the video once to the Defendant in 2013 and that the recipients received, at one time, one video.  Without more, the Court cannot determine that they committed "roughly the same crime under roughly the same circumstances."

Let it be clear: factors outside the Defendant's control prevent the Court from weighing the relevant factors related to the "similarly situated" question.  How can the Court consider the relative culpability, deterrence value, enforcement priorities, or the equivalency of the evidence against each recipient or Ammari when the Government performed no investigation of these people or the circumstances surrounding the receipt and transmission of the videos?[6]  How can Defendant prove that Ammari or these individuals even still possess the videos, short of calling them as witnesses, in which case they may invoke their Fifth Amendment privilege?  The Defendant simply cannot sustain his burden on this issue with respect to the recipients and Ammari; yet the law places it squarely on his shoulders.

---

[5] *See* Doc. 45 at 5 n. 1 ("Mr. Young does not suggest that the government should prosecute a Costa Rican citizen, but the government's failure even to contact Mr. Gomez proves that the government's position that it consistently investigates and prosecutes all child pornography is disingenuous.")  Thus, the Defendant seems to acknowledge that Gomez is, at best, circumstantial evidence for the discriminatory purpose prong of the analysis.

[6] The Court notes that, as will be explained in detail below, the Government was not aware of the fact that Ammari sent one of the videos to the Defendant until the Defendant testified at the September 15, 2016 hearing.  Defendant himself did not remember that Ammari had sent the video until he reviewed discovery on September 14, 2016. (Mot. Hr'g Tr., 12–15, Sept. 15, 2016, Doc. 49.)  Thus, the failure to investigate Ammari appears to be the fault of neither party.

Lastly, Lovejoy does not appear similarly situated.  At the onset, the decision not to prosecute Lovejoy was not made in this district. (*See* Gov't Ex. 15, Doc. 47-3.)  But, putting that aside, as the Government correctly asserts, the prosecutor in Lovejoy concluded that "the lack of evidence renders further prosecution of this matter unwise and impractical." (*Id.*)  There is no such lack of evidence here.

Further, Lovejoy's conduct was substantially different; after waiving his right to counsel, Lovejoy told the FBI in an interview that "he filmed the young boys in the locker room at Tulane University's Reily Center (gym) in order to show his girlfriend . . . the 'chaos' in the locker room." (Gov't Ex. 14, Doc. 47-2 at 1.)  Lovejoy said it was "stupid for him to video kids when they were getting dressed, but said his intentions were to capture the chaos." (*Id.*)  The FBI notes provide that, "While filming, LOVEJOY focused on one young boy after the young boy said he had 'poop' in his pants, making LOVEJOY laugh.  LOVEJOY was focusing on the young boy's face and asking the boy if he pooped in his underwear." (*Id.*)

Conversely, here, the Defendant allegedly engaged in repeated illegal conduct over a two year period. Moreover, the nature of the Defendant's videos (*i.e.*, bestiality between a prepubescent boy and a donkey) is materially different than the video at issue in Lovejoy.  Thus, there are clearly legitimate prosecutorial factors that might justify making different prosecutorial decisions.

Again, the standard is not whether other defendants committed worse violations; the question is whether "similarly situated defendants [outside the protected class] could have been prosecuted, but were not[.]" *Webster*, 162 F.3d at 334.  For the reasons stated, under the very unique circumstances of this case, Defendant's burden appears, through no fault of his own, insurmountable.

### b.  Discriminatory Purpose

As explained above, "the decision to prosecute may not be deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification, including the exercise of protected statutory and constitutional rights." *Wayte v. United States,* 470 U.S. 598, 608, 105 S. Ct. 1524, 1531, 84 L. Ed. 2d 547 (1985) (citations and quotations omitted).  To prevail on a selective prosecution claim, the defendant must show that the government's conduct "was motivated by a discriminatory purpose." *Id.* (citations and footnote omitted).

" 'Discriminatory purpose' implies more than intent as awareness of consequence.  It implies that the decisionmaker selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Wayte*, 470 U.S. at 609–10, 105 S. Ct. at 1531–32 (citation, quotations, and alterations omitted) (finding that the defendant had "not shown that the enforcement policy selected nonregistrants for prosecution on the basis of their speech" and that he had "not shown the Government prosecuted him *because of* his protest activities." (emphasis in original)); *see also United States v. Ramirez*, 765 F.2d 438, 440 (5th Cir. 1985) (holding that, even if defendants had shown discriminatory effect, they "still have not met their burden to demonstrate that the prosecution in the instant case occurred 'because' they were Haitian or 'because of' protected first amendment freedoms."). Thus, the Defendant "must . . . demonstrate that the government's discriminatory selection of him for prosecution has been invidious or in bad faith in that it rests upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights." *Hoover*, 727 F.2d at 389 (quoting *Greene*, 697 F.2d at 1234); *Webster*, 162 F.3d at 334 (citing *United States v. Sparks*, 2 F.3d 574, 580 (5th Cir. 1993)).

The Court has conducted an extensive review of the record.   Having done so, the Court finds that the Defendant has failed to satisfy his very heavy burden of proof on this issue.

Before providing the reasons for this decision, the Court wishes to make two preliminary notes.  First, the Defendant is correct that lobbying is a protected First Amendment activity. "[L]obbyists are protected by the First Amendment right to petition." *See Autor v. Pritzker*, 740 F.3d 176, 182 (D.C. Cir. 2014) (citing *Liberty Lobby, Inc. v. Pearson*, 390 F.2d 489, 491 (D.C. Cir. 1967) ("every person or group engaged . . . in trying to persuade Congressional action is exercising the First Amendment right of petition.")); *see also Regan v. Taxation With Representation of Wash.*, 461 U.S. 540, 552, 103 S. Ct. 1997, 2004, 76 L. Ed. 2d 129 (1983) (Blackmun, J., concurring) ("lobbying is protected by the First Amendment" (citation omitted)).

Second, the Defendant is also correct that discriminatory purpose can be shown if the government "followed any special or unusual procedures in deciding to prosecute him rather than" other similarly situated individuals. *See Hoover*, 727 F.2d at 391.  The Defendant has overwhelmingly shown that Mr. Young's investigation for child pornography by the FBI was handled in a most unusual and atypical way. These irregularities include:

- Giving the Defendant back his phone with the child pornography still on it;

- Making Agent Hattier the case agent rather than Agent Soli, when Agent Hattier had virtually no experience in child pornography cases and when Agent Soli was the main child pornography expert in that office;

- Failing to review the Defendant's other electronic devices;

- Failing to contact the Panamanian Legat until after the instant motion was filed;

- Failing to interview other recipients of the video; and

- Running the NCMEC report only after the November 5, 2015, meeting between the Defendant's attorneys and the Government.[7]

---

[7] See above discussion of evidence found in Section III.L.

119

Nevertheless, considering all of the evidence in the record, the Court finds that the

Defendant has not shown his selection for prosecution by the U.S. Attorney's Office "rests upon

such impermissible considerations as . . . the desire to prevent his exercise of constitutional

rights."  The Court finds that the Defendant was not prosecuted to stifle his lobbying or

association.  The Court further finds insufficient evidence that the federal prosecutors acted

inappropriately, selectively, or contrary to their policies or practices.  The Court bases this

conclusion on several grounds.

> **i.    Guidelines for the DOJ And This U.S. Attorney's Office**

First, the Court finds that this prosecution is consistent with DOJ guidelines generally and

the policy of the U.S. Attorney's Office in this district in particular.  Again, the U.S. Attorney's

Manual § 9-75.020 provides, "*Prosecution of all crimes* involving the sexual abuse or sexual

exploitation of children *and the distribution of child pornography is strongly encouraged*."

(Gov't Ex. 1 (emphasis added).).  The manual further provides that certain factors should be

considered when evaluating these cases:

> In evaluating such cases, consideration should be given to, inter alia,
> characteristics of the material, such as the age of the involved child, the type of
> conduct depicted, the number of involved children, the quantity of the involved
> material, whether violence or force is used against the child, and characteristics of
> the target, such as whether the target currently is engaging in sexual activity with
> children, whether the target is the parent or guardian, or is in a position of trust
> with the depicted children, whether the target has shown the material to children,
> whether the target is making money from the conduct, whether the target has
> committed any prior offenses involving child sexual abuse or exploitation, and the
> safety of the community.

USAM § 9-75.020.  Though the Defendant elicited testimony from Agent Soli showing that

many of these factors cut against prosecution in this case (*See* Mot. Hr'g Tr., 195–96, Sept. 15,

2016, Doc. 49), the Defendant ignores other factors, including the age of the involved children

(prepubescent boys) and the type of conduct depicted (bestiality). Given the "strong encourage[ment]" to prosecute "all crimes involving . . . the distribution of child pornography," and given the presence of some of the relevant characteristics set forth in the manual, the Defendant has not overcome the presumption of good faith.

Additionally, evidence from the U.S. Attorney's Office for the Middle District of Louisiana also supports the conclusion that the Defendant failed to carry his burden.  The Middle District of Louisiana Prosecution Guidelines for the United States Attorney's Office (July 2014) provide that the office in this district "will generally prosecute child pornography offenses, with particular emphasis on crimes involving . . . distributing child pornography involving one or more prepubescent children." (Gov't Ex. 2).  The Defendant's alleged conduct falls squarely within these guidelines.

Even more convincingly, First Assistant U.S. Attorney and Criminal Chief Corey Amundson declared under oath: (a) that this prosecution is consistent with this district's guidelines, which he drafted; (b) that "[n]o impermissible factors were considered" for this prosecution, and that "[t]he fact that the defendant did not provide information to law enforcement concerning possible public corruption was not a factor in the decision to prosecute the defendant"; (c) that he and the U.S. Attorney met with defense counsel for plea negotiations but maintained that "the offense conduct necessitated a felony conviction"; (d) that the office in this district "has declined to prosecute a child pornography matter only based on insufficiency of the evidence or the fact that the matter was being handled by another prosecutor's office"; and (e) that to his knowledge, the office in this district "has never declined to charge a child pornography matter because the suspect cooperated in any matter, including public corruption," and, "[i]n those instances when a child pornography defendant has provided substantial

cooperation, [the prosecutors] have asked the court for consideration at sentencing." (Gov't Ex. 10 at 1–2.). Again, considering the presumption that a prosecution is undertaken in good faith, this evidence strongly indicates that there was no invidious purpose in this case.

### ii. Government's Initial Investigation Into the Defendant

Second, the Court finds that other evidence, particularly related to the initial investigation of the Defendant, indicates a lack of bad faith by the Government. As explained in detail above, on July 31, 2015, Col. Green emailed Corey Amundson and Greg Fee of the FBI about a complaint they received from Shantel Wempren via Jill Craft. (Gov't Ex. 8D at 2.) The complaint specifically referenced "a bestiality video that appear[ed] to have a juvenile in the video as well" and mentioned an allegation that the Defendant "ha[d] been sexually harassing" Wempren. (*Id.*) Fee referred the matter to Steve Soli, the FBI's "resident child porn expert," and Col. Green said he would reach out to Steve. (*Id.*) On August 3, 2015, Amundson emailed Soli and AUSA Le asking them to interview Wempren. (Gov't Ex. 8D at 1.)

On August 4, 2015, Wempren, Soli and Le met to discuss the complaint and sought her help to consensually record a conversation with the Defendant involving the receipt of the child pornography video. (Mot. Hr'g Tr., 137–39, Sept. 15, 2016, Doc. 49.) On the same day, Forensic Examiner Downie was lined up to go to Baton Rouge to help with the collection of the Defendant's phone. (Mot. Hr'g Tr., 27–28, Oct. 5, 2016, Doc. 36.)

On August 5, 2015, Wempren had the meeting with the Defendant and raised the subject of the child pornography video. (Mot. Hr'g Tr., 7, Sept. 15, 2016, Doc. 49.) Agent Soli and other agents went to Galatoire's, had Wempren discuss the video with the Defendant as the conversation was being recorded, had Wempren confirm that Defendant had the phone on him, interviewed the Defendant, obtained information about Defendant's receipt and distribution of

the videos, and got consent from the Defendant to search the subject phone. (*Id.* at 10–12, 21–25, 139–41, 144–46, 164–65, 217–18.)

On August 6, 2015, Downie extracted the information from the iPhone and preserved a copy for evidence. (Mot. Hr'g Tr., 35–37, Oct. 5, 2016, Doc. 36.)  Downie's review of the phone revealed—in addition to the child pornography videos—two pictures of a young girl. (Mot. Hr'g Tr., 39–42, Oct. 5, 2016, Doc. 36.)  Defendant had talked about this girl in his text messages with another person, and one of them had mentioned that the young girl could not be sixteen or fifteen. (*Id.* at 41–42.)  Downie brought the pictures to Soli's attention. (*Id.*)  Downie testified that Soli said that this showed possible child exploitation, so it was relevant to the investigation; in fact, it needed to be investigated further. (*Id.* at 40.)  Similarly, Soli testified that this (reference to sexual contact with a fifteen-year-old girl and the pictures of a girl that may not have been of age) warranted more investigation to determine if Defendant had had sexual contact with a juvenile.[8] (Mot. Hr'g Tr., 189–90, Sept. 15, 2016, Doc. 49.)

Additionally, on August 6, 2015, when Agent Soli informed AUSA Cam Le that the extraction was done, she agreed to let the Defendant have his phone back "with the condition that the child pornography [be] removed from the device." (Mot. Hr'g Tr., 229–30, Sept. 15, 2016, Doc. 49; Gov't Ex. 8E.)

On August 7, 2015, Agent Soli requested the forensic analysis of Wempren's phone. (Def. Ex. 23.) This analysis included extraction of the pornographic video. (*Id.*)

---

[8] It is important to note that, later, at the November 2015 meeting between AUSA Cam Le and defense counsel, AUSA Le specifically referenced this young girl as being evidence the Defendant might be a danger to children. (Def. Ex. 11 at 3.)  Defendant himself even testified that, if he had said in the text messages that the girl was fifteen, then "certainly [he] would hope [the agents] would do something about it." (Mot. Hr'g Tr., 55, Sept. 15, 2016, Doc. 49.)

Lastly, early in the process, Agent Soli prepared an application for an affidavit and omnibus search warrant that was submitted to a judge.  (Mot. Hr'g Tr., 179–80, Sept. 15, 2016, Doc. 49; Gov't Ex. 12.)  The warrant was simply not granted. (Mot. Hr'g Tr., 213, Sept. 15, 2016, Doc. 49.)

All of these actions indicate there was a lack of bad faith on the part of the U.S. Attorney's Office.  In sum, the Government coordinated with the FBI's child pornography expert to meet the complainant, arranged for her to meet with the Defendant, and obtained a recording of him confessing to the conduct.  They obtained the cell phone in question and drew considerable electronic evidence from it.  All of this suggests that the Government treated the case as a child pornography investigation until they obtained enough evidence to support a conviction.

### iii.    Explanations for the Irregularities in the Investigation

Third, some (though not all) of the above irregularities in the FBI's investigation have plausible and believable explanations.

Perhaps most importantly, the Court finds that the Government did not intend to return the Defendant's cell phone with the child pornography still on it.  Agent Soli credibly stated that he wanted to get the phone back to the Defendant as soon as possible because the Defendant had told him how important the phone was to his business and livelihood. (Mot. Hr'g Tr., 176, 199, Sept. 15, 2016, Doc. 49.)  Soli testified that it is not their policy to return devices to defendants with child pornography still on them, that he did not knowingly do that in this case, and that he expected the child pornography material to be deleted or extracted from the phone before being released. (*Id.* at 199–200.)

Downie also explained why the child pornography video was not deleted when he was physically going through the phone to remove child pornography. (Mot. Hr'g Tr., 56, Oct. 5, 2016, Doc. 36.)  Downie testified that the video was in the chat stream with the fifteen-year-old-girl conversation; even though it was extracted and even though that chat stream was identified as relevant, Downie believed it was not contraband, so he did not go back and delete the whole chat stream. (*Id*. at 56–57.)  Downie said he did not purposefully leave child pornography on the phone, and, as far as he knew, Agent Soli would have no reason to know that the video was still on the phone. (*Id*. at 57–58.)

Most critically, an email dated August 6, 2016, demonstrates that AUSA Cam Le specifically instructed Agent Soli to return the phone with the child pornography removed. (Gov't Ex. 8E).  Soli intended to comply with those instructions, but they were not carried out due to "an error, inadvertent mistake." (Mot. Hr'g Tr., 230, Sept. 15, 2016, Doc. 49.)  All of this evidence demonstrates that the Government did not intend to give the Defendant his phone with the child pornography on it.[9]

The next irregularity that has a believable explanation is the failure to search other devices.   Agent Soli tried to obtain an omnibus warrant to search other devices, but it was rejected. (Mot. Hr'g Tr., 178–80, Sept. 15, 2016, Doc. 49.)  Soli believed that, even after searching the Defendant's phone and interviewing him, he lacked probable cause to search other devices, particularly since a judge had already denied him once on similar grounds. (*Id.* at 180–83.)  The Court finds Soli's testimony on this issue credible, particularly considering the steps

---

[9] Lastly, it is also worth noting that Downie testified that he has done hundreds of child pornography investigations. (Mot. Hr'g Tr., 76, Oct. 5, 2016, Doc. 36.) Downie stated that he has given the phone back the same day "probably on the order of ten – [ten] to [twelve] times." (*Id*. at 77.)  Thus, the quick return of the phone was not as unusual as the Defendant would argue.

Soli believed he had to take to get probable cause to search the Defendant's phone in the first place. (*See id.* at 213–18.)

Next, there is a reasonable explanation for the long delay between when the Defendant admitted to having the videos (August 2015) and when the Defendant was indicted (May 2016). Agent Soli testified that, in the fifteen or more child pornography cases in which he has been a case agent, some have been the subject of negotiations between the prosecutors and defense attorneys, and some of the negotiations have taken time. (Mot. Hr'g Tr., 222, Sept. 15, 2016, Doc. 49.)  During the period, sometimes he pauses working on the case "to let it work its way out in the legal process." (*Id.*)  To a certain extent, this happened in the Defendant's case. Discussions between defense counsel and the U.S. Attorney's office took place between at least November 2015 (*see* Def. Ex. 11) and February 2016 (*see* Gov't Ex. 8A-7.)  These facts undercut the conclusion that the long delay between the alleged offense and the Indictment is evidence of bad faith on the part of the U.S. Attorney's Office.

The Court also finds that the Government did not act in bad faith in failing to prosecute Ammari.  The Defendant's entire argument on this issue is premised on the claim that the Government was aware of the fact that Ammari distributed the video yet chose not to prosecute him.

But the Court finds insufficient evidence of this.  The Court believes Forensic Examiner Downie's testimony that, during his work on the Defendant's iPhone, Downie did not look at the child pornography video sent by Ammari and did not bring it to Agent Soli's attention. (Mot. Hr'g Tr., 52–53, Oct. 5, 2016, Doc. 36.)  While the Defendant has raised some questions as to Downie's believability on this issue,[10] the Defendant has not rebutted the report Downie

---

[10]  Downie testified that the software did not know what the Ammari video was, so it gave the file a "generic icon." (Mot. Hr'g Tr., 51–53, Oct. 5, 2016, Doc. 36.)  But, as stated above, the Defendant's post-hearing brief points out

prepared. (Gov't Ex. 3.)  In that report, Downie showed that the child pornography video was not

identified during the forensic exam. (Mot. Hr'g Tr., 53–55, Oct. 5, 2016, Doc. 36; Gov't Ex. 3.)

Specifically, page 4 of that report provides a list of the videos that showed up in Downie's

software, and the video Ammari sent (IMG_2343.Mov) did not appear on the list. (Mot. Hr'g

Tr., 56, Oct. 5, 2016, Doc. 36; Gov't Ex. 3.)  The Court also finds Downie's testimony and, most

importantly, page 4 of Gov't Ex. 3 have more weight than Soli's testimony that he had reviewed

the Ammari video at the time. (*See* Mot. Hr'g Tr., 211, Sept. 15, 2016, Doc. 49.)

 The Court also notes that the Indictment alleges that Young obtained both child

pornography videos in 2013 and in 2015 "from an associate in Costa Rica." (Doc. 1 ¶¶ 2, 4.)

When combined with AUSA Le's representations throughout this case, this strongly indicates

that, until the September 15, 2016, hearing, the Government believed that Gomez had sent both

videos to the Defendant, not Ammari.  As a result of all of this, the central premise of the

Defendant's argument that the Government consciously chose not to pursue charges against

Ammari (or even neglected to do so) collapses.

 For all these reasons, some (though not all) of the alleged irregularities in the

investigation of the Defendant have reasonable and believable explanations.  These facts weaken

any inference of misconduct and selective prosecution by the Government.

    **iv.** **Imputing Hattier's Statements to the U.S. Attorneys**

 Fourth, most of Defendant's argument is based on his testimony that Agent Hattier told

him twice that Defendant would not be prosecuted if he cooperated in a public corruption

investigation.  Here, Defendant and Hattier's testimony directly conflicts.  But it is not necessary

---

that the CART extraction report "shows the same 'generic icon' for every video that Mr. Young allegedly
distributed." (Doc. 40 at 12 (citing Def. Ex. 22 at 5, 8, 15, 47, 213, 333, 368, 1111, 1419, 1539, 1552, 1629, 1661,
1662, 1675, 1696, 1711, 1720, and 1740).) The CART extraction report confirms this.

to resolve that conflict since, even if Hattier had made these statements and even if he investigated the Defendant for his lobbying and political association, the Court "will not impute the unlawful biases of the investigating agents to the persons ultimately responsible for the prosecution." *United States v. Hastings*, 126 F.3d 310, 314 (4th Cir. 1997) (citations omitted); *United States v. Hommosany,* 208 F.3d 204 (2d Cir. 2000) (finding that "[i]t was not improper for the District Court to refuse to impute to the ultimate prosecutor the motives of agency investigators" and collecting cases on issue).

The same reasoning applies here. As has been demonstrated throughout this section— and as will be explored in even greater detail in the vindictive prosecution section—there is simply insufficient evidence to prove that the *prosecutors* engaged in any misconduct or selective prosecution. For this additional reason, the Defendant has not rebutted the presumption of good faith.

### v.   AUSA Cam Le's Meeting with Defense Counsel

Fifth, AUSA Cam Le's November 5, 2015, meeting with defense counsel shows a lack of bad faith on her part. Specifically, in the notes from that meeting, Agent Hattier wrote:

> Gibbens [Defendant's counsel] said he felt that the government's decision whether or not to charge Young was being predicated on whether Young could provide any useful assistance on corruption matters. Later in the meeting, Gibbens said he felt like Young was being extorted by the government and that, if the government chose to move forward, they (defense team) would be forced to mount an aggressive defense.

> AUSA Le and Writer [Hattier] disagreed with the attorney's characterization. It was explained to the attorneys that the government felt there was sufficient evidence to charge Young with a crime. The only decision at issue was what statute to charge and how many counts. Young was simply being given an opportunity to help himself by providing useful information; no different from any other criminal defendant.

> AUSA Le explained that some thought had been given to the timing of when to approach Young. Although she had initially considered charging Young first, it

was ultimately decided to serve Young with a target letter so that he could be given an opportunity to cooperate before others knew of his status as a defendant. AUSA Le further indicated that it is fairly rare to issue target letters in child pornography cases.

AUSA Le made it clear that the evidence indicated that Young had possessed and distributed child pornography. The phone data indicated that Young had distributed the videos on over [thirty] separate occasions.

In closing, AUSA Le expressed concern about the strong rhetoric that had already been communicated by Schonekas [another one of Defendant's lawyers]. It was her hope that both sides could remain in contact. Schonekas and Gibbens agreed.

(Def. Ex. 11 at 4-5.)  This document supports the conclusion that the Defendant was being treated the same as other Defendants by being given an opportunity to cooperate rather than the Government acting out of a desire to prevent the Defendant from lobbying or engaging in political association.

### vi.    Evidence of Plea Negotiations

Sixth, the Government submitted records of their plea negotiations with Defense counsel. (Gov't Exs. 8A-1–8A-7.)  Again, these documents account for the relatively long time between the Defendant being caught and the Indictment of the Defendant.

But more importantly, these plea negotiations reflect that the Government was engaged in good faith plea negotiations with the Defendant for an extended period of time.  These plea negotiations, which included a meeting with the U.S. Attorney himself, would be consistent with the Government's stated goals for this Defendant and offense conduct—a felony conviction (*see* Gov't Ex. 10)—but would allow consideration for the unique circumstances of the case (through a lesser crime of obscenity or interstate transmission of obscenity or child pornography). Moreover, even believing the Defendant about Hattier, the last alleged attempt to gain cooperation was in October 2015; these e-mails reflect communications in January and February 2016 in which the Government sought a guilty plea before any Indictment was filed and without

any requirement for cooperation.  These emails are thus consistent with and confirm the

Defendant's own testimony:

> Q:  After October 28th, 2015, which is the last time you had contact with any
> of the FBI Agents, any conversations about resolving the case, did that
> involve a requirement that you cooperate in a public corruption
> investigation?
>
> A:  I don't recall that being a requirement, no.

 (Mot. Hr'g Tr., 54, Sept. 15, 2016, Doc. 49.)  For this and the above reasons, the records of plea

negotiations demonstrate a lack of bad faith on the part of the U.S. Attorneys.

### vii.    Plain Language of the Statute

Seventh, Defendant points to legislative history to support his argument that the

Government acted in bad faith in prosecuting him when he had no sexual interest in the videos,

but the Court finds this argument misplaced.  The Court is not inclined to find that the

Government acted in bad faith (as defined by selective prosecution law) merely by its decision to

enforce the law as clearly and unambiguously written, regardless of what the legislative history

may say. [11]  18 U.S.C. § 2252A(a)(2) provides:

> Any person who . . . knowingly . . . distributes . . . any child pornography that has
> been mailed, or using any means or facility of interstate or foreign commerce
> shipped or transported in or affecting interstate or foreign commerce by any
> means, including by computer . . . shall be punished as provided in subsection (b).

---

[11] This Court notes, by way of analogy, that it is certainly not permitted to deviate from the plain language of a
statute in pursuit of the spirit or legislative intent.  As the Fifth Circuit explained in *Guilzon v. C.I.R.*, 985 F.2d 819,
823 n. 11 (5th Cir. 1993):

> Fifth Circuit law is crystal clear that when, as here, the language of a statute is unambiguous, this
> Court has no need to and will not defer to extrinsic aids or legislative history. *Swearingen v.
> Owens–Corning Fiberglas Corp.,* 968 F.2d 559, 562 (5th Cir.1992). Clear statutory language is
> dispositive. To paraphrase Justice Holmes' oft-quoted statement, we do not inquire what Congress
> meant; we only ask what it said. *See* Oliver W. Holmes, *The Theory of Legal Interpretation,* 12
> Harv. L. R. 417, 419 (1898).

Thus, under the plain, unambiguous language of the statute, there simply is no requirement that Defendant's conduct be driven by the pursuit of sexual gratification in order for Defendant to be guilty of the crime of distributing child pornography.

The Fifth Circuit's pattern jury charges for this crime confirm this interpretation of the statute. These charges provide the following elements for § 2252A(a)(2):

> *First*: That the defendant knowingly distributed a visual depiction, as alleged in the indictment, using any means or facility of interstate or foreign commerce; . . .

> *Second*: That the production of such visual depiction involved the use of a minor engaging in sexually explicit conduct;

> *Third*: That such visual depiction was of a minor engaged in sexually explicit conduct; and

> *Fourth*: That the defendant knew that such visual depiction was of sexually explicit conduct and that at least one of the persons engaged in sexually explicit conduct in such visual depiction was a minor.

*Fifth Circuit Pattern Jury Instructions (Criminal Cases)* § 2.85A (2015). "The word 'knowingly' . . . means that the act was done voluntarily and intentionally, not because of mistake or accident." *Id.* §§ 2.85A, 1.37. Again, sexual gratification is not a requirement.

Even if the Court were to consider further Congressional intent (without a full opportunity for the parties to brief the issue), the Defendant's conclusions are not as clear-cut as he would like. Section 2252A was originally passed as part of the Child Pornography Prevention Act of 1996. Omnibus Consolidated Appropriations Act, 1997, Pub. L. No. 104–208, § 121, 110 Stat 3009 (1997). This provision contained Congressional finds which provided in part:

> Congress finds that—

> (1) the use of children in the production of sexually explicit material, including photographs, films, videos, computer images, and other visual depictions, is a form of sexual abuse which can result in physical or psychological harm, or both, to the children involved;

(2) where children are used in its production, child pornography permanently records the victim's abuse, and its continued existence causes the child victims of sexual abuse continuing harm by haunting those children in future years; . . .

(7) the creation or distribution of child pornography which includes an image of a recognizable minor invades the child's privacy and reputational interests, since images that are created showing a child's face or other identifiable feature on a body engaging in sexually explicit conduct can haunt the minor for years to come . . .

(12) prohibiting the possession and viewing of child pornography will encourage the possessors of such material to rid themselves of or destroy the material, thereby helping to protect the victims of child pornography and to eliminate the market for the sexual exploitative use of children; and

(13) the elimination of child pornography and the protection of children from sexual exploitation provide a compelling governmental interest for prohibiting the production, distribution, possession, sale, or viewing of visual depictions of children engaging in sexually explicit conduct, including both photographic images of actual children engaging in such conduct and depictions produced by computer or other means which are virtually indistinguishable to the unsuspecting viewer from photographic images of actual children engaging in such conduct.

*Id.* §121(1). Many of these considerations appear implicated by this case, and, given the presumption of good faith, the Government's decision appears consistent with Congressional intent. In short, the Defendant's reliance on legislative history as evidence of bad faith is not persuasive.

### viii.    Failure to Cooperate Is Not a Protected Right

Eighth, even if the Court were to accept Defendant's argument that his failure to cooperate in a public corruption investigation was a central ingredient in the Government's decision to prosecute, Defendant would still be unable to meet his burden. As will be explored extensively in the vindictive prosecution section below, a defendant simply has no constitutional right to refuse to cooperate. *See United States v. Goff*, 400 F. App'x 1, 23–24 (6th Cir. 2010) (unreported); *United States v. Long*, 823 F.2d 1209, 1211 (7th Cir. 1987) (per curiam) (citing *Roberts v. United States*, 445 U.S. 552, 100 S. Ct. 1358, 63 L.Ed.2d 622 (1980)). Thus, the

defendant cannot prove that the "the government's discriminatory selection of him for prosecution has been invidious or in bad faith in that it rests upon such impermissible considerations as . . . the desire to prevent his exercise of constitutional rights." *Hoover*, 727 F.2d at 389 (quoting *Greene*, 697 F.2d at 1234).  For this additional reason the Defendant's argument fails.

### ix.     Summary

In sum, considering all the evidence, the Court finds that the Defendant has not met his burden of proving discriminatory purpose.  The Government's conduct may have had the *effect* of interfering with his lobbying and political association, but the Court does not find that the Government acted *from the desire to prevent* the Defendant from exercising these rights. Phrased another way, the prosecutors are not acting with the intent to suppress any protected speech or to prevent any political association.  *See Webster*, 162 F.3d at 335 ("a non-discriminatory explanation for seeking the death penalty against [defendant] is evident on the facts: It is justified by the objective circumstances of the crime and the sufficiency and availability of evidence to prove the required elements under the law. These are the precise considerations the Supreme Court identified as proper and legitimate grounds for such a decision." (citation omitted)). As a result, the motion to dismiss for selective prosecution is denied.

### 3. Legitimate Basis For Prosecuting

As explained above, if the defendant proves discriminatory effect and discriminatory purpose, "the burden shifts to the government to demonstrate a legitimate basis for selecting the defendant for prosecution." *Hoover*, 727 F.2d at 389 (quoting *Greene*, 697 F.2d at 1235).  The Court finds that, even if the Defendant had met its initial burden, the evidence submitted by the

Government—including its general and specific policy directives, the affidavit of Corey Amundson, and the evidence related to the initial response to Ms. Wempren's complaint—shows that the Government had a legitimate basis for selecting the Defendant for prosecution.  On this additional ground, the Defendant's motion is denied.

### B.  Vindictive Prosecution

#### 1. Parties' Arguments

##### a.  Defendant's Original Memorandum in Support (Doc. 11-1)

The Defendant's original brief intermingled the arguments about selective and vindictive prosecution.  These arguments are summarized above and need not be repeated here.

##### b.  Government's Original Opposition (Doc. 12)

The Government asserts that the presumption of vindictiveness arises "only where there exists a 'realistic likelihood of vindictiveness.' " (Doc. 12 at 8 (citation omitted).)  The Government argues that the "presumption is generally inappropriate in the pretrial context." (*Id.* (citation omitted).)

The Government also asserts that "there is nothing inappropriate in a prosecutor's decision to institute charges, even for more severe offenses or more numerous counts, after plea negotiations fail." (Doc. 12 at 8 (citing *United States v. Ruppel*, 666 F.2d 261, 267 (5th Cir. 1982)).)  The Government points the Court to this language from the Fifth Circuit:

> [T]he crucial inquiry . . . is whether the accused was aware of and knew the price of rejecting the bargain . . .  the key to disarming an allegation of vindictiveness is the knowledge and awareness by the accused of the terms of the plea bargain and the price of rejecting the bargain with a plea of not guilty.

(Doc. 12 at 8–9 (quoting *United States v. Mauricio*, 685 F.2d 143, 147 (5th Cir. 1982) (quoting *Ehl v. Estelle*, 656 F.2d 166, 170–71 (5th Cir. 1981))).)  The Government then asserts, "Thus, there is no due process violation where the prosecution has done no more than 'openly present[]

the defendant with the unpleasant alternatives of forgoing trial or facing charges on which he was plainly subject to prosecution.' " (Doc. 12 at 9 (quoting *Bordenkircher v. Hayes*, 434 U.S. 357, 365 (1978)).)  The Government maintains that, because the "defendant was free to, and did, refuse to cooperate and enter a plea, he has no room to complain," and the Government has "every right to charge the defendant with the most serious crimes he committed." (Doc. 12 at 9.)

### c.   Defendant's Post-Hearing Memorandum (Doc. 40)

Defendant argues that he was "not prosecuted because he refused to accept a plea bargain, but because he refused to 'wire up' or otherwise participate in a wholly separate campaign against public officials." (Doc. 40 at 17.)  The Defendant asserts that it is " 'patently unconstitutional' for the government 'to pursue a course of action whose objective is to penalize a person's reliance on his legal rights.' " (Doc. 40 at 17 (quoting *Bordenkircher*, 434 U.S. at 363).)

Here, the Government prosecuted the Defendant "only <u>after</u> he refused to participate in a public corruption investigation, not as part of a plea bargaining process." (Doc. 40 at 17 (emphasis in original).)  The Government's plea negotiations after the fact do not cure the original vindictive decision to prosecute.

The Defendant then explains how the four cases that the Court asked the parties to brief (*see* Doc. 37) all support his position.  Defendant contends that *United States v. Williams*, 47 F.3d 658 (4th Cir. 1995) stated "that courts should defer to prosecutors' decisions because they may 'uncover additional information' while preparing for trial and their 'assessment of the proper extent of the prosecution may not have crystalized,' "; but that is not the case here, argues Defendant, as the "government did not even try to uncover new information from the date of the seizure in August 2015 until the time of indictment in May 2016." (Doc. 40 at 17.)

Similarly, in *United States v. Kent*, 649 F.3d 906 (9th Cir. 2011), *United States v. Long*, 823 F.2d 1209 (7th Cir. 1987), and *United States v. Oliver*, 787 F.2d 124 (3rd Cir. 1986), the "defendants had already been charged before being threatened with enhanced charges.  That is not the case here." (Doc. 40 at 17.)  Defendant asserts, "Most importantly, all of these cases involved requests for cooperation in legitimate investigations related to the defendants' pending charges." (Doc. 40 at 18.)

Defendant argues that, unlike those cases, "this was not a good faith request for cooperation in a related investigation." (Doc. 40 at 19.)  Hattier said there was no open public corruption investigation, and all witnesses in this case said that they were unaware of improprieties by the Defendant in his lobbying activities.

Though case law recognizes that all citizens have a "*duty* to cooperate and report criminal activity, a duty grounded in the responsibilities of community life," the Defendant responds as follows:

> In Mr. Young's case, the government has turned that civic duty on its head. It took a child pornography case that it normally would not have prosecuted and used it to try to force Mr. Young to become a government agent in a fishing expedition for public corruption. When Mr. Young stood up to the government and refused to be extorted, the government vindictively charged him with the distribution of child pornography, which carries a five year mandatory minimum.

(Doc. 40 at 19.)

Additionally, the Defendant argues that, even if no presumption of vindictiveness applies, the Defendant can still prove vindictive prosecution through showing actual vindictiveness. Defendant says he has done so here: "Mr. Young has presented direct evidence that the government had an improper motivation for charging him and that that the government had no interest in pursuing child pornography charges at all until after Mr. Young accused the government of extortion." (Doc. 40 at 19–20.)

136

#### d.  Government's Post-Hearing Brief (Doc. 39)

The Government argues that the Defendant "has presented no evidence that prosecutors acted in order to punish him for standing on his legal rights." (Doc. 39 at 5.)  The Government asserts that, "[a]t the heart of his complaint" is the Defendant's position that he was " 'punished' for refusing to cooperate in an unrelated public corruption investigation." (Doc. 39 at 5.)  But, according to the Government, "courts that have addressed prosecutorial vindictiveness in the context of refusal to cooperate have found no vindictiveness where a prosecutor has brought or increased charges in response to a failure to cooperate." (Doc. 39 at 5.) The Government then cites seven cases from six federal circuits for this proposition.

The Government then argues that, even if this were not the case, the Defendant's claim still fails.  The Defendant's argument is based on imputing the statements of the FBI agents to the prosecutors, but these statements are irrelevant.  The Government states that "courts have been consistent that the actions of investigative agents are not imputed to prosecutors." (Doc. 39 at 6.)  The Government then cites to six cases from four different federal circuits for this proposition.

The Government further says that it did "nothing more than make good on its longstanding representation that [Defendant] would be charged for his crimes, which is plainly permissible. (Doc. 39 at 8 (citing *Bordenkircher*, 434 U.S. at 365).)   The Government says that the Defendant fails to address *Bordenkircher* or the plea negotiations preceding the indictment. The Government shows that the evidence of plea negotiations support their position; "Far from proving a vindictive prosecution, the credible evidence demonstrates a patient prosecution that gave Young multiple opportunities to carefully consider his predicament and options." (Doc. 39 at 8.)  The Government asserts, "In short, the record reveals that Young is not facing any

unfairness; he is simply facing the 'unpleasant alternative' that he chose after his serial rejection of the Government's plea offers." (Doc. 39 at 8.)

The Government also re-asserts that there is no presumption of vindictiveness here.  The Government concludes:

> Quite simply, given the overwhelming evidence that he violated federal laws by repeatedly distributing videos of prepubescent boys engaging in bestiality, judicial intervention should not come into play unless Young can show that he would not have been indicted *but for* the vindictive motive of the prosecutors. [*United States v. Goodwin,* 457 U.S. 368, 380 n. 12, 102 S. Ct. 2485, 73 L .Ed. 2d 74 (1982)]. Clearly, Young has not carried this burden. Consequently, no presumption of vindictiveness can arise, nor can there be shown any evidence of actual vindictiveness, when the doctrine is wholly inapplicable.

(Doc. 39 at 9.)

### e.  Defendant's Response to the Government's Post-Hearing Memorandum (Doc. 45)

The Defendant argues that the Defendant's "case is very different from the cases in which the Government was legitimately seeking cooperation." (Doc. 45 at 7.)  "Here, the government had no reason to believe that Mr. Young had evidence of public corruption or that Mr. Young could assist in a public corruption investigation." (Doc. 45 at 7.)   The prior investigation was closed, and there was no evidence of wrongdoing by the Defendant.  Defendant asserts:

> In response to this evidence, the government has offered *nothing* to suggest that it was seeking Mr. Young's cooperation in a legitimate, pending investigation. Instead, the government was simply attempting to leverage Mr. Young into becoming a government agent: if he could not make a public corruption case against 'someone,' he would be charged with child pornography.  No courts have condoned this type of threat.  Indeed, such threats by the government should be discouraged and punished, because it incentivizes individuals to create 'something' in order to avoid prosecution.

(Doc. 45 at 8.)  The Defendant then distinguished the other cases cited by the Government in its post-hearing memorandum.

The Defendant also asserts that courts consider the "timing of charges and the government's characterization of the strength of its case against the defendant." (Doc. 45 at 9 (citation omitted).)  Here, the Government maintains that the child pornography case was " 'open and shut' from day one," yet it did not charge the Defendant with child pornography until after he refused to cooperate and "accused the government of extorting him." (Doc. 45 at 9.) The Defendant concludes:

> In this case, the government threatened Mr. Young with a child pornography prosecution that it would not ordinarily bring unless Mr. Young could provide "something" about "someone." When Mr. Young refused to play along, the government charged him with the distribution of child pornography, which carries a five-year mandatory minimum. That was a vindictive charging decision, and the indictment should be dismissed.

(Doc. 45 at 9.)

### f.   Government's Reply to the Defendant's Post-Hearing Memorandum (Doc. 47)

The Government argues that each of the cases that the Court encouraged the parties to address found no vindictiveness.  The Government maintains that the Defendant's attempts to distinguish these cases are unpersuasive.  The Court then provides an analysis of each of those cases.

The Government also rejects the Defendant's argument that, in *Kent*, *Williams*, and *Oliver*, those "defendants had already been charged before being threatened with enhanced charges." (Doc. 47 at 9 (citing Doc. 40 at 17).)  The Government responds, "But the subject of cooperation is routinely undertaken before and after indictment and during plea negotiations between the Government and defendants who, like Young, could receive a favorable benefit both in charging decisions as well as sentencing." (Doc. 47 at 9.)  The Government then explains the negative consequences of the Defendant's logic on other defendants:

Indeed, "prompting prosecutors to file the harshest possible charges at the outset would cause prejudice to defendants, for an accused would bargain against a greater charge, face the likelihood of increased bail, and run the risk that the court would be less inclined to accept a bargained plea." Kent, 649 F.3d at 913 (internal quotation marks and brackets omitted). Thus, "[a]llowing prosecutors the leeway at first to withhold more severe charges also spares defendants damage to their reputation that could result from piling on of charges." Id. As explained by the Kent Court, "the prosecutor's latitude to threaten harsher charges to secure a plea agreement advances the interest in avoiding trial shared by the prosecutor, defendant, and public." Id. (citation omitted).

(Doc. 47 at 9–10.)

The Government asserts that, "[u]nlike the prosecutors in Kent, Williams, Oliver, and Long, the prosecutors in this case *never* conditioned any plea offers on Young's cooperation." (Doc. 47 at 10.)  Moreover, the decision to indict was not based on the Defendant's refusal to cooperate. (Doc. 47 at 10 (citing Gov't Ex. 10).)  Once the information provided by Ms. Wempren was corroborated by other evidence, "prosecutors had probable cause to seek federal felony charges and, by way of the target letter and through many discussions with defense counsel, repeatedly expressed the Government's intent to pursue federal felony charges *regardless of his cooperation*." (Doc. 47 at 10 (emphasis in original.)  The Government asserts that there is no evidence that the prosecutors retaliated against the Defendant for refusing to cooperate.

Moreover, even if the Defendant was indicted because he refused to cooperate, the Defendant's vindictive prosecution claim fails.  "After all, '[a] prosecutor, and presumably field officers too, may threaten a defendant with prosecution during an interview or plea negotiations, and if that defendant chooses not to cooperate or plead guilty, the prosecutor is free to initiate a prosecution.' " (Doc. 47 at 10 (quoting *United States v. Lopez*, 474 F.3d 1208, 1212 (9th Cir. 2007)).)  The Government asserts that Kent, *Williams*, *Oliver*, and *Long* as well as the other cases

cited by the Government each "clearly allow such action by prosecutors in the exercise of their broad discretion." (Doc. 47 at 10–11.)

### 2. Analysis

#### a. Standard and Summary of Ruling on This Issue

"To punish a person because he has done what the law plainly allows him to do is a due process violation 'of the most basic sort.' " *United States v. Saltzman*, 537 F.3d 353, 359 (5th Cir. 2008) (quoting *United States v. Goodwin,* 457 U.S. 368, 372, 102 S. Ct. 2485, 73 L. Ed. 2d 74 (1982)). "Thus, a prosecutor may not increase the charge against a defendant solely as a penalty for invoking a right, such as pursuing an appeal." *Saltzman*, 437 F.3d at 359 (citing *United States v. Krezdorn*, 718 F.2d 1360, 1362–65 (5th Cir. 1983) (en banc)). "The defendant has the burden of proving, by a preponderance of the evidence, prosecutorial vindictiveness." *Saltzman*, 437 F.3d at 359 (citing *Krezdorn*, 718 F.2d at 1365). Case law establishes that this can be done in two different ways: "First, a defendant may prove actual vindictiveness by presenting objective evidence that the prosecutor's actions were designed to punish a defendant for asserting his legal rights. Second, in certain circumstances, a defendant may show sufficient facts to give rise to a presumption of vindictiveness." *Saltzman*, 437 F.3d at 359 (citations omitted).

In sum, the Court finds that the Defendant's motion should be denied. First, even if Agent Hattier said everything that the Defendant claims, Hattier's statements are not legally imputed to the prosecutors under the facts of this case. Second, as explained above, the Court has thoroughly reviewed the facts and concludes that the primary reason that prosecutors pursued charges against the Defendant was because they had probable cause that a crime was committed, not to retaliate for a refusal to cooperate or for his exercising any First Amendment rights. And third, even if the Defendant had shown that the U.S. Attorney's Office prosecuted the Defendant

for not cooperating, case law overwhelming demonstrates that there is no vindictive prosecution

for such action under the facts of this case.

### b.  Presumption of Vindictiveness

Concerning the presumption of vindictiveness, "courts will apply [the presumption of

vindictiveness] only where there exists a 'realistic likelihood of "vindictiveness." ' " *Id.* (quoting

*Blackledge v. Perry*, 417 U.S. 21, 27, 94 S. Ct. 2098, 40 L. Ed. 2d 628 (1974)).  An exquisite

analysis of the presumption is not required here, as "a presumption of vindictiveness ordinarily

does not arise pretrial." *Prosecutorial Discretion*, 45 Geo. L.J. Ann. Rev. Crim. Proc. 271, 282–

83 & 278 n. 718 (2016) (collecting cases on this issue); *see also United States v. Goodwin*, 457

U.S. 368, 382, 102 S. Ct. 2485, 2493, 73 L. Ed. 2d 74 (1982) (declining to apply presumption in

a pretrial setting and stating that "[a] prosecutor should remain free before trial to exercise the

broad discretion entrusted to him to determine the extent of the societal interest in prosecution.

An initial decision should not freeze future conduct."); *Bordenkircher*, 434 U.S. at 365, 98 S. Ct.

at 669 (finding that the presumption of vindictiveness should not apply where the prosecution

had done no more than "openly present [ ] the defendant with the unpleasant alternatives of

forgoing trial or facing charges on which he was plainly subject to prosecution."); *Saltzman*, 437

F.3d at 360–61 (discussing how *Bordenkircher* and *Goodwin* cautioned against applying the

presumption in a pretrial setting and finding no presumption when the Government filed a

superseding indictment adding additional charges against the Defendant after he withdrew his

guilty plea); *United States v. Koh*, 199 F.3d 632, 639 (2d Cir. 1999) ("We have previously held

that the presumption of prosecutorial vindictiveness generally does not arise in the pretrial

setting." (citations omitted));  *United States v. Williams*, 47 F.3d 658, 662 (4th Cir. 1995)

(relying on *Goodwin* for the proposition that "In the pretrial situation, then, a defendant must

142

show that a prosecutor's decision to bring more severe charges against him was motivated by actual vindictiveness.").

By way of example, in *United States v. Stenger*, 605 F.3d 492 (8th Cir. 2010), the defendant "was originally charged in a single count indictment with bank robbery and use of a dangerous weapon." (*Id.* at 498). The Government and defendant engaged in plea negotiations, but the "government made clear . . . that it believed [defendant] qualified as a career offender and would be subject to a mandatory life imprisonment if the government filed a three-strikes notice." *Id.* The government told the Defendant it intended to file the notice "if the parties did not reach an agreement." *Id.* The plea negotiations failed, and the government filed additional charges and sought the mandatory life sentence.

The Eight Circuit rejected the Defendant's argument that he was vindictively prosecuted. The appellate court explained:

> Under any standard of review, however, [defendant's] argument fails. "There is no due process violation when a defendant is openly presented with the 'unpleasant alternatives of forgoing trial or facing charges on which he was plainly subject to prosecution.' " *Luna v. Black*, 772 F.2d 448, 449–50 (8th Cir. 1985) (quoting *Bordenkircher v. Hayes*, 434 U.S. 357, 365, 98 S. Ct. 663, 54 L. Ed. 2d 604 (1978)). Nothing more happened here. [Defendant] was plainly subject to additional charges, and he accepted the risk that he would face a lengthier sentence if he chose not to plead guilty. The government's frank assertion that it would file a § 3559 notice if the parties did not reach an agreement was not, as Knutson alleges, an improper threat. *Cf.* [*United States v. Campbell*, 410 F.3d 456, 462 (8th Cir. 2005)] ("An example of objective evidence of a vindictive motive would be a prosecutor's statement that he or she is bringing a new charge in order to dissuade the defendant from exercising his or her legal rights."). Rather, it was precisely the kind of candid disclosure of the government's bargaining position that is permissible in the context of plea negotiation. [Defendant] has produced no objective evidence that the government acted with an improper or vindictive motive.

*Stenger*, 605 F.3d at 498–99. The Eighth Circuit thus found no error in the district court's refusal to dismiss the three-strikes notice and superseding indictment.

All of these cases demonstrate that the presumption of vindictiveness is generally not to be applied in the pretrial context, and the Defendant has failed to show why an exception is warranted in this case.

### c.   Actual Vindictiveness

Thus, the Defendant must "prove actual vindictiveness by presenting objective evidence that the prosecutor's actions were designed to punish a defendant for asserting his legal rights." *Saltzman*, 437 F.3d at 359 (citations omitted).  The Defendant must prove that the prosecutor's actions were done "solely to 'penalize' [him] and could not be justified as a proper exercise of prosecutorial discretion." *Goodwin*, 457 U.S. at 380 n. 12, 102 S. Ct. at 2492.  Young "must present objective evidence that the government acted solely to punish him for exercising his legal rights, and that the reasons proffered by the government are pretextual." *Saltzman*, 537 F.3d at 364 (citing *United States v. Dorsey*, 512 F.3d 1321, 1325–26 (11th Cir.2008).  "A finding of 'actual vindictiveness requires "direct" evidence, such as evidence of a statement by the prosecutor . . .' " *Saltzman*, 537 F.3d at 364 (quoting *United States v. Johnson*, 221 F.3d 83, 94 (2nd Cir. 2000)); *see also Stenger*, 605 F.3d at 498–99 ("An example of objective evidence of a vindictive motive would be a prosecutor's statement that he or she is bringing a new charge in order to dissuade the defendant from exercising his or her legal rights." (quoting *Campbell*, 410 F.3d at 462)).

Here, the Court finds that the Defendant has failed to satisfy his burden of showing actual vindictiveness.  First, Agent Hattier's alleged statements do not show vindictiveness by the federal prosecutors. Second, there is insufficient evidence to demonstrate that the United States Attorney's Office for the Middle District of Louisiana acted to punish the Defendant for

exercising his legal rights.  And third, even if the Defendant had demonstrated that he was prosecuted for the failure to cooperate, overwhelming case law shows that this is permissible.

### i.  Agent Hattier's Statements Do Not Prove Vindictiveness

As stated above, the Defendant's case appears to hinge on his claim that Agent Hattier told him "whatever's on that phone does not have to become public if you cooperate with us in a public corruption investigation" and "we can make this go away if you cooperate." (Def. Ex. C.)

The Court rejects this argument.  Even assuming that Agent Hattier had made these statements (and the Court makes no such finding), the Government is correct that a considerable body of case law supports the conclusion that prosecutors are generally not accountable for the actions of federal investigators. *See*, *e.g., United States v. Gilbert*, 266 F.3d 1180, 1187 (9th Cir. 2001) ("We agree with the district court that [Defendant's] allegations of misconduct on the part of the IRS are not relevant to his claim of vindictive prosecution. In all but the most extreme cases, it is only the biases and motivations of the prosecutor that are relevant.").

In *Koh*, the Second Circuit explained that, to prove actual vindictiveness, the defendant must prove "(1) the prosecutor harbored genuine animus toward the defendant, or was prevailed upon to bring the charges by another with animus such that the prosecutor could be considered a 'stalking horse,' and (2) he would not have been prosecuted except for the animus." 199 F.3d at 640 (citation omitted).  Thus, in *Koh*, the Second Circuit found no abuse of discretion in the district court's conclusion that the defendant failed to show that a corporation's receiver "prevailed upon the U.S. Attorney's Office to seek an indictment[.]" *Id*. (citing *United States v. Monsoor*, 77 F.3d 1031, 1035 (7th Cir.1996) (defendant must show that the investigating agency in some way ultimately prevailed upon the prosecutor making the decision to seek an indictment).  "[E]ven if we were to assume that [the receiver] was a quasi-investigator for 'the

government,' there was no evidence that the decision to prosecute was the result of his allegedly improper motives." *Id.*

Similarly, in *United States v. Monsoor*, 77 F.3d 1031 (7th Cir. 1996), the defendant presented evidence that related "solely to the alleged vendetta of the Wisconsin Department of Natural Resources." *Id.* at 1034.  Defendant "presented no evidence suggesting that the United States Attorney or any of her assistants harbored animus against him or acted with vindictive motives in pursuing the prosecution," and he admitted as such. *Id.* at 1034–35.  Rejecting the defendant's claim, the Seventh Circuit stated:

> But the animus of a referring agency is not, without more, imputed to federal prosecutors. A defendant must show that the ill will, whoever its bearer, actually motivated his prosecution. Thus, to connect the animus of a referring agency to a federal prosecutor, a defendant must establish that the agency in some way prevailed upon the prosecutor in making the decision to seek an indictment.

*Id.* at 1035.  After looking at other cases, the Seventh Circuit concluded, "[defendant] has submitted no evidence suggesting that the DNR agents, whether or not ill-inclined toward [defendant], prevailed upon the United States Attorney in her decision to indict him for violating the Lacey Act." *Id.*

Each of these cases demonstrate that, as a general rule, the conduct of investigators is not imputed on the prosecutors.  Even assuming that Agent Hattier said what Defendant claims (and, again, the Court makes no finding as to whether he did), there is no evidence that the FBI "prevailed upon" the prosecutor to ultimately make the decision to seek the indictment or that he or she was the "stalking horse" of the FBI.  Thus, even if Hattier had said what the Defendant claims, this would not be enough to warrant dismissal for vindictive prosecution.

146

ii.     **Insufficient Evidence of Misconduct by the United States Attorney's Office**

In an attempt to connect the dots with Agent Hattier, the Defendant argued that AUSA Cam Le vindictively prosecuted the Defendant based on the following:

> (1) AUSA Le brought Agent Hattier—who is not a child pornography investigator—into the case in the first place; (2) AUSA Le and Agent Hattier, together, told Mr. Young's counsel on November 5, 2015 that Mr. Young's phone was 'only' being reviewed for the transmission of child pornography, when it clearly wasn't; and (3) the child pornography case was closed and converted to a public corruption matter <u>while the U.S. Attorney's Office was involved</u>.

(Doc. 45 at 2 (emphasis in original).)  The Court disagrees.

The Court has thoroughly reviewed the record and considered the evidence, and the Court concludes that the federal prosecutors did not act to punish the Defendant for refusing to cooperate in a public corruption investigation or for asserting any legal right.  Again, the primary reason the U.S. Attorneys acted was because they had probable cause to believe that the Defendant committed the crimes with which he is charged.

The Court bases this decision on the same findings set forth above in the selective prosecution section.  The Court will not repeat those findings in detail here; but, to briefly summarize, the Court bases its decision on the following:

> (1) The fact that the Defendant's prosecution is consistent with the U.S. Attorney Manual and the policies for the U.S. Attorney's Office for the Middle District of Louisiana, as confirmed by Amundson's declaration and the Middle District of Louisiana Prosecution Guidelines for the United States Attorney's Office (July 2014);
>
> (2) The U.S. Attorney's Office's initial investigation of Wempren's complaint;
>
> (3) The reasonable explanation for many of the irregularities in the FBI's investigation;
>
> (4) The record of AUSA Cam Le's initial meeting with defense counsel, which demonstrates that the Defendant was given an opportunity to cooperate like typical defendants, not that the Government was seeking to punish him for asserting his rights;

147

(5) The emails documenting plea negotiations between the Government and defense counsel, which show that the Government was negotiating in good faith and without any requirement that the Defendant cooperate in a public corruption investigation; and

(6) The fact that this prosecution is consistent with the clear and unambiguous language of the criminal statute at issue.

For all of these reasons, the Court finds that the Defendant has failed to satisfy his very heavy burden of proving actual vindictiveness; that is, the Defendant has failed to prove that the Government acted to punish the Defendant for asserting a legal right.

### iii.   Overwhelming Case Law Demonstrates that the Defendant's Motion Should Be Denied.

As demonstrated above, a thorough review of the evidence supports the conclusion that the Defendant has failed to satisfy his burden on this issue.  Nevertheless, even assuming that the Defendant had demonstrated that the Government prosecuted him for his refusal to cooperate, considerable case law in this circuit and others supports the conclusion that the Government did not act impermissibly or vindictively in this case.  For this additional reason, the Defendant's motion is denied.

In *United States v. Mauricio*, 685 F.2d 143 (5th Cir. 1982), the Fifth Circuit held that "the imposition of felony charges after a defendant chooses to plead not guilty to a misdemeanor does not violate the Constitution." *Id*. at 144. The appellate court discussed at length *Goodwin*, *Bordenkircher*, and other Fifth Circuit case law.  Quoting from *Ehl v. Estelle*, 656 F.2d 166 (5th Cir. 1981), the Fifth Circuit emphasized:

[T]he crucial inquiry . . .  is whether the accused was aware of and knew the price of rejecting the bargain . . . the key to disarming an allegation of vindictiveness is the knowledge and awareness by the accused of the terms of the plea bargain and the price of rejecting the bargain with a plea of not guilty.

*Mauricio*, 685 F.2d at 146 (quoting *Ehl*, 656 F.2d at 170-71). "The prosecutor . . . should be able to carry through with any expressed promises made if the accused persists in a plea of not guilty." *Id.* (quoting *Ehl*, 656 F.2d at 171). *Mauricio* also interpreted *United States v. Ruppel*, 666 F.2d 261 (5th Cir. 1982), stating "Ruppel interprets Bordenkircher as permitting a prosecutor, after the unsuccessful attempt to negotiate a guilty plea, to charge more severe or numerous offenses. It largely removes the vindictive prosecution claim in pre-trial skirmishes between defense counsel and prosecution." *Mauricio*, 685 F.2d at 147.

*Mauricio* is important for several reasons. First, it provides an overview of how the Fifth Circuit has interpreted and applied *Bordenkircher*. Second, it demonstrates the high burden that defendants generally need to meet to prevail on these claims in the pretrial setting. Third, it articulates the standard to be applied: the question is whether the Defendant was aware of and knew of the price of rejecting the plea bargain and rejected it freely.

Here, the Defendant has failed to satisfy that standard. Even assuming that the prosecutors had threatened Defendant with prosecution if he failed to cooperate (which they did not), the Defendant has failed to show how he would prevail under the *Bordenkircher* standard. For this reason, the Defendant's claim fails.

Additionally, numerous circuits have recognized that the Government may bring or increase charges when a Defendant refuses to cooperate. These cases have done so in different contexts and by emphasizing different things, but the results have been the same and warrant the same result here.

First, a vindictive prosecution claim requires the defendant to prove that "the prosecutor's actions were designed to punish a defendant for asserting his legal rights," *Saltzman*, 437 F.3d at 359 (citations omitted), and, as stated above, several cases have held that a defendant has no

legal right not to cooperate  In *United States v. Goff,* 400 F. App'x 1 (6th Cir. 2010) (unreported), the Sixth Circuit rejected the Defendant's argument "that the Government acted vindictively by prosecuting him based on his general refusal to cooperate with authorities (presumably by refusing to cooperate against his co-conspirators in exchange for a plea deal)[.]" *Id.* at 24.  The Sixth Circuit held that the defendant failed to exercise a protected right. *Id.* (citations omitted).

Similarly, in *United States v. Long*, 823 F.2d 1209 (7th Cir. 1987) (per curiam), the defendant sold cocaine to undercover FBI agents and was arrested in 1985. *Id.* at 1210.  The FBI sought "to obtain [defendant's] cooperation in investigating allegations that [defendant] had bribed police officers of Chicago to allow him to continue his drug business." *Id.*  With authorization from the U.S. Attorney's Office, FBI agents told the defendant that, if he cooperated, the charges for his drug sales were "negotiable" and that a forfeiture action would be dropped. *Id.*  Defendant claimed he was ignorant of any corruption and that he "would be killed if he did cooperate." *Id.*  After rejecting the plea, the defendant began serving a prior sentence. *Id.* The agents visited him in jail and told him they would "talk to" the U.S. Attorney "to see what could be done" about the 1985 charges. *Id.*  Defendant refused again and was indicted for the 1985 sales.

In rejecting the Defendant's claim of vindictive prosecution, the Seventh Circuit explained that there was no right to refuse cooperation.  The appellate court stated that the "constitutional protection [against vindictive prosecution] kicks in only when the government acts in response to the defendant's exercise of a protected right." *Id.* at 1211.  The Sixth Circuit then wrote:

> This realization sinks both of Long's claims of prosecutorial vindictiveness, because of *Roberts v. United States,* 445 U.S. 552, 100 S. Ct. 1358, 63 L. Ed. 2d 622 (1980). *Roberts* holds that a district court may properly consider, when imposing sentence, a defendant's refusal to cooperate. The Court found that, far

> from having a right not to cooperate, every citizen has a *duty* to cooperate and
> report criminal activity, a duty grounded in the responsibilities of community life.
> *Id.* at 558, 100 S. Ct. at 1363. Long claims that he was treated adversely because
> he refused to cooperate; *Roberts* says that the government may penalize such a
> refusal, and so under *Goodwin* and *Bordenkircher* there is no due process
> violation.

*Id.* The appellate court concluded, "there could be prosecutorial vindictiveness only if his refusal resulted in treatment harsher than would have occurred if the government had not sought his assistance. [Defendant] has not offered to prove that he was disadvantaged to such an extent." *Id.* at 1212.

Again, the Court finds these cases fatal to the Defendant's case. Even if the prosecutors pursued charges against the Defendant for not cooperating (which the Defendant has failed to prove), if there is no protected right not to cooperate, then the Defendant cannot show vindictive prosecution.

But, putting these cases aside and assuming that the Defendant were not automatically barred from such a claim, other courts that have rejected vindictiveness claims after a failure to cooperate have emphasized *Bordenkircher*, the freedom of the Defendant to accept or reject the offer, and the fact that prosecutors had probable cause to pursue the charges. Given the importance of this case, the Court will review these cases in detail.

In *United States v. Paguio*, 114 F.3d 928 (9th Cir. 1997), a husband and wife were indicted for making false statements to a bank to influence action on a loan application. *Id.* at 929–30. The loan application had falsely reported the couple's income. *Id.* at 930. The husband worked in the computer room of another bank and was under investigation because the bank had processed a counterfeit computer tape that lead to a $70 million dollar funds transfer to a foreign bank. *Id.* The husband had handled the tape last, so the FBI thought he had knowledge about the theft. *Id.* The husband did not provide any useful information. *Id.* The FBI investigated the

151

husband's financial situation and learned about the loan and "other evidence that [the husband] and his fiancée were not as financially secure as the loan application suggested." *Id.* The Ninth Circuit then stated that the "United States Attorney ultimately indicted [the husband and wife] in order to pressure [the husband] to tell what the government suspected he knew about the computer theft." *Id.*

The wife claimed vindictive prosecution. The Ninth Circuit rejected the argument, explaining:

> It is a nasty business to indict two people, in order to use the pressure to make one of them talk about an entirely different matter. But it is not what the precedents call "vindictive prosecution." Vindictive prosecution occurs when the government "penalize[s] a person merely because he has exercised a protected statutory or constitutional right." *People of Territory of Guam v. Fegurgur,* 800 F.2d 1470, 1472 (9th Cir. 1986); *see also Adamson v. Ricketts,* 865 F.2d 1011, 1017 (9th Cir. 1988). There is no constitutional right not to "snitch." *See United States v. Gardner,* 611 F.2d 770, 773 (9th Cir. 1980).
>
> [The wife] showed that she was indicted to pressure her fiancee to talk. We can find no precedent for the proposition that prosecution is "vindictive" when used to pressure a spouse, so long as "the prosecutor has probable cause to believe a defendant committed a crime." *See United States v. Duran,* 41 F.3d 540, 544 (9th Cir. 1994). The government may indict, even if its motive is to get cooperation in another case, *United States v. Gardner,* 611 F.2d 770, 773 (9th Cir. 1980), where the government has probable cause. Here the government had [the husband's] and [wife's] signatures on a loan application which was plainly and demonstrably fraudulent, seeking to borrow $200,000 which their present circumstances would not enable them to repay. Indicting them for this crime was not vindictive, even though the prosecution had an ulterior motive.

*Id.*

The same reasoning applies here. Even if the prosecutors pursued charges against the Defendant for failing to cooperate in another unrelated case, this is not a protected right. Even more importantly, the Government still had probable cause that the Defendant committed the crimes for which he was indicted. Under *Paguio*, the Defendant cannot prevail.

152

In *United States v. Williams*, 47 F.3d 658 (4th Cir. 1995), the Fourth Circuit examined the issue of "whether a state prosecutor, in the context of plea negotiations, can threaten a criminal defendant with a more severe federal prosecution if the defendant refuses to plead guilty to the state charges and to cooperate with the police." *Id.* at 659. There, the defendant was charged in state court of two counts of distributing crack cocaine, and the prosecutor threatened to refer the defendant to federal authorities if he did not plead guilty and agree to cooperate. *Id.* The federal crime carried a greater mandatory minimum sentence. *Id.* Concerning the level of cooperation, "the state would expect Williams to make several undercover drug purchases, to testify before grand juries and in open court, and to disclose all information of any criminal activities known to him." *Id.*

After the defendant refused and was indicted by a federal grand jury, the district court dismissed the indictment on the grounds of vindictive prosecution. *Id.* at 660. The court reasoned that the Defendant had a right to refuse to cooperate with police, and, by referring the case to federal authorities, the state prosecutor retaliated against him. *Id*.

The Fourth Circuit reversed. The appellate court explained:

It follows from *Bordenkircher* and *Goodwin* that a prosecutor, in the context of plea negotiations, may threaten a defendant with a more severe prosecution and carry out those threats if the defendant refuses to cooperate with the police in the criminal investigation of another person. A defendant's cooperation with the police is a legitimate concession for a prosecutor to seek during plea negotiations. Although the prosecutor may not retaliate against a defendant for exercising a legal right, in the give-and-take of plea bargaining, there is no element of retaliation as long as the defendant is free to refuse the government's demand of cooperation with the authorities. *See Bordenkircher,* 434 U.S. at 363, 98 S. Ct. at 667. Although a defendant has the right not to cooperate, a prosecutor may pressure a defendant to waive that right by threatening a more severe indictment. The right not to cooperate is certainly no more important than the right of an accused to a trial, and yet the Supreme Court has allowed prosecutors, during plea negotiations, to use the threat of a harsher indictment to pressure a defendant to plead guilty and thus waive his right to trial. *Id.* at 365, 98 S. Ct. at 669. If it is constitutionally permissible to use the threat of more severe punishment to

153

encourage a guilty plea, certainly it is legitimate to use the same tactics to encourage a defendant to cooperate with the authorities in the criminal investigation and prosecution of another.

A prosecutor's threat to bring a more severe indictment if the defendant refuses to cooperate does not amount to vindictiveness as long as the defendant, should he refuse to cooperate, is not treated worse than he would have been if no plea bargain had been offered. *See United States v. Long,* 823 F.2d 1209, 1211 (7th Cir. 1987) (citing *Bordenkircher,* 434 U.S. at 360-61, 98 S. Ct. at 666-67). However, a prosecutor in the pretrial setting should not be locked into the charges in his initial indictment, which might not represent the extent to which an individual is subject to prosecution. *Goodwin,* 457 U.S. at 382, 102 S. Ct. at 2493. Just as a prosecutor may forego legitimate charges in an effort to obtain the defendant's cooperation, a prosecutor may seek a more severe indictment if an initial expectation that the defendant would cooperate proves unfounded. *See id.* at 380, 102 S. Ct. at 2492. Thus, a court should not presume vindictiveness where a prosecutor decides to bring more severe charges against a defendant who has refused to cooperate, even if the prosecutor is carrying out a threat made in plea negotiations. *See id.* at 381-82, 102 S. Ct. at 2492-93.

*Id.* at 662–63. The Fourth Circuit concluded that the Defendant failed to show prosecutorial vindictiveness because:

[T]he decision to seek a more severe indictment did not create the apprehension of a retaliatory motivation on the part of the state. In the context of plea bargaining, a prosecutor may legitimately threaten a more severe indictment in order to pressure a defendant to plead guilty and to cooperate with the police.

*Id.* at 663.

The same reasoning again applies. The Defendant has failed to show that he was treated worse than he otherwise would have been had no offer to cooperate been made. For this additional reason, the Defendant's motion fails.

In *United States v. Oliver*, 787 F.2d 124 (3d Cir. 1986)**,** also cited by *Williams*, the Defendant argued on appeal that he was "the victim of prosecutorial vindictiveness when, as the result of his failure to cooperate with state authorities, his pending state firearms charge became the subject of a federal indictment." *Id.* at 124-25. The Third Circuit found the Defendant's argument meritless and affirmed. The appellate court explained:

154

> Since [defendant] Oliver's theory of the case is that he was prosecuted by federal authorities solely because he failed to cooperate satisfactorily with the Philadelphia Police in the plea bargaining process, this case is governed by *Bordenkircher.* It is not disputed that defendant's attorney, Mr. Alva, discussed with Mr. Oliver the decision that confronted him and explained the ramifications of each of his choices. Oliver made an informed decision not to cooperate fully with the police in the Luckett homicide investigation, though he did succeed in getting his state charges dropped. Thus, under the reasoning of *Bordenkircher,* there was no prosecutorial vindictiveness, for Oliver was fully informed of the consequences of his choices; he freely decided not to cooperate to a greater extent with the local authorities and, as a result, was later indicted by federal authorities.

*Id.* at 126 (footnote omitted).  The appellate court also explained that the defendant "failed to establish that he was prosecuted because he failed to cooperate with state authorities." *Id.*

In *United States v. Boss*, 652 F.2d 36 (10th Cir. 1981), the defendant was convicted of theft of liquor moving in interstate commerce. *Id.* at 37.  "Federal authorities wanted to obtain evidence that the local sheriff was crooked and involved in this criminal activity.  Defendant and his son were both asked to give evidence for the prosecution, and in informal discussions were told they would be prosecuted if they failed to cooperate." *Id*.  The Defendant and his son refused to cooperate and then claimed selective and vindictive prosecution.  *Id.*  In rejecting their arguments, the appellate court explained:

> As explained in *Bordenkircher* . . . , the due process violation in [selective and vindictive prosecution cases] lies not in the possibility that a defendant might be deterred from the exercise of a legal right, but rather in the danger that the state might be retaliating against the accused for conduct that the law plainly allows. *Id*. at 363, 98 S. Ct. at 667. The Supreme Court held that "in the 'give-and-take' of plea bargaining, there is no such element of punishment or retaliation so long as the accused is free to accept or reject the prosecution's offer." *Id*. The Court pointed out that the discouragement of a defendant's exercise of his trial rights is an inevitable attribute of any legitimate system that tolerates and encourages the negotiation of pleas. *Id*. at 364, 98 S. Ct. at 668. [Defendant] apparently wanted more here than the prosecution was willing to offer for his testimony. No evidence is presented to show that Boss was not given a free choice in accepting or rejecting the prosecution's offer; nor is there any suggestion that the prosecutor lacked probable cause to believe Boss had committed the charged crime.
>
> What happened in this case is no different from most situations in which prosecutors seek information to convict principals in crime by offering

> coconspirators immunity or leniency in return for testimony. When the party
> refuses to cooperate, [the] prosecution, based upon probable cause to believe the
> defendant committed the crime charged, does not present the likelihood of
> vindictiveness found in *Perry* and related cases. *See United States v. Gardner*,
> 611 F.2d 770 (9th Cir. 1980). We find no selective prosecution in these
> circumstances.

*Id.* at 38.

*United States v. Gardner*, 611 F.2d 770 (9th Cir. 1980) also considered the same issues.

In *Gardner*, after the defendant was indicted on three counts of tax evasion, the government

attempted to secure a plea bargain. *Id.* at 772.  The Ninth Circuit wrote:

> The Government offered to abandon plans to seek a second indictment against
> [defendant] on charges of filing false statements to secure loans and to dismiss
> two counts of the original indictment if [defendant] pleaded guilty to one count of
> tax evasion and cooperated with the Government in another criminal investigation
> involving other suspects. [Defendant] rejected the offer.

*Id.* at 773.  After the defendant was convicted of all three counts of tax evasion, the Government

obtained another indictment against the Defendant alleging filing false statements. *Id.*  The

defendant argued that the government burdened, among other things, his right "to refuse to

cooperate with the criminal investigation." *Id.*

The Ninth Circuit explained how, in *Bordenkircher*, the "Supreme Court held that, so

long as the defendant was free to accept or reject the offer, the prosecutor could lawfully present

the defendant with the alternatives of pleading guilty or facing charges on which he was plainly

subject to prosecution." *Id.* (citing *Bordenkircher*, 434 U.S. at 363–65, 98 S. Ct. 663).  The Ninth

Circuit concluded:

> [Defendant] does not assert that the Government had no probable cause to
> prosecute him on the charges of filing false statements, and it is clear that
> [Defendant] was free to accept or reject the offer proposed by the Government in
> plea bargaining. Consequently, in light of *Bordenkircher*, we must reject
> [Defendant's] contention that the Government's offer unlawfully impinged upon
> Gardner's right to plead not guilty and stand trial. Similarly, the Government

156

could lawfully seek to induce Gardner to cooperate in another criminal investigation.

*Id.* (citations omitted).

Thus, *Oliver*, *Boss*, and *Gardner* each stand for the position that, as long as the Defendant was fully informed of the consequences of his choices and freely decided not to cooperate, there is no vindictiveness. The Defendant has not shown that his vindictiveness claim survives this standard, and, for this additional reason, it fails.

To summarize this jurisprudence, the Court finds that, even if the Defendant had proven that the prosecutors pursued charges against him for a refusal to cooperate (which Defendant has not shown), for any of the above reasons—because there is no right not to cooperate, because the prosecutors had probable cause that he committed the crimes charged in the Indictment, because he was not treated worse than he would have been if no plea bargain had been offered, or because he was fully informed of the consequences of his choices yet freely decided not to cooperate to a greater extent with the authorities—the Defendant has failed to show that he was vindictively prosecuted. For these reasons, the Defendant's motion fails.

The Court provided the Defendant with citations to *Williams*, *Oliver*, *Long*, and another Ninth Circuit case before post-hearing briefs were due (Doc. 37) because the Court found these cases in preparing for the hearing in this matter and believed that they were fatal to the Defendant's case. Defendant has responded that these cases all involved "legitimate," "actual," or "related" investigations or that the prosecutors in these cases sought cooperation during (as opposed to before) plea negotiations. Defendant thus claims these cases are distinguishable.

The Court rejects these arguments. Though the Defendant has attempted to distinguish these and the Government's cases, it has provided no authority that would so limit the Government's otherwise permissible ability to negotiate for cooperation. To the contrary, the

cases appear to support the opposite conclusion. *See Paguio*, 114 F.3d at 930 (finding no vindictiveness in indicting a spouse of one crime to pressure her husband to talk in an unrelated matter, provided there is probable cause to believe the defendant committed the crime); *Williams*, 47 F.3d at 659–60 (finding no vindictive prosecution when the prosecutors had sought the Defendant's cooperation "to make several undercover drug purchases, to testify before grand juries and in open court, *and to disclose all information of any criminal activities known to him.*" (emphasis added)); *Long*, 823 F.2d at 1210 (no vindictiveness when prosecution pursued charges after defendant charged with drug crimes refused to cooperate in public corruption investigation); *Gardner*, 611 F.2d at 773 (finding no vindictiveness after Defendant refused to cooperate "in another criminal investigation involving other suspects").  Without any case law supporting Defendant's position, these appear to be distinctions without a difference.

In sum, the Defendant has failed to satisfy his burden on the vindictive prosecution claim. Agent Hattier's alleged statements, even if made, cannot be attributed to the prosecutors in this case.  Moreover, the Defendant failed to provide sufficient evidence to demonstrate that the prosecutors acted to punish the Defendant for exercising his legal rights.  And, perhaps most importantly, the clear weight of case law supports the conclusion that the Defendant cannot prevail in this case.

**V.**     **Conclusion**

Accordingly,

**IT IS ORDERED** that the Motion to Dismiss for Selective and Vindictive Prosecution

(Doc. 11) by Defendant Christopher G. Young is **DENIED**.

Signed in Baton Rouge, Louisiana, on <u>February 6, 2017</u>.


_____
**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

159